Martis Ann Alex (SBN 77903)
Daniel R. Leathers (*pro hac vice anticipated*)
Brian R. Morrison (*pro hac vice anticipated*)
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
malex@labaton.com
dleathers@labaton.com
bmorrison@labaton.com

Steve W. Berman (*pro hac vice anticipated*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

*Counsel for Plaintiffs*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| RICHARD DRAEGER, LAIMA ZBOJNIEWICZ, STANLEY AND JANET NEILL, ZORAN AND DOREEN BAISCH, BERNICE WIMLEY, JASON SHAPIRO, HOWARD REE, DANIEL CHESLER, ESTHER MYAPE REYES, NEIL STEVENS, MATTHEW KANG, JORDON MIKELAITIS, BRUCE GOLDSTONE, SCOTT GOLDSTONE, TIMOTHY SCHOENFELD, NICHOLAS MESSINA, JOHNNY HERNANDEZ , KEVIN SISTI, JR., JEFFREY SANDLER, MICHELLE SMITH, JANINE LOVUOLO, HELEN CIANGIULLI, JUDITH SHANE, JOHANA GARCIA, MARK PASTARNACK, and JOHN LEE, on behalf of themselves and those similarly situated | **Case No.:** <br><br> **CLASS ACTION COMPLAINT** <br><br><br> **DEMAND FOR JURY TRIAL** |
| Plaintiffs, | |
| vs. | |

1    TOYOTA MOTOR SALES, U.S.A.,
INC.; CALTY DESIGN RESEARCH

2    INC.; FORD MOTOR COMPANY;
NISSAN NORTH AMERICA, INC.;

3    NISSAN DESIGN AMERICA INC.;
AMERICAN HONDA MOTOR CO.,

4    INC.; HONDA R&D AMERICAS
INC.; FCA US LLC; GENERAL

5    MOTORS COMPANY; BMW OF
NORTH AMERICA, LLC;

6    DESIGNWORKS USA, INC.;
VOLKSWAGEN GROUP OF

7    AMERICA, INC.; BENTLEY
MOTORS, INC.; MERCEDES-BENZ

8    USA, LLC; MERCEDES-BENZ
RESEARCH & DEVELOPMENT

9    NORTH AMERICA, INC.;  HYUNDAI
MOTOR AMERICA, INC.; HYUNDAI

10    AMERICA TECHNICAL CENTER,
INC.; and KIA MOTORS AMERICA,

11    INC.,

12                  Defendants.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION ...................................................................... 1

II.    PARTIES ................................................................................... 11

    A.    Plaintiffs ........................................................................ 11

    B.    Defendants .................................................................... 33

III.    JURISDICTION ......................................................................... 44

IV.    VENUE ..................................................................................... 44

V.    FACTUAL ALLEGATIONS ....................................................... 44

    A.    The Keyless Fob ............................................................ 45

    B.    The Keyless Fobs Lead to Carbon Monoxide Poisoning Without Automatic Shut-off ......................................... 46

    C.    The Automakers had Actual Knowledge of the Dangerous Carbon Monoxide Poisoning Consequences of Vehicles with Keyless Fobs that lack an Automatic Shut-off ................. 65

    D.    The Automakers Should Have Known of the Dangerous Carbon Monoxide Poisoning Consequences of Vehicles with Keyless Fobs but without an Automatic Shut-off ........................................... 70

    E.    An "Auto-Off" Mechanism or System is Feasible ............................ 73

VI.    FRAUDULENT CONCEALMENT ALLEGATIONS ................................ 75

VII.    TOLLING OF THE STATUTE OF LIMITATIONS ................................. 78

    A.    Fraudulent Concealment Tolling ....................................... 78

    B.    Estoppel ........................................................................ 78

    C.    Discovery Rule .............................................................. 79

VIII.    CLASS ACTION ALLEGATIONS .................................................. 79

    A.    Numerosity & Ascertainability ......................................... 81

    B.    Typicality ...................................................................... 81

    C.    Adequate Representation ................................................. 82

    D.    Predominance of Common Issues ..................................... 82

    E.    Superiority .................................................................... 88

IX.    CAUSES OF ACTION ................................................................89

       A.    Claims Brought on Behalf of the Nationwide Class.........................89

FIRST CAUSE OF ACTION (NEGLIGENT FAILURE TO RECALL) .............89

SECOND CAUSE OF ACTION (UNJUST ENRICHMENT)..............................90

       B.    Claims Brought on Behalf of the California Class .........................91

THIRD CAUSE OF ACTION VIOLATION OF CALIFORNIA'S
    CONSUMER LEGAL REMEDIES ACT ("CLRA") (CAL. CIV.
    CODE § 1750, *ET SEQ.* – INJUNCTIVE RELIEF ONLY) ......................91

FOURTH CAUSE OF ACTION VIOLATION OF CALIFORNIA'S
    UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE §
    17200, *ET SEQ.*).......................................................................93

FIFTH CAUSE OF ACTION VIOLATION OF CAL. CIVIL CODE § 1710
    DECEIT AND COMMON LAW FRAUD....................................................95

SIXTH CAUSE OF ACTION CALIFORNIA FALSE ADVERTISING
    LAW (FAL) (BUS. & PROF CODE§ 17500 *ET SEQ.*)............................99

       C.    Claims Brought on Behalf of the Arizona Class ..........................101

SEVENTH CAUSE OF ACTION VIOLATIONS OF THE CONSUMER
    FRAUD ACT, (ARIZ. REV. STAT. §§ 44-1521, *ET SEQ.*)...................101

EIGHTH CAUSE OF ACTION BREACH OF THE IMPLIED
    WARRANTY OF MERCHANTABILITY (ARIZ. REV. STAT. § 47-
    2314)..............................................................................103

NINTH CAUSE OF ACTION FRAUDULENT CONCEALMENT BASED
    ON ARIZONA LAW ..............................................................104

       D.    Claims Brought on Behalf of the Colorado Class ........................106

TENTH CAUSE OF ACTION VIOLATIONS OF THE COLORADO
    CONSUMER PROTECTION ACT (COLO. REV. STAT. §§ 6-1-101,
    *ET SEQ.*).......................................................................106

ELEVENTH CAUSE OF ACTION BREACH OF IMPLIED WARRANTY
    OF MERCHANTABILITY (COLO. REV. STAT. § 4-2-314)................107

TWELFTH CAUSE OF ACTION FRAUDULENT CONCEALMENT
    (BASED ON COLORADO LAW)................................................108

       E.    Claims Brought on Behalf of the Connecticut Class .....................110

THIRTEENTH CAUSE OF ACTION VIOLATIONS OF THE UNFAIR
    TRADE PRACTICES ACT (CONN. GEN. STAT. ANN. §§ 42-
    110A, *ET SEQ.*)................................................................110

FOURTEENTH CAUSE OF ACTION BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY (CONN. GEN. STAT. ANN. § 42A-2-314) ...................................................................112

FIFTEENTH CAUSE OF ACTION FRAUDULENT CONCEALMENT (BASED ON CONNECTICUT LAW).........................................112

 F. Claims Brought on Behalf of the Florida Class..............................114

SIXTEENTH CAUSE OF ACTION VIOLATIONS OF THE FLORIDA DECEPTIVE & UNFAIR TRADE PRACTICES ACT (FLA. STAT. §§ 501.201, *ET SEQ.*)..................................................114

SEVENTEENTH CAUSE OF ACTION BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (FLA. STAT. § 672.314)......115

EIGHTEENTH CAUSE OF ACTION FRAUDULENT CONCEALMENT (BASED ON FLORIDA LAW)...................................................116

 G. Claims Brought on Behalf of the Massachusetts Class ..................118

NINETEENTH CAUSE OF ACTION VIOLATIONS OF THE MASSACHUSETTS CONSUMER PROTECTION ACT (MASS. GEN. LAWS CH. 93A)........................................................118

TWENTIETH CAUSE OF ACTION BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (MASS. GEN. LAWS CH. 106, § 2-314) ...............................................................119

TWENTY-FIRST CAUSE OF ACTION FRAUDULENT CONCEALMENT  (BASED ON MASSACHUSETTS LAW)...............119

 H. Claims Brought on Behalf of the New Jersey Class.......................121

TWENTY-SECOND CAUSE OF ACTION VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT (N.J. STAT. ANN. §§ 56:8-1, *ET SEQ.*)...............................................................121

TWENTY-THIRD CAUSE OF ACTION BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY  (N.J. STAT. ANN. § 12A:2-314) ....................................................................122

TWENTY-FOURTH CAUSE OF ACTION FRAUDULENT CONCEALMENT  (BASED ON NEW JERSEY LAW) ........................123

 I. Claims Brought on Behalf of the New York Class..........................125

TWENTY-FIFTH CAUSE OF ACTION VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349  (N.Y. GEN. BUS. LAW § 349) ....125

TWENTY-SIXTH CAUSE OF ACTION VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 350 (N.Y. GEN. BUS. LAW § 350) .....126

TWENTY-SEVENTH CAUSE OF ACTION BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (N.Y. U.C.C. § 2-314)..........127

TWENTY-EIGHTH CAUSE OF ACTION FRAUDULENT
    CONCEALMENT (BASED ON NEW YORK LAW) ............................128

    J.      Claims Brought on Behalf of the Pennsylvania Class ....................130

TWENTY-NINTH CAUSE OF ACTION VIOLATIONS OF THE UNFAIR
    TRADE PRACTICES AND CONSUMER PROTECTION LAW
    (PA. STAT. ANN. §§ 201-1, *ET SEQ.*) ........................................130

THIRTIETH CAUSE OF ACTION BREACH OF IMPLIED WARRANTY
    OF MERCHANTABILITY (13 PA. STAT. ANN. §2314)......................131

THIRTY-FIRST CAUSE OF ACTION FRAUDULENT CONCEALMENT
    (BASED ON PENNSYLVANIA LAW) ....................................................132

PRAYER FOR RELIEF ........................................................................134

DEMAND FOR JURY TRIAL ..........................................................135

The above-captioned plaintiffs (collectively, "Plaintiffs"), individually and on behalf of all other owners of vehicles designed, manufactured, distributed, and/or sold by the defendant vehicle manufacturers and design studios (the "Class" or "Class Members"), allege the following as their Complaint and Demand for Jury Trial:

## I.    INTRODUCTION

1.    This Complaint seeks redress for a deadly defect associated with the remote-control electronic keyless fob system[1] (collectively, "Keyless Fobs") implemented by ten different auto manufacturing groups and their associated research and design companies[2] (collectively, the "Automakers").

2.    Keyless Fobs are marketed as the ultimate driving convenience: drivers can keep the Keyless Fob in their pockets or bags and can use the fob without having to fumble for a traditional physical key. On rainy days or in cold weather, Keyless Fobs serve a convenient, useful purpose for quickly entering a vehicle.

3.    But, this so-called convenience has produced deadly consequences in the absence of adequate safeguards. Reasonable drivers, including Plaintiffs, misunderstand the role of the Keyless Fob in turning *off* the vehicle. Reasonable drivers mistakenly believe that removing the Keyless Fob from the vehicle turns

---

[1] *See* **Exhibit 1**. Although known by different names by different automakers, Keyless Fobs all work in the same basic manner as it pertains to this suit as described herein. *See id* (listing the various name designations that the Automakers have assigned to their respective Keyless Fobs).

**Exhibit 1** is the result of hundreds of hours of research and was compiled based on analysis of thousands of pages of automotive manuals and sales brochures for each of the more than 1,500 models, submodels, and trim levels listed in **Exhibit 1.** The brochures and sales manuals confirm that: 1) each make representations of safety, and 2) each make no mention of the lack of Auto-Off safety defect as defined and described herein.

[2] *See* paragraphs 173-182 (outlining which automotive brands are controlled by which Automaker).

---

off the engine. That confusion is unsurprising given the ever-changing technologies implemented by the Automakers.

4.      Traditionally, vehicle keys were simple (hereinafter, "Physical Keys").  Drivers inserted a Physical Key into the ignition cylinder to turn on the vehicle engine. Drivers took the physical action of turning the key back counter-clockwise to remove the Physical Key, thereby turning the engine off. When a Physical Key was removed from the vehicle, the engine could no longer operate. Drivers took comfort in knowing that if they removed the Physical Key from the vehicle, the engine was off.

5.      Over the course of decades, drivers have associated the presence of the Physical Key with the operation of the vehicle's engine.

6.      The Keyless Fob operates very differently than traditional Physical Keys.  Critically, the Keyless Fob *has nothing to do with turning off the engine*.  In today's modern vehicles that have implemented Keyless Fobs, engines do not turn off simply because the Keyless Fob is removed from the vehicle. For all of the vehicles listed in **Exhibit 1**, a driver can stop the vehicle, put it in park, exit with the Keyless Fob, and the vehicles' engine will still be running no matter how far away the driver goes from the car, and no matter how long the engine is running. (hereinafter, the "Affected Vehicles".)[3]

7.      Keyless Fobs were first introduced into the market approximately a decade ago and are becoming an increasingly common feature in modern cars.  A picture of a Keyless Fob is below:

---

[3] A list of the Affected Vehicles is attached as **Exhibit 1**. The number of Affected Vehicles is in excess of 5,000,000 vehicles.



8.     In many vehicles, the Keyless Fob is offered as part of an optional upgrade package, costing the consumer additional money.

9.     A Keyless Fob allows the driver to start the vehicle's ignition by sending an electronic signal to the vehicle's computer. Once the electronic signal is transmitted, and the vehicle senses the presence of the Keyless Fob, the driver can press a button to start the engine (the "Start/Stop Button"). A picture of a Start/Stop Button is below:



10.     The Keyless Fob never needs to come into physical contact with the vehicle in order to start the engine. Instead, a Keyless Fob can remain in the driver's pocket, purse, jacket, or even on the passenger seat or elsewhere in the car and still be used in conjunction with the start/stop button to start the engine.

11.     However, the presence of the Keyless Fob is irrelevant to whether the engine is turned off.  To turn off the engine, a driver still must press the Start/Stop Button, regardless of whether the Keyless Fob is still in the vehicle.

12.     In the name of convenience, and often at an increased purchase price, the Automakers created Keyless Fobs without instituting adequate safeguards, warnings, or other safety features.  The Automakers failed to properly consider the ramifications of eliminating the physical and psychological connection between the vehicle and Physical Keys.

13.     Upon information and belief, the Automakers similarly failed to undertake proper human factors analyses to understand the hazards associated with replacing the Physical Key with a Keyless Fob.

14.     There is a risk that drivers who grew accustomed to using a Physical Key to turn off a vehicle—which traditionally was a simple and predictable task—fail to appreciate that the Keyless Fob plays no role in turning off a Keyless Fob-equipped vehicle's engine. The Keyless Fob could be miles away from the Keyless Fob-equipped vehicle, and the engine still would not automatically turn off.

15.     Put simply, the Affected Vehicles are defective and unsafe because the Automakers have failed to include a basic safety mechanism whereby the Affected Vehicles, if left unattended with the engine still running, would automatically turn off after a certain period of time (hereinafter, "Auto-Off"). Affected Vehicles that necessarily lack such an Auto-Off system are also necessarily dangerous and defective for the reasons described herein. (Hereinafter, the "Defect").

16.     Despite this significant change in human interaction with vehicles to start and stop the vehicle engine when using Keyless Fobs, drivers may continue to equate Keyless Fobs with Physical Keys. This confusion can have deadly consequences as described in detail below.

17.     In a number of incidents, drivers have parked their Affected Vehicles inside their garages and removed the Keyless Fobs, only to later discover that the engines never actually turned off. As a result, deadly carbon monoxide—often referred to as the "silent killer" because it is a colorless, odorless gas—can fill enclosed spaces and spread to the attached homes. The results have been at least 13 documented deaths and many more serious injuries requiring hospitalization—all from carbon monoxide poisoning. Those injured by carbon monoxide poisoning caused by the Defect include drivers, their families, other occupants of the residence where the vehicle is left running in a garage, neighbors, and first responders.

18.     Symptoms of carbon monoxide poisoning include headaches, weakness, dizziness, nausea, vomiting, shortness of breath, confusion, blurred vision, and loss of consciousness. Additionally, a victim may suffer irreversible brain damage or death.  Vehicles in an enclosed environment, such as garages, can easily exceed 200 parts per million ("ppm") of carbon monoxide and rise rapidly. Once levels rise to 1,600 ppm, persons suffer increased heart rates, dizziness, and nausea within 20 minutes and death in less than 2 hours. Over thirty-percent of U.S. homes have garages attached to the home.

19.     Individuals have filed personal injury lawsuits against the Automakers seeking recovery for death or injuries caused because of the Defect. Perhaps unsurprisingly, many of those lawsuits have been resolved in confidential settlements.

(a)     An example of one lawsuit concerning death resulting from the Defect is the case of Chastity Glisson. On June 14, 2011, Kimberlin Nickles filed a wrongful death action against Toyota for the death of her daughter, Chastity Glisson, who died on August 26, 2010 at the age of 29 as a result of carbon monoxide poisoning from her 2006 Lexus IS 250, which was equipped with a

Keyless Fob.[4]  Chastity Glisson parked her Lexus in the garage to make room for her boyfriend, Timothy Maddock's, vehicle.  Chastity collapsed in the third-floor bathroom later that night.  Later, Timothy found her body, but then he too succumbed to carbon monoxide and lost consciousness. Neither Ms. Glisson nor Mr. Maddock were found until the next day. By then, 29-year-old Chastity Glisson had died, and Timothy Maddock was critically injured and required hospitalization for ten days.  An investigation revealed that the carbon monoxide that killed Ms. Glisson and severely injured Mr. Maddock came from the Lexus in the garage, which was equipped with a Keyless Fob, and unbeknownst to the occupants of the come, continued to run after the driver exited the vehicle.[5, 6.]

        (b)    Another example of personal injuries and related deaths caused by carbon monoxide poisoning caused by Keyless Fobs is described in the suit filed on October 29, 2010 by Mary Rivera against Toyota.[7] The amended complaint alleges that Ms. Rivera collapsed and was found barely breathing as a result of carbon monoxide poisoning caused by her 2008 Lexus EX 350, which was equipped with a Keyless Fob and continued to run after the driver left the vehicle.[8] Ms. Rivera is a former college professor who now suffers from permanent brain damage as a result of the carbon monoxide poisoning.  Though Ms. Rivera survived the incident, her partner Ernest Cordelia, Jr., died with 65 percent carbon monoxide poisoning in his blood, according to an autopsy report.[9.]

---

[4] Case No. 11-13565 (Circuit Court of the Seventeenth Judicial Circuit, Broward County, Florida).

[5] *Id.*

[6] *See* paragraph 208(d), *infra*.

[7] Case 1:10-cv-04998 (E.D.N.Y. 2010), Docket No. 1.

[8] *Id.* at Docket No. 13.

[9] *See* paragraph 208(a)-(b), *infra*.

1      20.    Consumers have also filed complaints with the National Highway

2    Traffic Safety Administration ("NHTSA"),[10] but the Automakers have taken no

3    action in response to complaints filed with NHTSA.

4      21.    A detailed patent search has also revealed that the two largest U.S.

5    Automakers—Ford and GM—have openly recognized the dangerous consequences

6    associated with Keyless Fobs. At least one of those patent applications included

7    language about preventing carbon monoxide poisoning in the event that the vehicle

8    engine continued to run without the presence of the Keyless Fob. But the

9    Automakers have failed to implement necessary safeguards in the Affected

10   Vehicles.

11     22.    For years the Automakers have known about the deadly consequences

12   that can result when a driver exits a vehicle with or without the Keyless Fob and

13   without having depressed the Start/Stop button. Nevertheless, even though an

14   Auto-Off feature can be implemented without significant effort or cost, the

15   Automakers have refused to act.

16     23.    Auto-Off is not only feasible; it has *already* been implemented by

17   some of the Automakers to prevent the very tragedies described here.

18     24.    The Keyless-Fob incidents described throughout this Complaint are

19   unsurprising given modern-day engine technologies. First, the Affected Vehicles

20   lack the tell-tale signs that the vehicle engine is turned on. The Automakers

21   designed the Affected Vehicles to operate quietly with advanced engine vibration

22   mounts, noise and harness reduction engineering, and exhaust baffling. Indeed, the

23   Automakers have promoted the fact that their vehicle engines run quietly and

24   smoothly as a marketing feature.[11] Second, hybrid and plug-in hybrid vehicles lack

25

26   _____
       [10] *See* paragraph 200, *infra*; *see also* **Exhibit 41.**

27     [11] *See,e.g.,* **Exhibit 2** (The Buick "LaCrosse is engineered using a QuietTuning
     process. It's a carefully orchestrated application of sound-reducing, sound-
28   blocking and sound-absorbing measures, including a windshield shaped to

1    *any* tell-tale sign that the "engine" is running.[12] In either case, consumers,

2    including all Plaintiffs, are left without any clear sign that an Affected Vehicle's

3    engine remains running even after parking the vehicle and removing the Keyless

4    Fob (hereinafter, "Undetected Engine Activity").

5         25.    In addition to the Automakers' failure to implement Auto-Off in the

6    Affected Vehicles, the Automakers have also failed to take any other adequate

7    precautions to prevent against Undetected Engine Activity: Counsel have collected

8    and analyzed relevant vehicle documents for each of the Affected Vehicles, and

9    there are *no warnings* whatsoever in the Affected Automobiles' auto manuals or

10   sales brochures that carbon monoxide poisoning is a risk in the event that the

11   driver removes the Keyless Fob without turning off the engine. Also, there are no

12   adequate external audible alerts to warn drivers that the engine continues to operate

13   even though the Keyless Fob has been removed.

14        26.    The resulting carbon monoxide risk is deadly.  Affected Vehicles

15   allow colorless and odorless carbon monoxide—the silent killer—to be emitted

16   continually and unabated. Those continuous noxious carbon monoxide emissions

17   accumulate, especially in enclosed environments, and are dangerous to human

18   health and potentially fatal.

19        27.    Because the Automakers have failed to recall, warn of the Defect in

20   their auto manuals or sales brochures, or otherwise rectify Affected Vehicles and

21

22   _____

    *(continued)*

23   minimize turbulence, triple door seals, optimized engine mounts and special
sealants.")

24       [12] There are multiple variations on hybrid and plug-in hybrid designs. Hybrid
vehicles, generally, can run just the engine, just the batteries, or a combination of

25   both. When at a standstill, hybrid vehicles run solely on battery power to conserve
gasoline. Plug-in hybrid vehicles are also known as gas-optional vehicles. Plug-in

26   hybrid vehicles run on and rely on the hybrid battery pack more of the time and run
on the gasoline engine far less of the time. The gasoline engine of the plug-in

27   hybrid vehicles only kicks on, generally, if the battery is nearly diminished. In
some variations of plug-in hybrid vehicles, the gasoline engine is used solely as an

28   internal generator to replenish the plug-in battery pack.

_____

1   institute Auto-Off, the Defect has caused carbon monoxide poisoning that has

2   caused at least 13 documented deaths and many more serious injuries resulting in

3   hospitalizations.

4        28.    The Automakers have failed to take any remedial actions in the

5   Affected Vehicles despite the fact that the Keyless Fob is merely a convenience

6   feature. Keyless Fobs remain optional equipment on many makes and models, and

7   the feature is seen as (and usually part of) expensive upgrade packages on many

8   vehicles.[13]

9        29.    Careful review of over 1,500 Affected Vehicle sales brochures reveals

10   that, without exception, the Automakers have misrepresented the Affected

11   Vehicles as safe even though they are not safe due to the Defect that is a direct

12   result of the lack of Auto-Off.

13        30.    Because of their design, the Affected Vehicles are, by the very nature

14   of Undetected Engine Activity, susceptible to repeated failures. Each use of an

15   Affected Vehicle may endanger the vehicle occupants, family members, innocent

16   bystanders, and first responders.

17        31.    The Defect impairs Class Members' proper and safe use of their

18   vehicles, endangers Class Members and persons near the Affected Vehicle. Class

19   Members have no way to mitigate or change the Affected Vehicle's Keyless

20   Ignition functionality to render the vehicles safe. Only the Automakers have the

21   ability to institute a readily-available fix to remedy the Defect.

22        32.    Upon information and belief, and as described more fully below, the

23   Automakers have known of the Defect at all relevant times, yet repeatedly failed to

24   disclose the Defect to Class Members and the public, and continue to conceal the

25   Defect, including through confidential personal injury settlements while continuing

26

27        [13] *See* **Exhibit 1** (delineating which makes and models have Keyless Fobs as standard equipment and in which makes, models and trims Keyless Fobs are optional).

28

---

1   to market and advertise the Affected Vehicles as "safe."  As documented by the

2   deaths and injuries caused by the Defect and as shown throughout this Complaint,

3   the Affected Vehicles are not safe.

4        33.    Shockingly, and as described below, while some Automakers have

5   instituted Auto-Off in *new* vehicles, they have not recalled or rectified *older* model

6   vehicles with a basic software update that would provide a permanent Auto-Off

7   remedy for this Defect. Nor have the Automakers warned owners and drivers of

8   the Affected Vehicles of the deadly safety risk of the Defect.

9        34.    As a result of the Automakers' material omissions and misstatements

10   regarding the Defect, Plaintiffs were harmed and suffered actual damages.

11   Plaintiffs have purchased or leased Affected Vehicles that they would not

12   otherwise have purchased or leased or would have paid less for had they known of

13   the Defect. Plaintiffs believed the Automakers' repeated promises that the Affected

14   Vehicles were safe, when in fact they are not.

15        35.    Additionally, due to the Defect, all Affected Vehicles' values have

16   diminished.

17        36.    Absent relief from the Court, Plaintiffs and Class Members who drive

18   their Affected Vehicles must also risk injury or death associated with the Defect.

19        37.    Due to the technological nature of the Affected Vehicles, Plaintiffs

20   and Class Members have no ability to rectify the Defect by any means through

21   independent auto repair shops. The programing of the Affected Vehicles and the

22   Keyless Fobs are based on the Automakers' proprietary software. In short,

23   Plaintiffs and Class Members are unable on their own to cure the Defect. Only the

24   Automakers can institute Auto-Off in the Affected Vehicles.

25

26

27

28

## II.   PARTIES

**A.   Plaintiffs**

    **1.   California**

        a.   **Plaintiff Richard Draeger**

38.   Plaintiff Richard Draeger is, and at all times relevant to this Complaint was, a citizen and resident of California.  Plaintiff purchased a 2011 Toyota Prius, a Toyota Group vehicle, without knowledge of the Defect. Plaintiff's vehicle is an Affected Vehicle.

39.   Plaintiff purchased the Toyota Prius primarily for personal, family, and household use.  Prior to purchasing the vehicle, Plaintiff read and relied on marketing brochures and sales materials in deciding to make the purchase.  For example, the sales brochure states that "Prius is as concerned with your well-being as it is with the planet's. That's why it offers the Toyota Star Safety System™ as standard equipment. This integration of innovative safety technologies is designed to help drivers avoid accidents. The Star Safety System™ in the Toyota Prius includes Enhanced Vehicle Stability Control (VSC), Traction Control (TRAC), Anti-lock Brake System (ABS), Electronic Brake-force Distribution (EBD), Brake Assist (BA) and Smart Stop Technology (SST)."  The sales brochure makes no mention that the vehicle lacks Auto-Off, nor does it state and/or warn of the Defect. A true and accurate representation of the 2011 Toyota Prius' sales brochure is attached as **Exhibit 3.**

40.   On two occasions, Plaintiff inadvertently left the vehicle running even after removing the Keyless Fob. On the first occasion, Plaintiff parked the vehicle in the driveway in the evening and removed the Keyless Fob, only to discover that the engine was still running the next morning. On the second occasion, Plaintiff parked the vehicle in the garage and removed the Keyless Fob, only to discover

1    that the engine was still running two hours later. For both incidents, Plaintiff could

2    not hear the engine running given the quiet nature of the Prius.

3        41.    Plaintiff Richard Draeger has been concerned about the Defect ever

4    since this incident.

5        42.    Plaintiff Richard Draeger would not have purchased or would have

6    paid less for the vehicle had he known of the Defect prior to purchase.

7            b.    **Plaintiff Laima Zbojniewicz**

8        43.    Plaintiff Laima Zbojniewicz is, and at all times relevant to this

9    Complaint was, a citizen and resident of California.  Plaintiff purchased a 2013

10   BMW X3, a BMW Group vehicle, without knowledge of the Defect.  Plaintiff's

11   vehicle is an Affected Vehicle.

12       44.    Plaintiff purchased the BMW X3 primarily for personal, family, and

13   household use.  Prior to purchasing the vehicle, Plaintiff read and relied on

14   marketing brochures and sales materials in deciding to make the purchase.  For

15   example, the sales brochure touts that "[t]he The BMW X3 integrates the latest

16   active and passive safety features to deliver the most pleasure out of every drive.

17   You'll feel secure and protected, no matter where your journey takes you." The

18   sales brochure goes onto list numerous advanced safety features of the vehicle. The

19   sales brochure makes no mention that the vehicle lacks Auto-Off, nor does it state

20   and/or warn of the Defect. A true and accurate representation of the 2013 BMW

21   X3's sales brochure is attached as **Exhibit 4.**

22       45.    Plaintiff removed the Keyless Fob and left the vehicle in a parking lot

23   for over two hours only to discover that the engine was still running when she

24   returned.  On a separate occasion, Plaintiff removed the Keyless Fob and parked

25   the vehicle in her garage, only to later discover that the engine was still running

26   when she returned.

27

28

46.     Plaintiff Laima Zbojniewicz has been concerned about the Defect ever since this incident, including about her child's safety.

47.     Plaintiff Laima Zbojniewicz would not have purchased or would have paid less for the vehicle had she known of the Defect prior to purchase.

c.     **Plaintiffs Stanley and Janet Neill**

48.     Plaintiffs Stanley and Janet Neill are, and at all times relevant to this Complaint were, citizens and residents of California.  Plaintiffs jointly purchased a 2014 Lexus RX350, a Toyota Group vehicle, without knowledge of the Defect. Plaintiffs' vehicle is an Affected Vehicle.

49.     Plaintiffs purchased the Lexus RX350 primarily for personal, family, and household use.  Prior to purchasing the vehicle, Plaintiffs read and relied on marketing brochures and sales materials in deciding to make the purchase.  For example, the sales brochure touts an "innovative approach to safety in the RX include a class-leading standard 10 airbags and active front headrests." The sales brochure makes no mention that the vehicle lacks Auto-Off, nor does it state and/or warn of the Defect. A true and accurate representation of the Lexus 2014 RX350's sales brochure is attached as **Exhibit 5.**

50.     Plaintiffs removed the Keyless Fob from the vehicle on many occasions only to discover that the engine was still running when they returned to the vehicle. This has occurred in their garage and in parking lots.

51.     Plaintiffs Stanley and Janet Neill have been concerned about the Defect ever since these incidents.

52.     Plaintiffs Stanley and Janet Neill would not have purchased or would have paid less for the vehicle had they known of the Defect prior to purchase.

d.     **Plaintiffs Zoran and Doreen Baisch**

53.     Plaintiffs Zoran and Doreen Baisch are, and at all times relevant to this Complaint were, citizens and residents of California.  Plaintiffs purchased a

1    2014 BMW 750i, a BMW Group vehicle, without knowledge of the Defect.

2    Plaintiffs' vehicle is an Affected Vehicle.

3        54.     Plaintiffs purchased the BMW 750i primarily for personal, family,

4    and household use.  Prior to purchasing the vehicle, Plaintiffs read and relied on

5    marketing brochures and sales materials in deciding to make the purchase.  For

6    example, the sales brochure touts that "The BMW 7 Series is one of the most

7    advanced cars on the road today when it comes to active and passive safety

8    features." The sales brochure then goes on to list numerous safety mechanisms

9    built into the car.  The sales brochure makes no mention that the vehicle lacks

10    Auto-Off, nor does it state and/or warn of the Defect. A true and accurate

11    representation of the 2014 BMW 7 Series sales brochure is attached as **Exhibit 6.**

12        55.     Plaintiffs removed the Keyless Fob from the vehicle on several

13    occasions only to discover that the engine was still running when they returned to

14    the vehicle.

15        56.     Plaintiffs Zoran and Doreen Baisch have been concerned about the

16    Defect, including the possibility of additional occurrences, ever since these

17    incidents.

18        57.     Plaintiffs Zoran and Doreen Baisch would not have purchased or

19    would have paid less for the vehicle had they known of the Defect prior to

20    purchase**.**

21          e.     **Plaintiff Bernice Wimley**

22        58.     Plaintiff Bernice Wimley is, and at all times relevant to this Complaint

23    was, a citizen and resident of California.  Plaintiff purchased a 2011 Dodge

24    Durango, an FCA Group vehicle, without knowledge of the Defect.  Plaintiff's

25    vehicle is an Affected Vehicle.

26        59.     Plaintiff purchased the Dodge Durango primarily for personal, family,

27    and household use.  Prior to purchasing the vehicle, Plaintiff read and relied on

28

---

marketing brochures and sales materials in deciding to make the purchase.  For example, the sales brochure touts a bullet-pointed list of no less than thirteen safety features. The sales brochure makes no mention that the vehicle lacks Auto-Off, nor does it state and/or warn of the Defect. A true and accurate representation of the 2011 Dodge Durango's sales brochure is attached as **Exhibit 7.**

60.     Plaintiff removed the Keyless Fob and parked the vehicle in her enclosed garage, only to later discover that the engine was still running.

61.     Plaintiff Bernice Wimley has been concerned about the Defect ever since this incident.

62.     Plaintiff Bernice Wimley would not have purchased or would have paid less for the vehicle had she known of the Defect prior to purchase**.**

f.      **Plaintiff Jason Shapiro**

63.     Plaintiff Jason Shapiro is, and at all times relevant to this Complaint was, a citizen and resident of California.  Plaintiff leased a 2013 Ford Explorer Sport, a Ford Group vehicle, without knowledge of the Defect.  Plaintiff's vehicle is an Affected Vehicle.

64.     Plaintiff leased the Ford Explorer Sport primarily for personal, family, and household use.  Prior to leasing the vehicle, Plaintiff read and relied on marketing brochures and sales materials in deciding to lease the vehicle.  For example, the sales brochure touts that the vehicle is "a 2012 IIHS 'Top Safety Pick.'" The sales brochure adds that "No wonder Explorer has earned 'Top Safety Pick' – the highest possible rating from the Insurance Institute for Highway Safety (IIHS) – 2 years in a row (2011–2012)." The sales brochure makes no mention that the vehicle lacks Auto-Off, nor does it state and/or warn of the Defect. A true and accurate representation of the 2013 Ford Explorer's sales brochure is attached as **Exhibit 8.**

65.     On two occasions, Plaintiff inadvertently left the vehicle running even after removing the Keyless Fob, each time in the grocery store parking lot.

66.     Plaintiff Jason Shapiro has been concerned about the Defect ever since this incident.

67.     Plaintiff Jason Shapiro would not have leased or would have paid less for the lease had he known of the Defect prior to his lease.

g.     **Plaintiff Howard Ree**

68.     Plaintiff Howard Ree is, and at all times relevant to this Complaint was, a citizen and resident of California.  Plaintiff purchased a 2008 Mercedes S550, an MB Group vehicle, without knowledge of the Defect.  Plaintiff's vehicle is an Affected Vehicle.

69.     Plaintiff purchased the Mercedes S550 primarily for personal, family, and household use.  Prior to purchasing the vehicle, Plaintiff read and relied on marketing brochures and sales materials in deciding to make the purchase.  For example, the sales brochure touts that the vehicle has "safety systems that can anticipate and prepare for an accident." The sales brochure adds that "Our position remain[s] as it was originally: that safety always comes first." The sales brochure makes no mention that the vehicle lacks Auto-Off, nor does it state and/or warn of the Defect. A true and accurate representation of the 2008 Mercedes S-Class sales brochure is attached as **Exhibit 9.**

70.     Plaintiff inadvertently left the vehicle running even after removing the Keyless Fob, and returned later to the vehicle to find that the engine was still running.

71.     Plaintiff Howard Ree has been concerned about the Defect ever since this incident.

72.     Plaintiff Howard Ree would not have purchased or would have paid less for the vehicle had he known of the Defect prior to purchase.

h.   **Plaintiff Daniel Chesler**

73.   Plaintiff Daniel Chesler is, and at all times relevant to this Complaint was, a citizen and resident of California.  Plaintiff leased a 2015 Hyundai Sonata, a Hyundai/Kia Group vehicle, without knowledge of the Defect.  Plaintiff's vehicle is an Affected Vehicle.

74.   Plaintiff leased the Hyundai Sonata primarily for personal, family, and household use.  Prior to leasing the vehicle, Plaintiff read and relied on marketing brochures and sales materials in deciding to lease the vehicle.  For example, the sales brochure touts that the vehicle has "industry-leading safety systems," listing a great number of them. The sales brochure makes no mention that the vehicle lacks Auto-Off, nor does it state and/or warn of the Defect. A true and accurate representation of the 2015 Hyundai Sonata's sales brochure is attached as **Exhibit 10.**

75.   Plaintiff inadvertently left the vehicle running even after removing the Keyless Fob, and returned later to the vehicle to find the engine running.

76.   Plaintiff Daniel Chesler has been concerned about the Defect ever since this incident.

77.   Plaintiff Daniel Chesler would not have leased or would have paid less for the lease had he known of the Defect prior to the lease.

i.   **Plaintiff Esther Myape Reyes**

78.   Plaintiff Esther Myape Reyes is, and at all times relevant to this Complaint was, a citizen and resident of California.  Plaintiff purchased a 2015 Audi A4, a VW Group vehicle, without knowledge of the Defect.  Plaintiff's vehicle is an Affected Vehicle.

79.   Plaintiff purchased the Audi A4 primarily for personal, family, and household use.  Prior to purchasing the vehicle, Plaintiff read and relied on marketing brochures and sales materials in deciding to make the purchase.  For

example, the sales brochure touts a bullet-pointed list of no less than eleven standard-equipment safety features. The sales brochure makes no mention that the vehicle lacks Auto-Off, nor does it state and/or warn of the Defect. A true and accurate representation of the 2015 Audi A4's sales brochure is attached as **Exhibit 11.**

80.    Plaintiff removed the Keyless Fob and parked the vehicle in her enclosed garage, only to discover later that the engine was still running.

81.    Plaintiff Esther Myape Reyes has been concerned about the Defect ever since this incident.

82.    Plaintiff Esther Myape Reyes would not have purchased or would have paid less for the vehicle had she known of the Defect prior to purchase**.**

j.    **Plaintiff Neil Stevens**

83.    Plaintiff Neil Stevens is, and at all times relevant to this Complaint was, a citizen and resident of California.  Plaintiff leased a 2012 Toyota Prius, a Toyota Group vehicle, without knowledge of the Defect.  Plaintiff's vehicle is an Affected Vehicle.

84.    Plaintiff leased the Toyota Prius primarily for personal, family, and household use.  Prior to lease of the vehicle, Plaintiff read and relied on marketing brochures and sales materials in deciding to lease the vehicle. For example, the sales brochure touts that "The 2012 Prius comes standard with the Star Safety System,™ a suite of advanced safety features designed to help keep you out of harm's way. On Prius, the system includes Enhanced Vehicle Stability Control (VSC), Traction Control (TRAC), Anti-lock Brake System (ABS), Electronic Brake-force Distribution (EBD), Brake Assist (BA) and Smart Stop Technology (SST)." The sales brochure makes no mention that the vehicle lacks Auto-Off, nor does it state and/or warn of the Defect. A true and accurate representation of the 2012 Toyota Prius' sales brochure is attached as **Exhibit 12.**

85.    Plaintiff removed the Keyless Fob and parked the vehicle in his driveway. Because the vehicle was silent (as a hybrid running on battery power while stationary) when parked, there was no noticeable "engine" sound. He did not realize the vehicle was left running until he later received a phone call from his neighbors telling him that the vehicle was still running.

86.    Plaintiff Neil Stevens has been concerned about the Defect ever since this incident.

87.    Plaintiff Neil Stevens would not have leased or would have paid less for the lease had he known of the Defect prior to the lease.

k.    **Plaintiff Matthew Kang**

88.    Plaintiff Matthew Kang is, and at all times relevant to this Complaint was, a citizen and resident of California.  Plaintiff leased a 2014 Hyundai Sonata 2.0T SE vehicle, without knowledge of the Defect.  Plaintiff's vehicle is an Affected Vehicle.

89.    Plaintiff leased the Hyundai Sonata primarily for personal, family, and household use.  Prior to leasing the vehicle, Plaintiff read and relied on marketing brochures and sales materials in deciding to lease the vehicle. For example, the sales brochure touts that the vehicle "earned a top five-star rating in government safety testing, as well as being named a Top Safety Pick by the Insurance Institute for Highway Safety." The sales brochure makes no mention that the vehicle lacks Auto-Off, nor does it state and/or warn of the Defect. A true and accurate representation of the 2014 Hyundai Sonata sales brochure is attached as **Exhibit 13.**

90.    Plaintiff removed the Keyless Fob and parked the vehicle in his driveway only to later discover that the vehicle was still running.

91.    Plaintiff Matthew Kang has been concerned about the Defect ever since this incident.

92.     Plaintiff Matthew Kang would not have leased or would have paid less for the lease had he known of the Defect prior to the lease.

**2.     Arizona**

  a.     **Plaintiff Jordon Mikelaitis**

93.     Plaintiff Jordon Mikelaitis is, and at all times relevant to this Complaint was, a citizen and resident of Arizona.  Plaintiff purchased a 2015 Dodge Charger SXT, an FCA Group vehicle, without knowledge of the Defect. Plaintiff's vehicle is an Affected Vehicle.

94.     Plaintiff purchased the Dodge Charger SXT primarily for personal, family, and household use.  Prior to purchasing the vehicle, Plaintiff read and relied on marketing brochures and sales materials in deciding to make the purchase.  For example, the sales brochure touts that the vehicle comes with "80+" safety and security features. The sales brochure makes no mention that the vehicle lacks Auto-Off, nor does it state and/or warn of the Defect. A true and accurate representation of the 2015 Dodge Charger's sales brochure is attached as **Exhibit 14.**

95.     Plaintiff removed the Keyless Fob and parked the vehicle at his house, only to later discover that the engine was still running.

96.     Plaintiff Jordon Mikelaitis has been concerned about the Defect ever since this incident.

97.     Plaintiff Jordon Mikelaitis would not have purchased or would have paid less for the vehicle had he known of the Defect prior to purchase.

**3.     Colorado**

  a.     **Plaintiff Bruce Goldstone**

98.     Plaintiff Bruce Goldstone is, and at all times relevant to this Complaint was, a citizen and resident of Colorado.  Plaintiff purchased a 2015

1    Mercedes C300, an MB Group vehicle, without knowledge of the Defect.

2    Plaintiff's vehicle is an Affected Vehicle.

3         99.    Plaintiff purchased the Mercedes C300 primarily for personal, family,

4    and household use.  Prior to purchasing the vehicle, Plaintiff read and relied on

5    marketing brochures and sales materials in deciding to make the purchase.  For

6    example, the sales brochure touts that the vehicle comes with "exclusive safety

7    innovations, " and that "[f]or more than 60 years, Mercedes-Benz engineers have

8    been predicting the future of driving safety by inventing it." The sales brochure

9    makes no mention that the vehicle lacks Auto-Off, nor does it state and/or warn of

10   the Defect. A true and accurate representation of the 2015 Mercedes C-Class sales

11   brochure is attached as **Exhibit 15.**

12        100.   Plaintiff, on multiple occasions, parked the vehicle and removed the

13   Keyless Fob during various errands and restaurant visits, only to later discover that

14   the engine was still running.

15        101.   Plaintiff Bruce Goldstone has been concerned about the Defect ever

16   since this incident.

17        102.   Plaintiff Bruce Goldstone would not have purchased or would have

18   paid less for the vehicle had he known of the Defect prior to purchase**.**

19             b.    **Plaintiff Scott Goldstone**

20        103.   Plaintiff Scott Goldstone is, and at all times relevant to this Complaint

21   was, a citizen and resident of Colorado.  Plaintiff purchased a 2015 Nissan Rogue

22   SL, a Nissan Group vehicle, without knowledge of the Defect.  Plaintiff's vehicle

23   is an Affected Vehicle.

24        104.   Plaintiff purchased the Nissan Rogue primarily for personal, family,

25   and household use.  Prior to purchasing the vehicle, Plaintiff read and relied on

26   marketing brochures and sales materials in deciding to make the purchase.  For

27   example, the sales brochure touts that the vehicle comes with "NISSAN SAFETY

28

---

1    SHIELD® PHILOSOPHY," which is "INNOVATION THAT LOOKS OUT FOR

2    YOU."  The Nissan Group describes "[t]he Nissan Safety Shield® [a]s a

3    comprehensive approach to safety that guides the engineering and development of

4    every vehicle we make." The sales brochure makes no mention that the vehicle

5    lacks Auto-Off, nor does it state and/or warn of the Defect. A true and accurate

6    representation of the 2015 Nissan Rogue sales brochure is attached as **Exhibit 16.**

7          105.   Plaintiff, on at least three occasions, removed the Keyless Fob and

8    parked the vehicle in his garage, in an outdoor parking lot, and outside of his

9    office, only to later discover that the engine was still running.

10         106.   Plaintiff Scott Goldstone has been concerned about the Defect ever

11   since this incident.

12         107.   Plaintiff Scott Goldstone would not have purchased or would have

13   paid less for the vehicle had he known of the Defect prior to purchase**.**

14        **4.     Connecticut**

15             a.    **Plaintiff Timothy Schoenfeld**

16         108.   Plaintiff Timothy Schoenfeld is, and at all times relevant to this

17   Complaint was, a citizen and resident of Connecticut.  Plaintiff leased a 2014 Ford

18   Fusion Hybrid, a Ford Group vehicle, without knowledge of the Defect.  Plaintiff's

19   vehicle is an Affected Vehicle.

20         109.   Plaintiff leased the Ford Fusion Hybrid primarily for personal, family,

21   and household use.  Prior to leasing the vehicle, Plaintiff read and relied on

22   marketing brochures and sales materials in deciding to lease the vehicle.  For

23   example, the sales brochure touts that "each vehicle in the Fusion lineup earned a

24   5-star safety rating from the National Highway Traffic Safety Administration

25   (NHTSA) the government's highest-possible vehicle safety rating. In addition,

26   Ford Fusion has earned a 2013 'Top Safety Pick+' from the Insurance Institute for

27   Highway Safety (IIHS)." The sales brochure makes no mention that the vehicle

28

1    lacks Auto-Off, nor does it state and/or warn of the Defect. A true and accurate

2    representation of the 2014 Ford Fusion's sales brochure is attached as **Exhibit 17.**

3        110.   On multiple occasions, Plaintiff removed the Keyless Fob and parked

4    the vehicle at his house, only to later discover that the engine was still running

5    when he returned to the vehicle. On at least one occasion, he returned several hours

6    later to find the engine still running.

7        111.   Plaintiff Timothy Schoenfeld has been concerned about the Defect

8    ever since this incident.

9        112.   Plaintiff Timothy Schoenfeld would not have leased or would have

10   paid less for the lease had he known of the Defect prior to the lease**.**

11               b.    **Plaintiff Nicholas Messina**

12       113.   Plaintiff Nicholas Messina is, and at all times relevant to this

13   Complaint was, a citizen and resident of Connecticut.  Plaintiff's wife Christine

14   Messina purchased a 2014 Kia Cadenza, a Hyundai/Kia Group vehicle, without

15   knowledge of the Defect.  Plaintiff's vehicle is an Affected Vehicle.

16       114.   Plaintiff purchased the Kia Cadenza primarily for personal, family,

17   and household use.  Prior to purchasing the vehicle, Plaintiff read and relied on

18   marketing brochures and sales materials in deciding to make the purchase.  For

19   example, the sales brochure touts that "[t]he Cadenza features advanced active

20   safety systems designed to help give you peace of mind every time you drive." The

21   sales brochure makes no mention that the vehicle lacks Auto-Off, nor does it state

22   and/or warn of the Defect. A true and accurate representation of the 2014 Kia

23   Cadenza's sales brochure is attached as **Exhibit 18.**

24       115.   On at least one occasion, Plaintiff removed the Keyless Fob and

25   parked the vehicle at his house, only to later discover that the engine was still

26   running when he returned to the vehicle.

27

28

---

116.   Plaintiff Nicholas Messina has been concerned about the Defect ever since this incident.

117.   Plaintiff Nicholas Messina would not have purchased or would have paid less for the vehicle had he known of the Defect prior to purchase.

c.   **Plaintiff Johnny Hernandez**

118.   Plaintiff Johnny Hernandez is, and at all times relevant to this Complaint was, a citizen and resident of Connecticut.  Plaintiff purchased a 2012 Acura TL, a Honda Group vehicle, without knowledge of the Defect.  Plaintiff's vehicle is an Affected Vehicle.

119.   Plaintiff purchased the Acura TL primarily for personal, family, and household use.  Prior to purchasing the vehicle, Plaintiff read and relied on marketing brochures and sales materials in deciding to make the purchase.  For example, the sales brochure touts a bullet-pointed list of no less than sixteen standard safety features.  The sales brochure makes no mention that the vehicle lacks Auto-Off, nor does it state and/or warn of the Defect. A true and accurate representation of the 2012 Acura TL sales brochure is attached as **Exhibit 19.**

120.   On at least one occasion, Plaintiff removed the Keyless Fob and parked the vehicle at his house, only to later discover that the engine was still running when he returned to the vehicle.

121.   Plaintiff Johnny Hernandez has been concerned about the Defect ever since this incident.

122.   Plaintiff Johnny Hernandez would not have purchased or would have paid less for the vehicle had he known of the Defect prior to purchase.

d.   **Plaintiff Kevin Sisti, Jr.**

123.   Plaintiff Kevin Sisti, Jr. is, and at all times relevant to this Complaint was, a citizen and resident of Connecticut.  Plaintiff leased a 2014 Jeep Grand

1  Cherokee, an FCA Group vehicle, without knowledge of the Defect.  Plaintiff's

2  vehicle is an Affected Vehicle.

3      124.   Plaintiff leased the Jeep Grand Cherokee primarily for personal,

4  family, and household use.  Prior to leasing the vehicle, Plaintiff read and relied on

5  marketing brochures and sales materials in deciding to lease the vehicle.  For

6  example, the sales brochure touts that the vehicle gives consumers "Pease of Mind,

7  Delivered 60 ways. Grand Cherokee surrounds you with more than 60 standard and

8  available safety and security features" The sales brochure makes no mention that

9  the vehicle lacks Auto-Off, nor does it state and/or warn of the Defect. A true and

10  accurate representation of the 2014 Jeep Grand Cherokee sales brochure is attached

11  as **Exhibit 20.**

12      125.   On more than one occasion, Plaintiff removed the Keyless Fob and

13  parked the vehicle at his house, only to later discover that the engine was still

14  running when he returned to the vehicle.

15      126.   Plaintiff Kevin Sisti, Jr. has been concerned about the Defect ever

16  since these incidents.

17      127.   Plaintiff Kevin Sisti, Jr. would not have leased or would have paid

18  less for the lease had he known of the Defect prior to leasing**.**

19      **5.**   **Florida**

20          a.   **Plaintiff Jeffrey Sandler**

21      128.   Plaintiff Jeffrey Sandler is, and at all times relevant to this Complaint

22  was, a citizen and resident of Florida.  Plaintiff purchased a 2010 Infiniti FX35, a

23  Nissan Group vehicle, without knowledge of the Defect.  Plaintiff's vehicle is an

24  Affected Vehicle.

25      129.   Plaintiff purchased the Infiniti FX35 primarily for personal, family,

26  and household use.  Prior to purchasing the vehicle, Plaintiff read and relied on

27  marketing brochures and sales materials in deciding to make the purchase.  For

28

example, the sales brochure touts a bullet-pointed list of no less than thirteen safety features. The sales brochure makes no mention that the vehicle lacks Auto-Off, nor does it state and/or warn of the Defect. A true and accurate representation of the 2010 Infiniti FX35's sales brochure is attached as **Exhibit 21.**

130.   Plaintiff removed the Keyless Fob and parked the vehicle, only to later discover that the engine was still running.

131.   Plaintiff Jeffrey Sandler has been concerned about the Defect ever since this incident.

132.   Plaintiff Jeffrey Sandler would not have purchased or would have paid less for the vehicle had he known of the Defect prior to purchase**.**

b.   **Plaintiff Michelle Smith**

133.   Plaintiff Michelle Smith is, and at all times relevant to this Complaint was, a citizen and resident of Florida.  Plaintiff purchased a 2012 Nissan Altima, a Nissan Group vehicle, without knowledge of the Defect.  Plaintiff's vehicle is an Affected Vehicle.

134.   Plaintiff purchased the Nissan Altima primarily for personal, family, and household use.  Prior to purchasing the vehicle, Plaintiff read and relied on marketing brochures and sales materials in deciding to make the purchase.  For example, the sales brochure touts that "[w]e're not just looking out for your safety, we're taking a stand – incorporating Brake Override Technology across our lineup ahead of others in the industry, and offering an industry-first guide to help ensure the correct installation of child safety seats. That, along with features like six standard air bags and a rigorous durability testing program, should help you feel confident whenever you're in your Altima." The sales brochure makes no mention that the vehicle lacks Auto-Off, nor does it state and/or warn of the Defect. A true and accurate representation of the 2012 Nissan Altima's sales brochure is attached as **Exhibit 22.**

135.   Plaintiff removed the Keyless Fob, parked the vehicle in her driveway and then left the house to run an errand. Plaintiff's husband discovered the car in the driveway with the engine running. Her husband panicked because the car was idling but Plaintiff Michelle Smith was nowhere to be found.

136.   Plaintiff Michelle Smith has been concerned about the Defect ever since this incident.

137.   Plaintiff Michelle Smith would not have purchased or would have paid less for the vehicle had she known of the Defect prior to purchase.

**6.   Massachusetts**

c.   **Plaintiff Janine LoVuolo**

138.   Plaintiff Janine LoVuolo is, and at all times relevant to this Complaint was, a citizen and resident of Massachusetts.  Plaintiff leased a 2015 Kia Optima EX, a Hyundai/Kia Group vehicle, without knowledge of the Defect.  Plaintiff's vehicle is an Affected Vehicle.

139.   Plaintiff leased the Kia Optima EX primarily for personal, family, and household use.  Prior to leasing the vehicle, Plaintiff read and relied on marketing brochures and sales materials in deciding to lease the vehicle.  For example, the sales brochure touts that the vehicle has "advanced safety systems" such as "[a]dvanced safety systems to help handle unexpected conditions," and adds, "[s]afety systems help add peace of mind in certain situations. That's why all Optima models are equipped with advanced safety systems engineered to help you maintain control, even in challenging road conditions and in some emergency situations. They function automatically, leaving you free to focus on the road." The sales brochure makes no mention that the vehicle lacks Auto-Off, nor does it state and/or warn of the Defect. A true and accurate representation of the 2015 Kia Optima's sales brochure is attached as **Exhibit 23.**

140.  On two occasions, Plaintiff removed the Keyless Fob, parked the vehicle, and then returned later to discover that the engine was still running –once in her driveway after unloading groceries, and once in a parking lot at the local mall after coming back from shopping.

141.  Plaintiff Janine LoVuolo has been concerned about the Defect ever since these incidents.

142.  Plaintiff  Janine LoVuolo would not have leased or would have paid less for the leased had she known of the Defect prior to the lease**.**

**7.    New Jersey**

        a.    **Plaintiff Helen Ciangiulli**

143.  Plaintiff Helen Ciangiulli is, and at all times relevant to this Complaint was, a citizen and resident of New Jersey.  Plaintiff purchased a 2007 Toyota Avalon, a Toyota Group vehicle, without knowledge of the Defect. Plaintiff's vehicle is an Affected Vehicle.

144.  Plaintiff purchased the Toyota Avalon primarily for personal, family, and household use.  Prior to purchasing the vehicle, Plaintiff read and relied on marketing brochures and sales materials in deciding to make the purchase.  For example, the sales brochure touts a bullet-pointed list of no less than eleven standard safety features. The sales brochure makes no mention that the vehicle lacks Auto-Off, nor does it state and/or warn of the Defect. A true and accurate representation of the 2007 Toyota Avalon's sales brochure is attached as **Exhibit 24.**

145.  On one occasion, Plaintiff drove the vehicle to work, parked the vehicle in the parking lot, and removed the Keyless Fob. When Plaintiff returned to her vehicle approximately eight hours later, the vehicle engine was still running.

146.  Plaintiff Helen Ciangiulli has been concerned about the Defect ever since this incident.

147.   Plaintiff  Helen Ciangiulli would not have purchased or would have paid less for the vehicle had she known of the Defect prior to purchase.

b.   **Plaintiff Judith Harr Shane**

148.   Plaintiff Judith Harr Shane is, and at all times relevant to this Complaint was, a citizen and resident of New Jersey.  Plaintiff purchased a 2015 Lexus RX450h, a Toyota Group vehicle, without knowledge of the Defect.  Plaintiff's vehicle is an Affected Vehicle.

149.   Plaintiff purchased the Lexus RX 450h primarily for personal, family, and household use.  Prior to purchasing the vehicle, Plaintiff read and relied on marketing brochures and sales materials in deciding to make the purchase.  For example, the sales brochure touts an "innovative approach to safety in the RX include a class-leading standard 10 airbags and active front headrests." The sales brochure makes no mention that the vehicle lacks Auto-Off, nor does it state and/or warn of the Defect. A true and accurate representation of the 2015 Lexus RX450h's sales brochure is attached as **Exhibit 25.**

150.   In one incident, Plaintiff parked the vehicle, removed the Keyless Fob, and then later discovered that the engine was still running when she returned to the vehicle.

151.   Plaintiff Judith Harr Shane has been concerned about the Defect ever since this incident.

152.   Plaintiff Judith Harr Shane would not have purchased or would have paid less for the vehicle had she known of the Defect prior to purchase.

c.   **Plaintiff Steven Green**

153.   Plaintiff Steven Green is, and at all times relevant to this Complaint was, a citizen and resident of New Jersey.  Plaintiff purchased a 2014 Lexus GX470, a Toyota Group vehicle, without knowledge of the Defect.  Plaintiff's vehicle is an Affected Vehicle.

154.   Plaintiff purchased the Lexus GX470 primarily for personal, family, and household use.  Prior to purchasing the vehicle, Plaintiff read and relied on marketing brochures and sales materials in deciding to make the purchase.  For example, the sales brochure touts a myriad of safety features, including at least five cutting-edge safety features that come as standard. The sales brochure makes no mention that the vehicle lacks Auto-Off, nor does it state and/or warn of the Defect. A true and accurate representation of the 2014 Lexus GX470's sales brochure is attached as **Exhibit 26.**

155.   Plaintiff parked the vehicle, removed the Keyless Fob, and then later discovered that the engine was still running when he returned to the vehicle.

156.   Plaintiff Steven Green has been concerned about the Defect ever since this incident.

157.   Plaintiff Steven Green would not have purchased or would have paid less for the vehicle had he known of the Defect prior to purchase**.**

**8.   New York**

a.   **Plaintiff Johana Garcia**

158.   Plaintiff Johana Garcia is, and at all times relevant to this Complaint was, a citizen and resident of New York.  Plaintiff purchased a 2011 Nissan Rogue, a Nissan Group vehicle, without knowledge of the Defect.  Plaintiff's vehicle is an Affected Vehicle.

159.   Plaintiff purchased the Nissan Rogue primarily for personal, family, and household use.  Prior to purchasing the vehicle, Plaintiff read and relied on marketing brochures and sales materials in deciding to make the purchase.  For example, the sales brochure touts a bullet-pointed list of no less than sixteen standard safety features. The sales brochure makes no mention that the vehicle lacks Auto-Off, nor does it state and/or warn of the Defect. A true and accurate

1  representation of the 2011 Nissan Rogue's sales brochure is attached as **Exhibit**

2  **27.**

3      160.   On one occasion, Plaintiff parked the vehicle in her garage and

4  believed she had turned off the vehicle. When she later returned to the vehicle, she

5  discovered that the engine was still running.

6      161.   Plaintiff Johana Garcia has been concerned about the Defect ever

7  since this incident.

8      162.   Plaintiff Johana Garcia would not have purchased or would have paid

9  less for the vehicle had she known of the Defect prior to purchase**.**

10                b.      **Plaintiff Mark Pastarnack**

11     163.   Plaintiff Mark Pastarnack is, and at all times relevant to this

12  Complaint was, a citizen and resident of New York. Plaintiff leased a 2013 Dodge

13  Journey, an FCA Group vehicle, without knowledge of the Defect.  Plaintiff's

14  vehicle is an Affected Vehicle.

15     164.   Plaintiff leased the Dodge Journey primarily for personal, family, and

16  household use.  Prior to leasing the vehicle, Plaintiff read and relied on marketing

17  brochures and sales materials in deciding to lease the vehicle, with special concern

18  for the safety of his family.  For example, the sales brochure touts that "[w]e tend

19  to be overprotective with the things that matter most. That's why we put over 50

20  standard and available safety and security features on Dodge Journey." The sales

21  brochure makes no mention that the vehicle lacks Auto-Off, nor does it state and/or

22  warn of the Defect. A true and accurate representation of the 2013 Dodge

23  Journey's sales brochure is attached as **Exhibit 28.**

24     165.   Plaintiff parked the vehicle on at least four occasions believing he had

25  turned the vehicle off because of lack of engine noise or any other indication that

26  the engine remained on. After the first two times this occurred, plaintiff became

27  concerned and began to double or even triple-check that the engine was off,

28

1   including feeling the hood of the vehicle. Nevertheless, because of the quiet
2   engine, on at least two additional occasions, the engine was left running after he
3   exited the vehicle with the Key Fob, due to the Defect. On at least one occasion,
4   the engine remained running for at least three hours.

5   166.   Plaintiff Mark Pastarnack has been concerned about the Defect ever
6   since these incidences.

7   167.   Plaintiff Mark Pastarnack would not have leased or would have paid
8   less for the lease of the vehicle had he known of the Defect prior to the lease.

9   **9.    Pennsylvania**

10          a.    **Plaintiff John Lee**

11   168.   Plaintiff John Lee is, and at all times relevant to this Complaint was, a
12   citizen and resident of Pennsylvania.  Plaintiff purchased a 2013 BMW 335Xi, a
13   BMW Group vehicle, without knowledge of the Defect.  Plaintiff's vehicle is an
14   Affected Vehicle.

15   169.   Plaintiff purchased the BMW 335Xi primarily for personal, family,
16   and household use.  Prior to purchasing the vehicle, Plaintiff read and relied on
17   marketing brochures and sales materials in deciding to make the purchase.  For
18   example, the sales brochure touts that "[t]he 3 Series Sedan is designed with
19   BMW's full range of standard state-of-the-art active and passive safety
20   technologies. Active safety features, such as Xenon Adaptive Headlights, powerful
21   engines and large brakes, help you see and respond to potentially dangerous
22   situations. Should an accident prove unavoidable, passive safety features, such as
23   airbags, are designed to help protect you and your passengers. After a severe
24   impact, a host of features spring into action: the doors automatically unlock,
25   headlights and taillights flash, the starter cable is disconnected from the battery and
26   the fuel supply is cut off. If your vehicle is equipped with BMW Assist,™ should
27   any airbags deploy, response specialists are automatically alerted and notified of

28

1   your location." The sales brochure makes no mention that the vehicle lacks Auto-

2   Off, nor does it state and/or warn of the Defect. A true and accurate representation

3   of the 2013 BMW 3-Series sales brochure is attached as **Exhibit 29.**

4       170.   On two occasions, Plaintiff removed the Keyless Fob and parked the

5   vehicle in his garage, only to later discover that the engine was still running.

6       171.   Plaintiff John Lee has been concerned about the Defect ever since this

7   incident.

8       172.   Plaintiff John Lee would not have purchased or would have paid less

9   for the vehicle had he known of the Defect prior to purchase.

10  **B.    Defendants**

11      173.   Toyota Group

12          a.    Toyota

13              (i)    Defendant Toyota Motor Sales, U.S.A., Inc. ("TMS") is a

14  Delaware corporation whose principal place of business is 19001 South Western

15  Avenue, Department WC11, Torrance, CA 90501. TMS's address for customer

16  complaints is 19001 South Western Avenue, Department WC11, Torrance, CA

17  90501.  TMS's registered agent for service of process is Toyota Motor Sales,

18  U.S.A., Inc., c/o CT Corporation System, 818 W. Seventh St. 2nd Fl., Los Angeles,

19  CA 90017.

20              (ii)    TMS maintains a design research center in California:

21  Defendant Calty Design Research Inc. ("CDR"), located at 2810 Jamboree Rd.,

22  Newport Beach, CA 92660. CDR is a Delaware corporation whose principal place

23  of business is 2810 Jamboree Rd., Newport Beach, CA 92660. CDR's registered

24  agent for service of process is Calty Design Research Inc., c/o Shinichi Yamaji,

25  2810 Jamboree Rd., Newport Beach, CA 92660.

26

27

28

---

1             b.     Lexus

2               (i)     Though Lexus – brand vehicles are sold under a different

3 brand name in the United States, and are generally sold as more luxurious vehicles,

4 Lexus vehicles are universally manufactured, marketed, and distributed by TMS.

5               (ii)    Moreover, Lexus has the same registered agent for

6 service of process in the United States as TMS.

7             c.     The Toyota Group

8               (i)     TMS and CDR, through their various entities, design,

9 manufacture, market, distribute and sell Toyota and Lexus automobiles in

10 California and multiple other locations in the United States and worldwide.

11              (ii)    Collectively, the Defendants TMS and CDR are herein

12 referred to as the "Toyota Group."

13       174.   Ford Group

14             a.     Ford

15               (i)     Defendant Ford Motor Company ("Ford") is a Delaware

16 company with its principal place of business at 1 American Road, Suite 1026,

17 Dearborn, MI 48126. Ford's address for customer complaints is Ford Motor

18 Company, Customer Relationship Center, P.O. Box 6248, Dearborn, MI 48126.

19 Ford's registered agent for service of process is Ford Motor Company, c/o CT

20 Corporation System, 818 W. Seventh St., Suite 930, Los Angeles, CA 90017.

21              (ii)    Moreover, Ford maintains a design research center in

22 California: Global Advanced Design Studio ("GADS"), 3 Glen Bell Way #110,

23 Irvine, CA 92618.

24             b.     Lincoln

25               (i)     Though Lincoln–brand vehicles are sold under a different

26 brand name in the United States, and are generally sold as more luxurious vehicles,

27 they are universally manufactured, marketed, and distributed by Ford. Lincoln

28

1   utilizes the same California design studio as Ford and the customer complaint

2   address is identical as well.

3               (ii)    Moreover, Lincoln has the same registered agent for

4   service of process in the United States as Ford.

5           c.    The Ford Group

6               (i)    Ford, through its various entities, designs, manufactures,

7   markets, distributes and sells Ford and Lincoln automobiles in California and

8   multiple other locations in the United States and worldwide.

9               (ii)    Collectively, Ford (including its Lincoln brand models)

10  and GADS design studio are herein referred as the "Ford Group."

11      175.   Nissan Group

12          a.    Nissan

13              (i)    Defendant Nissan North America, Inc. ("NNA") is a

14  California corporation whose principal place of business is 1 Nissan Way,

15  Franklin, TN 37067. NNA's address for customer complaints is Nissan Consumer

16  Affairs, P.O. Box 685003, Franklin, TN 37068-5003.  NNA's registered agent for

17  service of process is Nissan North America, Inc., c/o Corporation Service

18  Company which will do business in California as CSC - Lawyers Incorporating

19  Service, 2710 Gateway Oaks Dr., Ste. 150n, Sacramento, CA 95833.

20              (ii)    NNA maintains a design research center in California:

21  Defendant Nissan Design America Inc. ("NDI"), 9800 Campus Point Drive, San

22  Diego, CA 92121. NDI is a Delaware corporation whose principal place of

23  business is 9800 Campus Point Drive, San Diego, CA 92121. NDI's registered

24  agent for service of process is Nissan Design America, Inc., c/o LexisNexis

25  Document Solutions Inc., 2711 Centerville Road, Suite 400, Wilmington, DE

26  19808.

27

28

b.      Infiniti

(i)      Though Infiniti–brand vehicles are sold under a different brand name in the United States, and are generally sold as more luxurious vehicles, Infiniti vehicles are universally manufactured, marketed, and distributed by NNA.

(ii)     Moreover, Infiniti has the same registered agent for service of process in the United States as NNA and utilizes the same NDI design research center.

c.      The Nissan Group

(i)      NNA and NDI through their various entities, design, manufacture, market, distribute and sell Nissan and Infiniti automobiles in California and multiple other locations in the United States and worldwide.

(ii)     Collectively, the Defendants NNA and NDI are herein referred to as the "Nissan Group."

176.   Honda Group

a.      Honda

(i)      Defendant American Honda Motor Co., Inc. ("HMC") is a California corporation whose principal place of business is 1919 Torrance Boulevard, Torrance, CA 90501. HMC's address for customer complaints is Honda Automobile Customer Service, Mail Stop: 500 - 2N - 7A, 1919 Torrance Blvd., Torrance, CA 90501. HMC's registered agent for service of process is American Honda Motor Co., Inc., c/o CT Corporation System, 818 W. Seventh St., Suite 930, Los Angeles, CA 90017.

(ii)     HMC maintains a design research center in California: Defendant Honda R&D Americas Inc. ("HRD"), 1900 Harpers Way, Torrance, CA 90501-2746. HRD is a California corporation whose principal place of business is 1900 Harpers Way, Torrance, CA 90501-2746. HRD's registered agent for service

1  of process is Honda R&D Americas, Inc., c/o CT Corporation System, 818 W.

2  Seventh St., Suite 930, Los Angeles, CA 90017.

3                      b.      Acura

4                         (i)     Though Acura–brand vehicles are sold under a different

5  brand name in the United States, and are generally sold as more luxurious vehicles,

6  Acura vehicles are universally manufactured, marketed, and distributed by HMC.

7                        (ii)    Moreover, Acura has the same registered agent for

8  service of process in the United States as HMC.

9                       (iii)   Only Acura's customer service complaint is different

10  from HMC's contact information, at Acura Client Relations, 1919 Torrance Blvd.,

11  M/S 500-2N7E, Torrance, CA 90501-2746.

12                      c.     The Honda Group

13                       (i)     HMC and HRD, through its various entities, design,

14  manufacture, market, distribute and sell Honda and Acura automobiles in

15  California and multiple other locations in the United States and worldwide.

16                       (ii)    Collectively, the Defendants HMC and HRD are herein

17  referred to as the "Honda Group."

18        177.   FCA Group

19                    a.     FCA's Umbrella of Brands

20                       (i)     Defendant FCA US LLC ("FCA") is a Delaware Limited

21  Liability Corporation whose principal place of business is 1000 Chrysler Drive,

22  Auburn Hills, MI 48326.  FCA's registered agent for service of process is The

23  Corporation Trust Company, Corporation Trust Center, 1209 Orange St,

24  Wilmington, DE, 19801.

25                       (ii)    FCA universally manufactures, markets, and distributes

26  Affected Vehicles sold under a variety of different brand names: Chrysler, Jeep,

27

28

1  Dodge, and RAM. The principal places of business and registered agent for service

2  of process for any of these four brands is identical to that of FCA's.

3             b.     The FCA Group

4                 (i)     FCA, through its various entities, designs, manufactures,

5  markets, distributes and sells Chrysler, Jeep, Dodge, and RAM–brand automobiles

6  in California and multiple other locations in the United States and worldwide.

7                 (ii)     Defendant FCA (including its Chrysler, Jeep, Dodge, and

8  RAM-branded vehicles) is herein referred to as the "FCA Group."

9             c.     Suit Allegations Pertaining to FCA

10                 (i)     This suit is seeking relief only as to vehicles

11  manufactured on or after June 10, 2009, the date, upon information and belief,  that

12  FCA's predecessor companies emerged from bankruptcy.

13                 (ii)     To the extent that any claim could be interpreted as

14  including any claims relating to any vehicles pre-bankruptcy-resolution, those

15  claims are expressly *not* brought here.

16        178.   GM Group

17             a.     GM's Umbrella of Brands

18                 (i)     Defendant General Motors Company ("GM") is a

19  Delaware corporation whose principal place of business is 300 Renaissance Ctr.,

20  Detroit, MI 48243-1402. GM's address for customer complaints is General Motors

21  Company, Customer Service Resources, P.O. Box 33170, Detroit, MI 48232-5170.

22  GM's registered agent for service of process is Corporation Service Company,

23  2711 Centerville Rd, Suite 400, Wilmington, DE, 19808.

24                 (ii)     GM universally manufactures, markets, and distributes

25  Affected Vehicles sold under a variety of different brand names: GMC, Chevrolet,

26  Cadillac, and Buick. The principal places of business and registered agent for

27  service of process for any of these four brands is identical to that of GM's.

28

1              (iii)    For all of its vehicle brands, GM maintains a design

2    research center in California: General Motors Design Studio ("GMDS"), 5350

3    Biloxi Ave, North Hollywood, CA 91601.

4              b.      The GM Group

5              (i)      GM, through its various entities, designs, manufactures,

6    markets, distributes and sells GMC, Chevrolet, Cadillac, and Buick–brand

7    automobiles in California and multiple other locations in the United States and

8    worldwide.

9              (ii)     Collectively, the GM brands of (and GMDS designed and

10   engineered) vehicles are herein referred to as the "GM Group."

11             c.      Suit Allegations Pertain to the "New" GM Only

12             (i)      This suit is seeking relief only as to vehicles

13   manufactured on or after July 20, 2009, the date, upon information and belief,  that

14   GM's predecessor companies emerged from bankruptcy.

15             (ii)     To the extent that any claim could be interpreted as

16   including any claims relating to any vehicles pre-bankruptcy-resolution, those

17   claims are expressly *not* brought here.

18       179.   BMW Group

19             a.      BMW

20             (i)      Defendant BMW of North America, LLC ("BMW") is a

21   Delaware limited liability corporation whose principal place of business is 300

22   Chestnut Ridge Road, Woodcliff Lake, NJ 07677-7731. BMW's address for

23   customer complaints is Customer Relations Dept., P.O. Box 1227, Westwood, NJ

24   07675. BMW's registered agent for service of process is The Corporation Trust

25   Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE, 19801.

26             (ii)     BMW maintains a design research center in California:

27   Defendant Designworks USA, Inc. ("DW"), 2201 Corporate Center Drive,

28

1   Newbury Park, CA 91320. DW is a California corporation whose principal place

2   of business is 2201 Corporate Center Drive, Newbury Park, CA 91320. DW's

3   registered agent for service of process is Designworks USA, Inc., c/o Laurenz

4   Schaffer, 2201 Corporate Center Dr., Newbury Park, CA 91320.

5           b.    Mini

6              (i)    Though Mini–brand vehicles are sold under a different

7   brand name in the United States, and are generally sold as quirky, small-niche

8   vehicles, Mini vehicles are universally manufactured, marketed, and distributed by

9   BMW.

10              (ii)    Moreover, Mini has the same registered agent for service

11   of process in the United States as BMW.

12           c.    The BMW Group

13              (i)    BMW and DW, through their various entities, design,

14   manufacture, market, distribute and sell BMW and Mini–brand automobiles in

15   California and multiple other locations in the United States and worldwide.

16              (ii)    Collectively, the Defendants BMW and DW are herein

17   referred to as the "BMW Group."

18       180.   VW Group

19           a.    Volkswagen

20              (i)    Defendant Volkswagen Group of America, Inc. ("VW")

21   is a New Jersey Corporation whose principal place of business is 2200 Ferdinand

22   Porsche Drive, Herndon, VA 20171. VW's address for customer complaints is the

23   same address.  VW's registered agent for service of process is Volkswagen Group

24   of America, Inc., c/o Corporation Service Company which will do business in

25   California as CSC - Lawyers Incorporating Service, 2710 Gateway Oaks Dr., Ste.

26   150n, Sacramento, CA 95833.

27

28

1          (ii)    VW maintains a design research center in California:

2 Volkswagen Audi Design Center ("VADC"), 2772 Donald Douglas Loop North,

3 Santa Monica, CA 90405.

4          b.    Audi

5          (i)    Though Audi–brand vehicles are sold under a different

6 brand name in the United States, and are generally sold as more luxurious vehicles,

7 Audi vehicles are universally manufactured, marketed, and distributed by VW.

8          (ii)    Moreover, Audi has the same registered agent for service

9 of process in the United States as VW and utilizes the same VADC California

10 design studio.

11          c.    Bentley

12          (i)    VW is the parent corporation of Defendant Bentley

13 Motors, Inc. ("Bentley"). Bentley is a Delaware corporation whose principal place

14 of business is 75 Arlington Street, 5th Floor, Boston, MA 02116. Bentley's address

15 for customer complaints is the same address as for VW.  Bentley's registered agent

16 for service of process is Bentley Motors, Inc., c/o Corporation Service Company

17 which will do business in California as CSC - Lawyers Incorporating Service, 2710

18 Gateway Oaks Dr., Ste. 150n, Sacramento, CA 95833.

19          (ii)    Though Bentley–brand vehicles are sold under a different

20 brand name in the United States, and are generally sold as highly luxurious

21 vehicles, Bentley–brand vehicles are universally manufactured, marketed, and

22 distributed by VW.

23          (iii)    Moreover, Bentley has the same registered agent for

24 service of process in the United States as VW and utilizes the same VADC

25 California design studio.

26

27

28

---

1           d.     The VW Group

2           (i)    VW, VADC, and Bentley, through their various entities,

3    design, manufacture, market, distribute and sell Volkswagen, Audi, and Bentley–

4    brand automobiles in California and multiple other locations in the United States

5    and worldwide.

6           (ii)    Collectively, the Defendants VW, VADC, and Bentley

7    are herein referred to as the "VW Group."

8        181.   MB Group

9           (a)    Defendant Mercedes-Benz USA, LLC ("MB") is a Delaware

10   limited liability corporation whose principal place of business is 1 Mercedes Drive,

11   Montvale, NJ 07645. MB's address for customer complaints is 3 Mercedes Drive,

12   Montvale, NJ 07645.  MB's registered agent for service of process is The

13   Corporation Trust Company, Corporation Trust Center, 1209 Orange St,

14   Wilmington, DE, 19801.

15          (b)    MB maintains a design research center in California: Defendant

16   Mercedes-Benz Research & Development North America, Inc. ("MBRD"), 309

17   North Pastoria Avenue, Sunnyvale, CA 94085. MBRD is a Delaware corporation

18   whose principal place of business is 3953 Research Park Dr., Ann Arbor, MI

19   48108. MBRDs' registered agent for service of process is Mercedes-Benz

20   Research & Development North America, Inc., c/o CT Corporation System, 818

21   W. Seventh St., Suite 930, Los Angeles, CA 90017.

22          (c)    MB and MBRD, through their various entities, design,

23   manufacture, market, distribute and sell Mercedes-Benz automobiles in California

24   and multiple other locations in the United States and worldwide.

25          (d)    Collectively, the Defendants MB and MBRD are herein

26   referred to as the "MB Group."

27       182.   Hyundai/Kia Group

28

1        a.      Hyundai

2            (i)      Defendant Hyundai Motor America, Inc. ("HMA") is a

3    California corporation whose principal place of business is 10550 Talbert Avenue,

4    Fountain Valley, CA 92708. HMA's address for customer complaints is P.O. Box

5    20850, Fountain Valley, CA 92728-0850. HMA's registered agent for service of

6    process is National Registered Agents, Inc., 818 W. Seventh St., Ste. 930, Los

7    Angeles, CA 90017.

8            (ii)      HMA maintains a design research center in California:

9    Defendant Hyundai America Technical Center, Inc. ("HATC"), 81 Bunsen, Irvine,

10   CA 92618. HATC is a Michigan corporation whose principal place of business is

11   6800 Geddes Road, Superior Township, MI 48198. HATC's registered agent for

12   service of process is Hyundai America Technical Center, Inc., c/o National

13   Registered Agents, Inc., 818 W. Seventh St., Suite 930, Los Angeles, CA 90017.

14       b.      Kia

15           (i)      HMA is the parent corporation and/or sister company of

16   Defendant Kia Motors America, Inc. ("Kia"). Kia is a California corporation

17   whose principal place of business is 111 Peters Canyon Road, Irvine, CA 92606.

18           (ii)      Though Kia vehicles are sold under a different brand

19   name in the United States, upon information and belief, Kia vehicles are

20   universally manufactured, marketed, and distributed by HMA.

21           (iii)      Moreover, Kia has the same registered agent for service

22   of process in the United States as HMA (c/o CT Corporation System, 818 W.

23   Seventh St., Suite 930, Los Angeles, CA 90017).

24           (iv)      Only Kia's customer service complaint department has

25   an address that is different from HMA's contact information.  Kia's customer

26   service complaint address is Kia Motors America Consumer Affairs Dept., P.O.

27   Box 52410, Irvine, CA 92619-2410.

28

1        (v)     Moreover, Kia uses the same design and research center,

2  HATC.

3        c.    The Hyundai/Kia Group

4        (i)    HMA, HATC, and Kia, through their various entities,

5  design, manufacture, market, distribute and sell Hyundai and Kia automobiles in

6  California and multiple other locations in the United States and worldwide.

7        (ii)   Collectively, the Defendants HMA, HATC, and Kia are

8  herein referred to as the "Hyundai/Kia Group."

9            **III.    JURISDICTION**

10     183.   Jurisdiction is proper in this Court pursuant to the Class Action

11  Fairness Act, 28 U.S.C. § 1332(d).

12     184.   This is a class action.  Some of the members of the proposed Plaintiff

13  Class are citizens of states different from the Automakers' home states.

14     185.   Upon information and belief, aggregate claims of individual Class

15  Members exceed $5,000,000, exclusive of interest and costs.

16            **IV.    VENUE**

17     186.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a).

18     187.   Each of the Automakers are deemed to reside in this district pursuant

19  to 28 U.S.C. § 1391(c), so personal jurisdiction is appropriate.

20     188.   In addition, a substantial part of the events or omissions giving rise to

21  these claims occurred in this district.

22     189.   The California-resident plaintiffs' Venue Declarations pursuant to

23  Cal. Civ. Code § 1780(d) are attached hereto as **Exhibits 30 through 40.**

24         **V.    FACTUAL ALLEGATIONS**

25     190.   Plaintiffs bring this action for themselves and on behalf of all Class

26  Members.  Plaintiffs are informed and believe that, because of the Defect—the

27  lack of Auto-Off in the Affected Vehicles—all such Affected Vehicles have a

28

dangerous propensity to cause carbon monoxide poisoning, placing Plaintiffs and the Class Members at undue risk of suffering physical injury and death due to carbon monoxide poisoning. This risk of imminent injury is caused by the Defect in conjunction with the Automakers' failure to recall, buy back, provide warnings about, and/or supply funds to retrofit and/or repair the dangerously defective Affected Vehicles.

191.   Affected Vehicles at issue in this action are described in detail in **Exhibit 1**.  The Automakers can readily ascertain and identify all Affected Vehicles by Vehicle Identification Number ("VIN") and/or specification sheets to discern which Affected Vehicles were optioned with or had the Keyless Fob as standard equipment. Department of Motor Vehicle registries readily identify those with Affected Vehicles.

192.   Plaintiffs reserve the right to amend the definition and list of "Affected Vehicles" should further discovery reveal that additional models, model-years, and model variations and trim levels are affected by the Defect.

**A.     The Keyless Fob**

193.   Over the past decade, an increasing number of vehicles in the United States are being sold with Keyless Fobs.  Keyless Fobs function without ever touching the vehicle (e.g., the Keyless Fob can remain in the driver's pocket or purse throughout operation of the vehicle).

194.   Vehicles with Keyless Fobs have several features that differentiate them from vehicles that use Physical Keys.  First, vehicles with Keyless Fobs have a "Start/Stop" button on the dashboard, center console, or shifter mechanism, rather than an ignition slot that accepts a Physical Key that is used to start the engine.  Second, the Affected Vehicles have a transponder (the Keyless Fob) that contains the circuitry that sends an electronic signal, rather than a conventional Physical Key with teeth.

195.   All named Automakers sell vehicles in the United States that are equipped with Keyless Fobs. As noted in **Exhibit 1**, though the Automakers name the Keyless Fobs using various catch-phrases such as "Intelligent Keys" and "SmartAccess", the Keyless Fobs are functionally the same when it comes to this Complaint's allegations regarding the Defect and a lack of Auto-Off.

196.   Over the years, the makes and models of automobiles with Keyless Fobs have risen dramatically:



**Number of models with keyless start**

*By model year*   ■ Standard   ■ Optional

| Year | Total | Optional | Standard |
|------|-------|----------|----------|
| 2010 | 144 | 44 | 100 |
| 2011 | 177 | 48 | 129 |
| 2012 | 197 | 41 | 156 |
| 2013 | 234 | 43 | 191 |
| 2014 | 254 | 40 | 214 |
| 2015 | 276 | 31 | 245 |

Sources: Edmunds.com

**B.   The Keyless Fobs Lead to Carbon Monoxide Poisoning Without Automatic Shut-off**

197.   Unfortunately and inexplicably, the Automakers have failed to implement an updated safety feature to prevent the Defect in the Affected Vehicles.  In these vehicles, a driver may place the car into park but due to Undetected Engine Activity, may not turn off the Affected Vehicle's engine. Thus, the Defect exists because the Affected Vehicle can emit dangerous (if not deadly)

1    levels of carbon monoxide, especially if left running in an enclosed environment,

2    such as a garage.

3        198.   In some instances, the engine may continue to run *even if the driver*

4    *pushes the Start/Stop button*. For example, in a recent recall, the Ford Group

5    recalled 432,096 vehicles, including  the 2015 model year Escape, Focus, and C-

6    Max models equipped with Keyless Fobs because, according to the official recall

7    report:[14]

8    Description of the Noncompliance : On your vehicle, it may be possible for the engine to continue to run after

9    turning the ignition key to the "off" position and removing the key
     (vehicles with standard ignition keys), or after pressing the Engine Start/

10   Stop button (vehicles with push-button start and intelligent access keys).

11   In other words, because of software glitches that affected nearly one-half of one-

12   million vehicles, depressing the "Start/Stop" button failed to turn off the engine as

13   the manufactures had intended.

14       199.   Although all of the makes/models of automobiles listed in **Exhibit 1**

15   have Keyless Fobs, upon information and belief (and based on counsel's review of

16   the thousands of pages of over 1,500 auto manuals and sales brochures), *none* have

17   Auto-Off. As a result, in just the past five years, at least 13 people have died and

18   many more have been injured, requiring hospitalization due to carbon monoxide

19   poisoning.

20       200.   Attached as **Exhibit 41** is a list of 27 complaints lodged with the

21   NHTSA by consumers about Defect incidents associated with Keyless Fobs. For

22   example, and as listed in chronological order:

23           (a)    On April 6, 2009, a person with a Toyota Group vehicle, a 2008

24   Lexus LS460, filed NHTSA complaint number 10264229, stating:

25           COMPLAINT REGARDING DANGER OF DEATH

26           DUE TO CARBON MONOXIDE. THIS CAR IS

27   ───────────────────

     [14] Non-Compliance Notice, July 1, 2015, *available at*: http://www-
28   odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM481952/RCLRPT-15V436-
     2235.PDF

KEYLESS WHICH OFTEN RESULTS IN THE FAILURE OF THEIR DRIVER SHUTTING OFF THE ENGINE WHICH IS AT TIMES PARKED INSIDE AN ENCLOSED GARAGE OF A HOME. THIS OCCURRED ON THREE DIFFERENT OCCASIONS AT MY HOME. THANK GOD I HAD A CARBON MONOXIDE ALARM IN MY HOME WHICH ALERTED ME OF THIS PROBLEM. LEXUS SHOULD HAVE INSTALLED SOME SORT OF SWITCH WHICH WOULD AUTOMATICALLY SHUT OFF THE ENGINE WHEN THE DRIVER SEAT HAS BEEN UNOCCUPIED FOR FIFTEEN MINUTES. **LEXUS STATES THEY HAVE RECEIVED MANY COMPLAINTS THROUGHOUT THE COUNTRY, HOWEVER THERE IS NOTHING THEY CAN DO ABOUT THIS PROBLEM AND DANGER. EXISTING CARS SHOULD BE RECALLED AND REPAIRED AND THIS SHOULD BE MANDATORY FOR ALL FUTURE CARS WITH A KEYLESS SYSTEM.**[15]

(b)      On May 4, 2009, a person with a Nissan Group vehicle, a 2009 Nissan Murano S, filed NHTSA complaint number 10267647, stating:

[MY CAR] COMES WITH PUSH BUTTON "START/STOP" ENGINE […] THE DANGER IS WHEN YOU PARK THE CAR IN YOUR GARAGE...AND FORGET TO PUSH THE START/STOP BUTTON TO TURN THE ENGINE OFF... BECAUSE THIS TECHNOLOGY IS NEW, THE INSTINCT IS TO PULL THE KEY FOB OUT AND GET OUT OF THE CAR... THE ENGINE REMAINS ON AND IT IS QUIET ENOUGH THAT YOU DO NOT NOTICE THE ENGINE RUNNING... THE DANGER IS THAT CARBON MONOXIDE CAN FILL UP YOUR GARAGE AND HOUSE AND KILL THE INHABITANTS... I CONTACTED NISSAN VIA EMAIL. THEY HAD A TECH. REVIEW MY COMPLAINT AND RESPONDED AS FOLLOWS "DON'T FORGET TO PUSH THE BUTTON TO TURN THE ENGINE OFF"... **OBVIOUSLY [NISSAN] DO[ES] NOT GET THE DANGER**.[16]

---

[15] **Exhibit 41** at 25 (emphasis added).

[16] *Id.* at 26 (emphasis added).

1              (c)     On February 3, 2010, a person with a Nissan Group vehicle, a

2   Nissan Altima, filed NHTSA complaint number 10304356, stating:

3                  [I] WOULD LIKE TO BRING TO YOUR ATTENTION
4   A DEFECT THAT I BELIEVE NEEDS TO BE
    CORRECTED IN AT LEAST SOME, IF NOT ALL, OF
5   NISSAN, LATEST ALTIMA VEHICLES. THE
    PROBLEM OCCURS WHEN THE CAR IS LEFT
6   RUNNING AND THE VEHICLE DOORS ARE
    CLOSED WITH THE REMOTE "KEYLESS". THIS
7   PROBLEM COULD CREATE A SERIOUS SAFETY &
    HEALTH ISSUE IF A DRIVER FORGETS TO SHUT
8   OFF THE ENGINE BEFORE USING THE REMOTE
    KEY TO CLOSE THE VEHICLE DOORS.[17]
9

10              (d)     On February 9, 2010, a person with a Toyota Group vehicle, a

11   2009 Toyota Camry Hybrid, filed NHTSA complaint number 10308004, stating:

12                  SAFETY HAZARD!. 2009 TOYOTA CAMRY
13   (LIKELY ALL HYBRID AUTOMOBILES) WILL
    CONTINUOUSLY RESTART THE GAS ENGINE TO
14   RECHARGE THE BATTERY IF THE IGNITION
    SYSTEM IS NOT TURNED OFF WHEN DEPARTING
15   THE VEHICLE. IF THE AUTO IS IN AN ATTACHED
    GARAGE THIS COULD RESULT IN ACCIDENTAL
16   CO POISONING TO OCCUPANTS WITHIN THE
    DWELLING. I HAVE OBSERVED A HYBRID
17   CONTINUOUSLY RESTARTING WHILE PARKED
    IN THE DRIVEWAY. THIS CAR IS USUALLY KEPT
18   IN AN ATTACHED GARAGE. THE OWNER
    FORGOT TO TURN OFF THE IGNITION UPON
19   LEAVING THE CAR. THIS IS LIKELY A COMMON
    EVENT. THIS WILL EVENTUALLY RESULT IN
20   SERIOUSLY INJURY OR DEATH, AND MAY HAVE
21   ALREADY HAPPENED AND NOT BEEN
    PROPERLY IDENTIFIED AND REPORTED.[18]
22

23              (e)     On April 28, 2010, a person with a Toyota Group vehicle, a

24   2007 Lexus LS460, filed NHTSA complaint number 10326861, stating:

25

26       [17] *Id.* at 24.

27       [18] *Id.* at 5.

28

---

I ARRIVED HOME AFTER DINNER […] CLOSED THE GARAGE DOOR AND, LEAVING THE KEY FOB INSIDE THE VEHICLE, I ENTERED MY HOME AND EVENTUALLY WENT TO SLEEP. I WAS AWOKEN AT APPROX. 2:15AM BY A CARBON MONOXIDE ALARM LOCATED IN THE FOYER INSIDE MY HOME ADJACENT TO THE ENTRANCE TO THE GARAGE. I ENTERED THE GARAGE TO DISCOVER THAT THE CAR'S ENGINE WAS STILL RUNNING, THE GARAGE FILLED WITH NOXIOUS FUMES, AND THE ENTIRE VEHICLE EXTREMELY HOT TO TOUCH, INSIDE AND OUT. I OPENED THE GARAGE DOOR AND WAS EVENTUALLY ABLE TO SHUT DOWN THE ENGINE AND CLEAR OUT THE FUMES. AS I SEE IT, THE FAILURE HERE WAS TWO-FOLD: (1) WHEN I OPENED MY DOOR TO EXIT THE CAR, NO ALARM OR OTHER SOUND ALERTED ME THAT THE ENGINE WAS STILL RUNNING, AS IS THE CASE WITH IGNITIONS REQUIRING KEYS. THIS IS PARTICULARLY PROBLEMATIC BECAUSE THE **CAR'S ENGINE RUNS IN VIRTUAL SILENCE**; AND (2) EVEN AFTER THE CAR WAS UNWITTINGLY LEFT IDLING WHILE IN PARK, **THE ENGINE DID NOT CUT OFF AFTER SOME PREDETERMINED PERIOD OF TIME**. I SPOKE TO MY LOCAL LEXUS DEALER, WHO SUGGESTED THAT I CONTACT LEXUS USA DIRECTLY. […] **AFTER BEING TOLD BY LEXUS THAT THEY SEE NO PROBLEMS WITH THEIR KEYLESS IGNITION SYSTEM, I ELECTED TO TAKE ANOTHER APPROACH AND CONTACT NHTSA. […] LEXUS HAS TAKEN NO RESPONSIBILITY FOR THIS INCIDENT WHICH NEARLY KILLED ME AND WHICH COULD KILL OTHERS, AND OFFERS NO SOLUTIONS OR FIXES TO THIS PROBLEM**.[19]

(f)     On May 28, 2010, a person with a Toyota Group vehicle, a 2009 Toyota Highlander Hybrid, filed NHTSA complaint number 10332639, stating:

OUR GARAGE IS ATTACHED TO OUR HOUSE WITH OUR BEDROOM ABOVE THE GARAGE. WITH 3 KIDS, BOTH MY WIFE AND I HAVE BEEN

---

[19] *Id.* at 23 (emphasis added).

DISTRACTED LEAVING THE CAR IN THE GARAGE TO UNLOAD GROCERIES OR HELP THE CHILDREN. WHEN ON ELECTRIC POWER WE HAVE NEGLECTED TO TURN OFF THE IGNITION **SINCE THE [HYBRID] CAR IS SILENT [WHILE PARKED]**. ONLY WHEN THE CARBON-MONOXIDE DETECTOR SOUNDED IN OUR GARAGE DID WE REALIZE THE ENGINE HAD STARTED WHILE WE WERE IN THE HOUSE. WE THINK THIS COULD BE DEADLY TO OTHER FAMILIES WITHOUT CARBON MONOXIDE ALARMS WHO MAY ALSO FORGET TO TURN OFF THE ENGINE WHEN PARKED IN AN ATTACHED GARAGE WHILE ON ELECTRIC POWER.[20]

(g)     One death was associated with a Toyota Group vehicle, described in NHTSA complaint number 10375730, filed on January 5, 2011:

ON THE EVENING OF DECEMBER 13, 2010, VICTIM LEFT HIS CAR RUNNING IN HIS GARAGE. THE CAR HAS A "SMART KEY" WHICH IS A REMOTE KEY-FOB. THIS MEANS THAT HE DOES NOT HAVE TO TURN A KEY TO TURN THE IGNITION ON AND OFF. INSTEAD, THE CAR TURNS ON AND OFF BY PRESSING THE SAME BUTTON ON THE DASH BOARD. HE MUST HAVE FORGOTTEN TO TURN THE CAR OFF. HE THEN WENT TO SLEEP AND SUFFERED CARBON MONOXIDE POISONING DURING THE NIGHT. HE WAS FOUND UNCONSCIOUS ON THE FLOOR THE NEXT MORNING. THE CAR WAS STILL RUNNING. THE VICTIM WAS TAKEN TO THE HOSPITAL, WHERE HE IS IN THE ICU AND SEDATED.[21]

(h)     One injury and one death associated with a Toyota Group vehicle, a 2006 Lexus IS 250, was  described in NHTSA complaint number 10380153, filed on February 3, 2011:

A YOUNG LADY PARKED HER 2006 IS 250 LEXUS, EQUIPPED WITH A "SMART KEY" SYSTEM, IN HER ATTACHED GARAGE WHICH WAS ON THE GROUND FLOOR OF HER THREE STORY

---

[20] *Id.* at 22 (emphasis added).

[21] *Id.* at 21.

TOWNHOUSE. SHE EXITED THE VEHICLE WITH THE "KEY FOB" ON HER PERSON, BUT EITHER INADVERTENTLY FORGOT TO SHUT DOWN THE ENGINE OR PUSHED THE START BUTTON IN AN EFFORT TO DO SO BUT WAS UNSUCCESSFUL. THE YOUNG LADY DID NOT REALIZE THE VEHICLE WAS RUNNING AND AFTER ENTERING HER TOWNHOUSE FROM THE GARAGE PLACED THE "KEY FOB" ON A TABLE ON THE SECOND FLOOR. THE YOUNG LADY REMAINED IN HER TOWNHOUSE WITH THE VEHICLE RUNNING IN THE GARAGE UNTIL IT RAN OUT OF GASOLINE AND STOPPED. THE YOUNG LADY WAS SUBSEQUENTLY FOUND DEAD IN HER BATHROOM ON THE THIRD FLOOR. THE DEATH WAS DETERMINED TO HAVE BEEN CAUSED BY CARBON MONOXIDE POISONING AS A RESULT OF THE VEHICLE HAVING BEEN LEFT RUNNING IN THE GARAGE. THE VEHICLE LACKED A "SHUT-DOWN" SWITCH TO SHUT THE ENGINE OFF WHEN UNOCCUPIED AND INERT FOR AN INTERVAL OF TIME AND/OR LACKED AN ADEQUATE AURAL WARNING THAT THE "KEY FOB" WAS BEING REMOVED FROM THE VEHICLE WHILE IT WAS RUNNING OR THE OPERATOR HAD EXITED THE VEHICLE WHILE THE ENGINE WAS RUNNING.[22]

(i)     Two injuries were associated with a person with a Toyota Group vehicle, a 2011 Toyota Camry XLE,  described in NHTSA complaint number 10394590, filed on March 20, 2011:

MY WIFE AND I ARE RETIRED IN FLORIDA. WE PARKED OUR 2011 TOYOTA CAMRY XLE WITH KEYLESS IGNITION IN OUR GARAGE AND BROUGHT THE KEY FOB WITH US INTO OUR HOME. MY WIFE EITHER DID NOT PUSH THE ENGINE OFF BUTTON HARD ENOUGH OR FORGOT TO PUSH THE ENGINE OFF BUTTON TO TURN OFF THE ENGINE. WE DID NOT HEAR THE 3 SHORT BEEPS TELLING US THE ENGINE WAS RUNNING AND THE KEY FOB WAS REMOVED FROM THE VEHICLE. THE GARAGE IS ATTACHED TO OUR HOME. THE VEHICLE WAS

_____
[22] *Id.* at 20.

LEFT RUNNING IN OUR CLOSED GARAGE. CARBON MONOXIDE FUMES ENTERED OUR HOME CAUSING HEADACHES, NAUSEA, AND LETHARGY. OUR HOME CARBON MONOXIDE DETECTOR SOUNDED AN ALARM. WE INVESTIGATED AND FOUND THAT WE LEFT THE VEHICLE RUNNING IN THE GARAGE FOR 90 MINUTES. THE GARAGE TEMPERATURE WAS OVER 100(F) DEGREES. […] WE WERE SICKENED BY THE CARBON MONOXIDE FUMES AND CAME CLOSE TO LOSING OUR LIVES. THE KEYLESS IGNITION OPTION IS TOO DANGEROUS. **THERE NEEDS TO BE A CHANGE IN DESIGN THAT TURNS OFF THE ENGINE WHEN THE KEY FOB LEAVES THE VEHICLE AND THE ENGINE OFF BUTTON IS NOT DEPRESSED**.[23]

(j)     On June 10. 2011, a person with a GM Group vehicle, a 2011 Cadillac SRX, filed NHTSA complaint number 10405921, stating:

ON THE 2011 CADILLAC SRX THERE IS NO WARNING SOUNDED IF YOU LEAVE YOUR KEYLESS IGNITION RUNNING AND LEAVE THE VEHICLE. YESTERDAY, I INADVERTENTLY LEFT THE VEHICLE RUNNING AND **THE CAR DID NOT BEEP OR GIVE ME ANY INDICATION THAT I HAD DONE SO**. THESE KEYLESS IGNITION SYSTEMS ARE VERY DANGEROUS BECAUSE IF YOU ACCIDENTALLY LEAVE THE CAR RUNNING IN THE GARAGE YOU COULD INADVERTENTLY CAUSE A CARBON MONOXIDE  POISONING SITUATION. IT IS A VERY UNSAFE FEATURE THAT COULD BE CORRECTED WITH A SIMPLE WARNING SIGNAL. THERE NEEDS TO BE SOME TYPE OF WARNING, A CAR HORN BEEP OR SOMETHING TO LET THE DRIVER KNOW THAT THE VEHICLE IS RUNNING WHEN THE DRIVER LEAVES THE VEHICLE.[24]

(k)     On November 29, 2011, a person with a Toyota Group vehicle, a 2010 LEXUS RX450h, filed NHTSA complaint number 10437757, stating:

---

[23] *Id.* at 19 (emphasis added).

[24] *Id.* at 18 (emphasis added).

HYBRID VEHICLE + KELSEY [sic, KEYLESS] IGNITION = DEADLY COMBINATION. WE ACCIDENTALLY LEFT OUR 2010 LEXUS RX450H IN THE GARAGE WITH THE IGNITION "ON" AND TURNED IN FOR THE NIGHT. **SINCE IT IS A HYBRID, IT MAKES NO SOUND - EVEN WHEN "RUNNING".** SO WE WERE UNAWARE THE IGNITION WAS STILL ON. MUCH LATER IN THE EVENING, AFTER THE BATTERY HAD DEPLETED, THE GAS ENGINE CAME ON, FILLING OUR GARAGE WITH CARBON MONOXIDE. HAD I NOT GONE BACK OUT TO RETRIEVE SOMETHING FROM THE GARAGE AND NOTICED THAT BY THIS TIME THE CAR'S GAS ENGINE WAS RUNNING, I LIKELY WOULDN'T BE WRITING THIS E-MAIL. THIS IS A VERY DANGEROUS FLAW IN AN OTHERWISE GREAT CAR. THE TINY RED VS. GREEN LED ON THE IGNITION BUTTON IS NOT ENOUGH INDICATION THAT THE CAR IS RUNNING. AN AUDIBLE ALARM OR SOME TYPE OF POSITIVE INTERLOCK IS NEEDED.[25]

(l)     On August 17, 2012, a person with a GM Group vehicle, a Chevrolet Volt, filed NHTSA complaint number 10471278, stating:

THERE IS AN APPARENT DESIGN FLAW IN THE CHEVY VOLT RELATED TO AN INDIVIDUAL EXITING THE VEHICLE WITHOUT POWERING DOWN THE SYSTEMS WHICH COULD RESULT IN CO POISONING OR DEATH AND POSSIBLE FIRE HAZARDS IN THE RIGHT SITUATION. THE VOLT USES A KEY FOB SYSTEM AND PUSH BUTTON START. KEY FOBS ARE ALREADY PROVING TO BE A SAFETY ISSUE. WITH THE VOLT, THE SITUATION IS EXACERBATED. SINCE THE CAR IS VIRTUALLY SILENT, IT IS VERY EASY FOR A PERSON TO FORGET TO TURN OFF THE CAR, AND WHEN THEY EXIT, **THE LACK OF ANY ENGINE NOISE** WILL OFTEN NOT GIVE THEM THE CUES NECESSARY TO REALIZE THEIR MISTAKE. WHEN THE INDIVIDUAL LEAVES THE CAR POWERED ON, THE BATTERY WILL DRAIN. WHEN THE BATTERY IS SUFFICIENTLY DRAINED, AN ENGINE WILL TURN ON AND

---

[25] *Id.* at 17 (emphasis added).

CHARGE THE BATTERIES. THIS IS SIGNIFICANT, BECAUSE THIS WILL LIKELY HAPPEN SOMETIME AFTER A PERSON HAS PARKED THEIR CAR. THE RESULT WILL BE A GARAGE FILLING WITH CO FUMES. THE VOLT WILL CONTINUE TO RUN THE ENGINE, IN CYCLES, UNTIL THERE IS NO MORE GAS IN THE TANK. WHILE THERE HAVE ALREADY BEEN DEATHS ASSOCIATED WITH NON-ELECTRIC VEHICLES EQUIPPED WITH KEY FOBS AND CO POISONING AS THE RESULT OF THE DRIVER FORGETTING TO TURN THE CAR, THIS IS GOING TO BE MUCH MORE COMMON IN ELECTRIC HYBRID VEHICLES. IN AN UNSCIENTIFIC POLL CONDUCTED ON GM-VOLT.COM, OF 100 RESPONDENTS, 30% ADMITTED TO FORGETTING TO TURN THEIR VEHICLE OFF. ONE USER ON THE SITE FORGOT TO TURN THE VEHICLE OFF, AND ENTERED THE GARAGE SOMETIME LATER TO FIND IT FILLED WITH FUMES. THERE NEEDS TO BE PASSIVE (HORN SIGNALS UPON EXIT) OR ACTIVE (WELL ENGINEERED AUTO SHUTOFF) SYSTEMS PUT IN PLACE TO PREVENT A TRAGEDY.[26]

(m)    One injury was reported associated with a person with a Toyota Group vehicle, a 2011 Lexus ES350, described in NHTSA complaint number 10458009, filed on May 10, 2012:

CONTACT OWNS A …2011 LEXUS ES350. THE CONTACT STATED THAT THE DRIVER EXITED THE VEHICLE AND FORGOT TO SHUT THE IGNITION OFF. THE VEHICLE WAS EQUIPPED WITH A PUSH TO START AND STOP FEATURE. THE ENGINE CONTINUED TO RUN UNTIL A CARBON MONOXIDE DETECTOR SOUNDED. THE DRIVER SUFFERED CARBON MONOXIDE POISONING AND AS A RESULT, WAS TAKEN TO A HOSPITAL TO TREAT THE CONDITION.[27]

---

[26] *Id.* at 4 (emphasis added).

[27] *Id.* at 16.

(n)     One death was reported associated with a person with a Toyota Group vehicle, a 2006 Toyota Avalon, described in NHTSA complaint number 10497402, filed on February 11, 2013:

> CONSUMER STATED HER PARENTS PURCHASED A NEW VEHICLE BACK IN 2006. THE VEHICLE CAME EQUIPPED WITH A KEYLESS REMOTE STARTING SYSTEM. ALL IT TOOK, WAS TO HAVE THE DEVICE IN ONES POCKET AND HER FATHER COULD GET IN THE VEHICLE, PRESS A BUTTON AND THE VEHICLE WOULD START UP. WHEN HER FATHER ARRIVED AT HIS DESTINATION, ALL HE HAD TO DO WAS, PUT THE VEHICLE IN PARK, PRESS THE REMOTE BUTTON AND THE ENGINE WOULD SHUT OFF. ON JUNE 28, 2012, WHEN THE CONSUMERS FATHER RETURNED HOME, HE PARKED THE VEHICLE IN THE GARAGE AND WENT IN THE HOUSE. HOURS LATER, THE CONSUMERS FATHER WAS FOUND DECEASED IN THE HOUSE FROM CARBON MONOXIDE POISONING. […]  AFTER HER DAD TOOK HIS PACKAGES OUT OF THE CAR AND INTO THE HOUSE, HE CLOSED THE GARAGE, AND NEVER SHUT OFF THE REMOTE STARTER BUTTON. FROM MORNING ALL THROUGH THE DAY, CARBON MONOXIDE SLOWLY SEEPED IN THE KITCHEN WHERE THE GARAGE WAS ATTACHED, THROUGH THE KITCHEN AND INTO THE DEN WHERE HER DAD WAS SITTING. **THE CONSUMER STATED HAD THERE BEEN AN AUTOMATIC SHUT OFF SYSTEM THAT ACTIVATED AFTER A PRESET TIME, WHEN THERE WAS NO WEIGHT IN THE DRIVER'S SEAT, MUCH LIKE THE AIR BAGS ON THE PASSENGER SIDE, THIS SENSELESS TRAGEDY WOULD HAVE NEVER OCCURRED.**[28]

(o)     On April 5, 2013, a person with a Nissan Group vehicle, a Nissan Altima, filed NHTSA complaint number 10507204, stating:

> I WAS DRIVING A BRAND-NEW, NISSAN ALTIMA RENTAL CAR ON A BUSINESS TRIP. AFTER I RETURNED TO MY HOTEL ONE AFTERNOON, I

---

[28] *Id.* at 14 (emphasis added).

FORGOT TO TURN THE ENGINE OFF. THIS VEHICLE HAS A KEY FOB AND A "START/STOP" BUTTON ONLY. THERE IS NO METAL KEY. AFTER I EXITED THE VEHICLE, I NOTICED THAT THE HORN DID NOT HONK WHEN I LOCKED THE VEHICLE WITH THE KEY FOB. THE TRUNK RELEASE DID NOT AUTOMATICALLY OPEN WHEN I USED THE KEY FOB. I MANUALLY PRESSED A BUTTON UNDER THE TRUNK LID TO RETRIEVE MY BAG. THE NEXT MORNING, I NOTICED STEAM AND WATER COMING OUT OF THE EXHAUST TAILPIPES. (IT WAS APP. 34 DEGREES THAT MORNING.) I DISCOVERED THAT THE ENGINE WAS STILL RUNNING, AND THE CAR USED APP[ROXIMATELY] 3/8S OF A TANK OF GASOLINE OVERNIGHT. MY CONCERN IS THAT A CAR LIKE THIS COULD BE DRIVEN INTO A GARAGE WITH THE ENGINE LEFT ON, AND THEN THE OCCUPANTS OF THE RESIDENCE COULD GET CARBON MONOXIDE POISONING FROM THE EXHAUST FUMES. THIS VEHICLE NEEDS SOME TIME [sic, KIND] OF WARNING BELL, CHIME, ETC. TO REMIND THE DRIVER THAT THE ENGINE IS STILL RUNNING IF THEY OPEN THE DRIVER'S SIDE DOOR AND/OR EXIT THE VEHICLE.[29]

(p)   On July 19. 2013, a person with a Toyota Group vehicle, a 2012 Toyota Camry, filed NHTSA complaint number 10525838, stating:

AT LEAST FOUR OCCASIONS THE MOTOR HAS REMAINED RUNNING AFTER I LEFT THE CAR....THIS CAR HAS PUSH BUTTON IGNITION....DID I NOT TURN IF OFF PROPERLY OR IS THERE A SYSTEM MALFUNCTION....I PARK MY CAR IN AN ATTACHED GARAGE TO OUR HOUSE AND THE DOOR TO OUR HOUSE FROM THE GARAGE IS LEFT OPEN IN THE SUMMER FOR VENTILATION.....IF THE CAR REMAINED RUNNING UNKNOWN TO US DURING THE NIGHT WE WOULD PERISH FROM THE CARBON MONOXIDE FUMES....I FEEL THIS IS A SAFETY ISSUE THAT NEEDS TO BE ADDRESSED BY TOYOTA, IF NOT ONLY FOR US BUT OTHER

---

[29] *Id.* at 13.

TOYOTA CAMRY OWNERS....SO FAR TOYOTA HAS NOT ADDRESSED THIS ISSUE TO OUR SATISFACTION....**IN FACT THE OWNER OF THE DEALERSHIP WHERE WE PURCHASED THE CAR LAUGHED AT OUR SAFETY CONCERN**.....THE ALARM SYSTEM +ON THE CAR IS USELESS AS THE ALARM IS THE SAME WHEN I START THE CAR AS WHEN I STOP THE CAR AND HAVE THE DOOR OPEN OR IF DO NOT TURN OFF THE ENGINE AND GET OUT OF THE CAR AND CLOSE THE DOOR....ALL THESE ALARMS SOUND THE SAME AND MAKE THEM INEFFECTIVE....I HAVE A HEARING PROBLEM RELATED TO EAR SURGERY REPLACING MY BONES OF HEARING BY AN IMPLANT IN MY RIGHT EAR WHICH ALSO MAKES IT HARD FOR ME TO HEAR IF THE ENGINE IS RUNNING OR TURNED OFF.....THE ALARM SYSTEM ON THIS CAR NEEDS TO BE MODIFIED TO ENSURE NOTIFICATION TO THE DRIVER IF THE ENGINE IS RUNNING. …[30]

(q)    On July 31. 2014, a person with a Nissan Group vehicle filed NHTSA complaint number 10617949, stating:

THIS VEHICLE HAS A PUSH BUTTON ENGINE SHUT OFF BUTTON. I WENT TO A SHOPPING MALL AND FORGOT TO SHUT OFF THE ENGINE. WHEN I RETURNED APPROX. 1 HOUR LATER, THE ENGINE WAS STILL RUNNING. I AM CONCERNED SHOULD THIS HAPPEN WHEN I PARK THE AUTO IN MY CLOSED GARAGE WHICH IS LOCATED DIRECTLY BELOW A BEDROOM. THE ENGINE WILL BE RUNNING ALL NIGHT AND THE BEDROOM WILL BE FILLED WITH CARBON MONOXIDE   RESULTING IN DEATH TO THE OCCUPANTS. **THE VEHICLE NEEDS A TIME DELAY SHUT OFF SHOULD THE DRIVER FORGET TO SHUT OFF THE ENGINE. THE TIME DELAY COULD BE SET BY THE MANUFACTURER AND SHOULD BE APPROXIMATELY 15 TO 20 MINUTES OTHERWISE THE ENGINE WILL RUN FOREVER**.[31]

---

[30] *Id.* at 12 (emphasis added).

[31] *Id.* at 11 (emphasis added).

(r)     On August 12, 2014, a person with a FCA Group vehicle filed NHTSA complaint number 10694821, stating:

> THIS IS A SAFETY CONCERN REGARDING THE ENGINE STARTING/STOP BUTTON WHEN OPERATING THE VEHICLE USING THE START/STOP BUTTON YOU CAN EXIT THE VEHICLE WITH THE ENGINE RUNNING WITHOUT ANY TYPE OF WARNING SIGNAL THAT THE ENGINE IS STILL RUNNING SUCH AS A WARDING [sic, WARNING] CHIME HORN BEEP OR A VIBRATION ON THE KEY FOB. IT IS EASY TO FORGET TO PRESS THE STOP BUTTON WHEN LEAVING THE VEHICLE. AS WE HAVE EXPERIENCED SEVERAL TIMES. THE DANGEROUS CONCERN WITH THIS LACK OF A SAFETY NOTIFICATION IS THE CAR CAN BE LEFT RUNNING IN AN ENCLOSED GARAGE SPREADING DEADLY CARBON MONOXIDE THROUGH A HOME.[32]

(s)     Two injuries were reported associated with a person with a GM Group vehicle, a Chevrolet Volt,  described in NHTSA complaint number 10658921, filed on November 18, 2014:

> THE INCIDENT OCCURRED ON 8/27/14, AND RESULTED IN MY WIFE [AND] ME [BEING] TAKEN TO THE HOSPITAL AND TREATED FOR CARBON MONOXIDE POISONING. THE INCIDENT OCCURRED AT OUR HOME. THE VOLT WAS PARKED IN THE ENCLOSED GARAGE ON 8/26 AROUND 7PM. THE 240 VOLT CHARGER WAS PLUGGED IN AS USUAL. I DID NOT NOTICE ANYTHING UNUSUAL AFTER PLUGGING IN THE CHARGER, AND THE VOLT WAS LEFT UNATTENDED UNTIL THE EMS ARRIVED AROUND 11AM THE FOLLOWING DAY. THE EMS PERSONNEL FOUND THE ENGINE RUNNING, VERY HIGH LEVELS OF CO UPON ENTERING THE GARAGE AND EVEN HIGHER LEVELS INSIDE THE CAR. THE INSIDE OF THE PASSAGE COMPARTMENT WAS DESCRIBED AS HOT. THE FRONT EXTERIOR OF THE CAR WAS TO HOT TO

---

[32] *Id.* at 3.

1
2
3
4
5

TOUCH AND THE CAR REAR WARM. THE TEMPERATURE UNDER THE CAR HOOD WAS DESCRIBED AS "RED HOT". THE ENGINE HAD CONSUMED AROUND 5 GALLONS OF GAS DURING THIS TIME PERIOD. DISTRIBUTION OF THE CO THROUGHOUT THE HOUSE WAS PROBABLY CAUSED BY THE A/C AIR HANDLER WHICH IS LOCATED INSIDE THE GARAGE. … [33]

6

     (t)     Two injuries were reported associated with a person with a

7   Toyota Group vehicle, a 2009 Toyota Camry, described in NHTSA complaint

8   number 10654360, filed on December 2, 2014:

9
10
11
12
13
14
15
16
17
18

CONSUMER STATED ENGINE DID NOT TURN OFF EVEN AFTER PUSHING THE POWER OFF BUTTON. THE CAR WAS PARKED IN THE GARAGE OVER A PERIOD OF TIME. CONSEQUENTLY, CARBON MONOXIDE ENTERED THE CONSUMER'S HOME. SHE AND HER HUSBAND WENT TO THE HOSPITAL FOR CARBON MONOXIDE POISONING. CONSUMER STATED ENGINE DID NOT TURN OFF EVEN AFTER PUSHING THE POWER OFF BUTTON. THE CAR WAS PARKED IN THE GARAGE OVER A PERIOD OF TIME. CONSEQUENTLY, CARBON MONOXIDE ENTERED THE CONSUMER'S HOME. SHE AND HER HUSBAND WENT TO THE HOSPITAL FOR CARBON MONOXIDE POISONING. … [34]

19

     (u)     Three injuries were reported associated with a person with a

20   GM Group vehicle, a Chevrolet Volt, as described in NHTSA complaint number

21   10694821, filed on March 17, 2015:

22
23
24
25
26

ON MARCH 2, 2015, THREE PEOPLE WENT TO AN EMERGENCY DEPARTMENT (ED) FOR CO POISONING. A 40 YEAR OLD MALE PARKED HIS 2012 CHEVROLET VOLT IN THE GARAGE TO CHARGE (PLUGGED INTO THE OUTLET) AND ACCIDENTALLY LEFT THE CAR RUNNING OVERNIGHT. IN THE MORNING, HE NOTICED

27   [33] *Id.* at 9.

28   [34] *Id.* at 10.

THE CAR WAS RUNNING AND HAD SWITCHED TO GASOLINE USE. HE AND HIS TWO CHILDREN COMPLAINED OF HEADACHE, WEAKNESS, CHEST PAIN, PALPITATION, AND DIZZINESS. CARBOXYHEMOGLOBIN (COHB) LEVELS WERE >15% FOR ALL THREE INDIVIDUALS. ON MARCH 12, 2015, SEVERAL NEWS MEDIA OUTLETS REPORTED THAT GM IS RECALLING ALL 2011-2013 CHEVROLET VOLTS (ABOUT 64,000) TO INSTALL UPDATES TO PREVENT CO POISONING WHEN THE DRIVER FORGETS TO SHUT OFF THE VEHICLE.[35]

(v)     On March 19, 2015, a person with a Nissan Group vehicle filed NHTSA complaint number 10695250, stating:

SINCE I LEASED MY CAR IN MAY[ ]2014[.] I FORGOT TO TURN THE ENGINE OFF 4 TIMES. TWICE IT RAN ALL NIGHT IN MY GARAGE BUT FORTUNATELY THE GAS FUMES DID NOT ENTER MY HOUSE WHILE I WAS SLEEPING. […] **I AM ELDERLY AND HARD OF HEARING AND I CAN HARDLY HEAR THE ENGINE RUNNING, I WEAR A HEARING AID. IT RUNS VERY QUIETLY.** ONCE I LOANED MY DAUGHTER THE CAR AND SHE ENCOUNTERED THE SAME PROBLEM OF NOT TURNING OFF THE ENGINE, I LEARN FROM INTERNET POST THAT COUNTLESS REPORTS HAVE BEEN MADE AND SEVERAL DEATHS BY CARBON MONOXIDE ENTERING HOMES HAVE OCCURRED DUE TO THIS PROBLEM, I UNDERSTAND THE KEYLESS IGNITION SYSTEM HAS BEEN AROUND FOR MANY YEARS AND IS INSTALLED IN MANY DIFFERENT VEHICLES, I WAS NOT AWARE OF IT UNTIL I GOT MY CAR. I FEEL A SAFETY RECALL SHOULD BE ISSUED TO CORRECT THE PROBLEM BEFORE MORE PEOPLE GET KILLED, THE PUBLIC SHOULD BE MADE AWARE OF IT WITHOUT FURTHER DELAY SINCE COUNTLESS REPORTS HAVE ALREADY BEEN MADE.[36]

---

[35] *Id.* at 2 (emphasis added).

[36] *Id.* at 8.

1      (w)    On April 28, 2015, a person with a FCA Group vehicle filed

2  NHTSA complaint number 10713276, stating:

3              ON THE KEYLESS START SYSTEM THERE IS NO
              WARNING THAT THE ENGINE IS RUNNING
4              WHEN YOU OPEN THE DOOR. THE DOOR CAN BE
              LOCKED AND YOU WALK AWAY WITH THE
5              VERY QUIET ENGINE RUNNING. HAD THIS
              HAPPENED WITH THE VEHICLE PARKED IN MY
6              GARAGE THE HOUSE WOULD FILL WITH
              CARBON MONOXIDE AND SOMEONE COULD
7              DIE.[37]

8      (x)    On June 9, 2015, a person with a Nissan Group vehicle filed

9

10 NHTSA complaint number 10724386, stating:

11             I NEGLECTED TO PUSH THE START/STOP
              BUTTON UPON EXITING THE CAR.
12             CONSEQUENTLY, THE CAR CONTINUED TO RUN.
              AT 10:30 PM, NEEDING A TOOL, I WENT BACK
13             AND OPENED THE GARAGE DOOR. A RUSH OF
              HOT AIR HIT ME IN THE FACE. TO MY HORROR, I
14             REALIZED THAT I DID NOT SHUT THE CAR OFF.
              GARAGE TEMPERATURE HAD TO BE ABOUT 120
15             DEGREES. WHO KNOWS WHAT COULD HAVE
              HAPPENED, HAD THE CAR RUN ALL NIGHT. **I
16             THINK THERE'S A SIMPLE EASY INEXPENSIVE
              FIX TO THIS. SOLUTION: REQUIRE ALL AUTO
17             MANUFACTURERS, UTILIZING THE KEYLESS
              IGNITION OPTION, TO, MANDATORILY, EQUIP
18             ALL VEHICLES WITH AN AUTOMATIC SHUT
              OFF IF A CAR IDLES IN PARK (TRANSMISSION
19             SELECTION) FOR MORE THAN 20 MINUTES.**
              THIS SAFETY OPTION SHOULD NOT BE ABLE TO
20             BE OVER RIDDEN BY CUSTOMER. I'M JUST
              THANKFUL THAT MY GARAGE WAS DETACHED.
21             CARBON MONOXIDE DEATHS VIA KEYLESS
              IGNITION ARE EASILY AVOIDABLE.[38]
22

23

24

25

26

27  [37] *Id.* at 7.

28  [38] *Id.* at 6 (emphasis added).

1    201.   These consumer complaints and reports to NHTSA are consistent.

2    They all outline the Defect, and many of the filings put the Automakers on notice

3    of the exact, simple, and basic remedy sought here: Auto-Off.

4    202.   A detailed investigation by counsel has uncovered scattered news

5    reports over the past few years describing deaths and injuries from the Defect.

6    203.   To date in 2015 alone, several people have died or have been

7    seriously injured from carbon monoxide poisoning caused by the Defect:

8    (a)    Just two months ago, a Highland Park, Illinois couple died of

9    carbon monoxide poisoning when their Affected Vehicle continued to run in the

10   garage;[39]

11   (b)    An elderly man was found unconscious in his townhome from

12   carbon monoxide poisoning caused by an Affected Vehicle. Fortunately, his

13   neighbor discovered and rescued him and was able to prevent his untimely death;[40]

14   (c)    A Berkley Heights, New Jersey man died and his wife was left

15   unconscious after their Affected Vehicle continued to run;[41] and

16   (d)    In Mooresville, North Carolina, several household members

17   woke up vomiting and had to be hospitalized for carbon monoxide poisoning after

18

19

20

21   [39] Associate Press. (June 22, 2015). Carbon Monoxide Death Prompts

22   Questions About Keyless Auto Ignitions. [online] Northernpublicradio.org.
     Available at: http://northernpublicradio.org/post/carbon-monoxide-death-prompts-

23   questions-about-keyless-auto-ignitions [Accessed 5 Aug. 2015].

24   [40] Sun-Sentinel, (April 24, 2015). *Carbon monoxide detector saves lives in
     apartment complex.* [online] Sun-Sentinel.com. Available at: http://www.sun-

25   sentinel.com/local/broward/fort-lauderdale/fl-lauderdale-carbon-monoxide-rescue-
     20150424-story.html [Accessed 5 Aug. 2015].

26   [41] Suzanne Russell,  (June 18, 2015). Carbon monoxide fumes kill Berkeley
     Heights man. [online] MY CENTRAL JERSEY. Available at:

27   http://www.mycentraljersey.com/story/news/local/union-
     county/2015/06/18/elderly-berkeley-heights-man-dies-apparent-exposure-co-

28   fumes/28925991/ [Accessed 5 Aug. 2015].

1   a Keyless Fob-equipped Nissan Murano continued to run for over 10 hours in the

2   garage.[42]

3         204.    More deaths and injuries were also reported between 2010 and 2014:

4             (a)    A woman was found dead in her townhome and her boyfriend

5   was found "clinging to life" when the woman's Lexus with a Keyless Fob

6   continued to run in the garage of the woman's home;[43]

7             (b)    An elderly couple were found dead as a result of Anoxic brain

8   injuries (carbon monoxide poisoning) when their Toyota Avalon continued to run

9   in their garage;[44]

10            (c)    A Weymouth, Massachusetts couple and their two

11  grandchildren all became ill and had to be hospitalized after their Keyless Fob-

12  equipped Lexus ES350 caused carbon monoxide poisoning;[45]

13            (d)    A couple from Manchester, Missouri died after their Keyless

14  Fob-equipped vehicle continued to run in their garage;[46]

15            (e)    A Lancaster Township, Pennsylvania couple died from carbon

16  monoxide poisoning after their Affected Vehicle continued to run in their garage;[47]

17

18  _____

19  [42] WBTV, (April 12, 2015). *Keyless ignition cars linked to carbon monoxide poisoning.* [online] Available at: http://www.wbtv.com/story/28473481/keyless-ignition-cars-linked-to-co-poisoning [Accessed 5 Aug. 2015].

20  [43] WMAR, (June 27, 2011). *A warning about keyless ignitions.* [online]
21  Available at: http://www.abc2news.com/news/local-news/investigations/a-warning-about-keyless-ignitions [Accessed 5 Aug. 2015].

22  [44] TheState, (June 19, 2013). *Accident likely caused Greenville couple's deaths, police say.* [online] Available at:
23  http://www.thestate.com/news/local/article14434898.html [Accessed 5 Aug. 2015].

24  [45] WCVB, (April 22, 2014). *Couple, kids hospitalized after car left running in Weymouth garage.* [online] Available at: http://www.wcvb.com/news/couple-kids-
25  hospitalized-after-car-left-running-in-weymouth-garage/25597062 [Accessed 5 Aug. 2015].

26  [46] Bruce, Betsey. (May 17, 2014). *Elderly couple found dead in Manchester home.* [online] FOX2now.com. Available at:
27  http://fox2now.com/2014/05/17/elderly-couple-found-dead-in-manchester-home/
28  [Accessed 5 Aug. 2015].

(f)     In Boca Raton, Florida, a 29-year-old woman died of carbon monoxide poisoning caused by her Keyless Fob-equipped 2006 Lexus;[48] and

(g)     In Boca Raton, Florida, a couple died when their Keyless Fob-equipped Mercedes-Benz continued to run.[49, 50]

205.   While counsel uncovered the above-referenced news stories concerning the Defect during their pre-suit investigation, counsel believe that the number of deaths and injuries are likely greater than reported because only some deaths are reported in the media, and even when deaths are reported, a cause of death is often not given or known.

**C.     The Automakers had Actual Knowledge of the Dangerous Carbon Monoxide Poisoning Consequences of Vehicles with Keyless Fobs that lack an Automatic Shut-off**

206.   Both the GM Group and the Ford Group have patented or have sought to patent the very Auto-Off systems that would prevent the Defect.

(a)     On May 20, 2013, the GM Group filed for a patent (issued on March 17, 2015 under patent number 8,983,720), to address the Defect.[51]  GM's

---

*(continued)*

[47] Stauffer, Cindy. (May 7, 2014). *Forgetting to turn off your car: Carbon monoxide deaths happen in Lancaster County, and across the country.* [online] Lancasteronline.com Available at: http://lancasteronline.com/news/local/forgetting-to-turn-off-your-car-carbon-monoxide-deaths-happen/article_40e8f97e-d602-11e3-a66e-0017a43b2370.html [Accessed 5 Aug. 2015].

[48] Sun-Sentinel, (September 1, 2010). *Investigation into carbon monoxide death near Boca Raton includes keyless car.* [online] Available at: http://articles.sun-sentinel.com/2010-09-01/news/fl-carbon-monoxide-keyless-20100831_1_carbon-monoxide-electronic-fob-auto-safety-experts [Accessed 5 Aug. 2015].

[49] Sun-Sentinel, (March 16, 2012). *Keyless Mercedes linked to carbon monoxide poisoning in West Boca, authorities say.* [online] Available at: http://articles.sun-sentinel.com/2012-03-16/news/fl-carbon-monoxide-cars-20120313_1_carbon-monoxide-keyless-ignition-keyless-systems [Accessed 5 Aug. 2015].

[50] *See also*, Factual Allegations, Section C, *infra* (discussing personal injury and wrongful death lawsuits filed against various Automakers for failing to institute an Auto-Off mechanism in Affected Vehicles).

[51] *See* **Exhibit 42**.

---

1    granted patent explicitly addressed the concerns (and relief requested) that

2    Plaintiffs and the Class seek here. Specifically, the patent seeks to avoid the

3    situation wherein the "engine may have been errantly left running, in which case

4    the vehicle sends a notice to the user[, and i]f no response [from the user] is

5    received [then] the vehicle can activate the engine kill device and stop the

6    engine."[52]  The patent acknowledges that a "vehicle operator may unintentionally

7    leave a motor vehicle engine running … [which can] even contribute to an

8    accumulation of exhaust gas if not properly ventilated, such as in some garages."

9    Moreover, the patent includes "one or more carbon monoxide (CO) sensors" so

10   that the vehicle can "indicate [if] exhaust fumes are present at dangerous levels."[53]

11   The GM Group had actual knowledge of the inherent dangers of not including

12   Auto-Off (and the Defect that would otherwise result) well in advance of its May

13   20, 2013 patent application filing.

14           (b)    Similarly, on November 1, 2011, the Ford Group filed for a

15   patent, application number 2013/0110374, to address the Defect.[54]  The patent

16   application explicitly addresses the concerns (and relief requested) that Plaintiffs

17   and the Class seek here. Specifically, the patent application seeks to avoid the

18   situation wherein "a vehicle operator may unintentionally leave the vehicle with

19   the engine idling," which is common because "engine technology that have made

20   vehicle engines quieter further increase the likelihood that a vehicle operator may

21   leave the vehicle with the engine running."[55] Thus, the patent application proposes

22   a method whereby the "vehicle control systems may be configured to automatically

23   shut down an idling engine, for example, upon the elapse of a specified duration of

24

25   _____

26   [52] *Id.*

     [53] *Id.*

27   [54] *See* **Exhibit 43**.

28   [55] *Id.*

1   idling time."[56] Moreover, the patent application anticipates a situation in which the

2   vehicle is left "in a substantially enclosed space, such as an indoor garage, [then]

3   the vehicle control system may automatically shut down the idling engine in

4   anticipation of the operator not returning to the vehicle imminently."[57] Thus, the

5   Ford Group had actual knowledge of the inherent dangers of not including Auto-

6   Off (and the Defect that would otherwise result) well in advance of its November

7   1, 2011 patent application filing.

8         (c)    Upon information and belief, *all* of the named Automakers

9   regularly review patents by competitor Automakers, and thus they too had actual

10   knowledge (or constructive knowledge, at the very least) of the Defect that exists

11   in the absence of Auto-Off.

12        207.   The Automakers, and the GM Group especially, know the dangers of

13   the Affected Automobiles and the Defects that result. On Friday, March 13, 2015,

14   Chevrolet, a GM Group vehicle brand, issued an official recall of all 2011, 2012

15   and 2013 model year Chevrolet Volt range-extended electric cars to address an

16   issue with the car's on-board software that allowed its gasoline engine to operate

17   for extended periods of time while parked but unintentionally left powered on.

18   According to official NHTSA recall documents, the GM Group itself estimated

19   that "100%" of the 50,236 Chevrolet Volts were plagued by this defect, noting that

20   when the vehicle's gas engine continues to run after the battery is depleted:

21   Description of the Safety Risk : If the gas engine runs for long periods of time within an enclosed space, such as

22               a garage, carbon monoxide could build up in the enclosed space and potentially cause injury.

23   Description of the Cause : The 2011-2013 MY Volt vehicles were not equipped with software that

24               automatically shuts off a vehicle after a predetermined amount of time.  This software was deployed starting with the 2014 MY Volt vehicles and beyond.

25

26

27   [56] *Id.*

28   [57] *Id.*

58  The recall itself was not a prolonged, difficult process.  To the contrary, vehicle dealers simply had to reprogram the cars via a software update taking approximately 30 minutes per vehicle. U.S. dealers were reimbursed by the GM Group $4.78 per vehicle for the reprogramming.[59]

(a)  In other words, the GM Group admitted in its recall of the 2011-2013 Chevrolet Volts that: 1) Keyless Fobs pose a safety risk because "carbon monoxide could build up in [an] enclosed space"[60], and 2) the vehicles could be modified to cure the Defect with a simple software update costing less than $5.00 per vehicle and taking just 30 minutes of dealership time.

(b)  Despite the fact that the GM Group implemented this remedy to the Defect for the 2011-2013 Chevrolet Volts, it has failed to do so for *any* of its other Affected Vehicles that have the *exact same* Defect.

208.  Many of the Automakers have faced personal injury and wrongful death lawsuits as a result of the Defect, but instead of instituting Auto-Off across the board, the Automakers have quietly settled the suits behind confidentiality agreements, thereby concealing the risks of the Defect. Thus, the Defect has yet to see the full light of day. For example:

(a)  On November 1, 2010, Myrna and Donato Pastore filed a wrongful death lawsuit against Toyota for the death of Ernest Codelia, Jr..[61] The amended complaint states that Ernest Codelia, Jr. died of carbon monoxide poisoning as a result of his 2008 Lexus EX 350, which was equipped with a

_____

[58] NHTSA Safety Recall 14617; *Defect Notice report*; Available at: http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM474874/RCLRPT-15V145-6748.PDF.

[59] NHTSA Safety Recall 14617; *Remedy Instructions and TSB*; Available at: http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM476093/RCRIT-15V145-6506.pdf.

[60] NHTSA Safety Recall 14617; *Defect Notice report*; Available at: http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM474874/RCLRPT-15V145-6748.PDF.

[61] Case 1:10-cv-05020 (E.D.N.Y. 2010), Docket No. 1.

1  Keyless Fob.[62] The case was settled under seal.[63] Toyota insisted that the

2  settlement be under seal, and thus there are no public documents or information as

3  a result of this suit.[64]

4          (b)     In a related suit, filed by Mary Rivera on October 29, 2010

5  against Toyota, she alleges that she collapsed and was found barely breathing as a

6  result of carbon monoxide poisoning caused by her 2008 Lexus EX 350, which

7  was equipped with a Keyless Fob and continued to run after the driver left the

8  vehicle. [65] Ms. Rivera is a former college professor who now suffers from

9  permanent brain damage as a result of the carbon monoxide poisoning.  Though

10  Ms. Rivera survived the incident, her partner Ernest Cordelia, Jr., died—as noted

11  in the paragraph immediately above—with 65 percent carbon monoxide poisoning

12  in his blood, according to an autopsy report. This case was settled and closed on

13  October 1, 2014; the settlement was also done under seal.[66]

14          (c)     On April 1, 2011, Linda Bloom and Rachelle Brown filed a

15  wrongful death action against Toyota for the death of their father, Meyer Michael

16  Yaffe, who died on December 30, 2010, as a result of carbon monoxide poisoning

17  from his 2009 Lexus EX 350, which was equipped with a Keyless Fob.[67]

18          (d)     On June 14, 2011, Kimberlin Nickles filed a wrongful death

19  action against Toyota for the death of her daughter, Chastity Glisson, who died on

20  August 26, 2010 at the age of 29 as a result of carbon monoxide poisoning from

21  her 2006 Lexus IS 250, which was equipped with a Keyless Fob.[68] Chastity

---

22  [62] *Id.* at Docket No. 11.

23  [63] *Id* at Docket No. 55.

24  [64] *See id*, at Docket Nos. 53, 54 (joint letter stating that Toyota insisted on full confidentiality, even though safety concerns were at issue).

25  [65] Case 1:10-cv-04998 (E.D.N.Y. 2010), Docket No. 13.

26  [66] *Id* at Docket Nos. 64 & 65.

27  [67] Case No. BC458715 (Cal. Sup. Ct., County of Los Angeles).

28  [68] Case No. 11-13565 (Circuit Court of the Seventeenth Judicial Circuit, Broward County, Florida).

---

1    Glisson parked her Lexus in the garage to make room for her boyfriend, Timothy

2    Maddock's, vehicle.  Chastity collapsed in the third-floor bathroom later that night.

3    Later, Timothy found her body, but then he too succumbed to carbon monoxide

4    and lost consciousness. Neither Ms. Glisson nor Mr. Maddock were found until the

5    next day. By then, 29-year-old Chastity Glisson had died, and Timothy Maddock

6    was critically injured and required hospitalization for ten days.  An investigation

7    revealed that the carbon monoxide that killed Ms. Glisson and severely injured Mr.

8    Maddock came from the Lexus in the garage, which was equipped with a Keyless

9    Fob, and unbeknownst to the occupants of the home, continued to run after the

10   driver exited the vehicle.[69]

11            (e)     On December 30, 2014, William Thomason, Jr. filed a

12   wrongful death action against Toyota for the death of his wife, Eugenia McCuen

13   Thomason, who died on June 17, 2013, as a result of carbon monoxide poisoning

14   from her 2005 Toyota Avalon, which was equipped with a Keyless Fob.[70] The

15   married couple parked their car in their garage. Both were killed by carbon

16   monoxide poisoning.[71]

17   **D.    The Automakers Should Have Known of the Dangerous Carbon
         Monoxide Poisoning Consequences of Vehicles with Keyless Fobs but
18       without an Automatic Shut-off**

19            209.   Even if some of the Automakers were not parties to lawsuits

20   concerning the Defects, *all* of the Automakers *should* have known of the dangers

21   that the Defect poses for the Affected Vehicles through other industry recalls and

22   industry modifications.

23            210.   The Automakers readily have access to all NHTSA complaints

24   pertaining to both their own manufactured vehicles as well as any other

25

26   [69] *Id.*

27   [70] Case No. 6:14-cv-04895 (D.S.C. (Greenville Division)).

28   [71] *Id.*

1    manufacturers' automobiles. Upon information and belief, the Automakers do (or

2    should) regularly review NHTSA complaints to ensure internal quality and safety

3    compliance. As noted above, there have been, at minimum, 27 formally-filed

4    NHTSA complaints about the Defect.[72]

5        211.   Upon information and belief, *all* of the named Automakers regularly

6    review patents pertaining to the automotive industry and safety. There are, at

7    minimum, four issued or pending patents for "Auto-Off" systems or mechanisms

8    dating back to November 16, 2007, not including the applications submitted by the

9    Ford Group and the GM Group. For example:

10       (a)    Patent number 7,650,864, applied for on November 16, 2007 by

11   Magna Electronics Inc. and issued on January 26, 2010 concerns remote starting

12   systems on cars and a built-in Auto-Off system to prevent the Defect. Magna

13   Electronics instituted such a technology in its patent "[s]ince vehicles typically

14   exhaust carbon monoxide and carbon dioxide emissions during operation of the

15   engine, and since such emission buildup in an enclosed environment can be

16   dangerous, the remote starter control module preferably provides one or more

17   safety measures or features to reduce or mitigate any potential CO/CO2 buildup in

18   situations where the vehicle may be parked in an enclosed environment."[73]

19       (b)    Patent application number 2012/0130604, filed on November

20   21, 2011 by Michael W. Kirshon, *et al.*, is for "a series of sensors installed within a

21   vehicle to monitor functions to determine if a vehicle engine is running and there is

22   a potential for toxic exhaust gases to accumulate, creating a toxic environment."[74]

23   In other words, this patent describes an Auto-Off system to prevent the Defect.

24   Patent application number 2012/0130604 describes the Defect associated with the

25   Affected Vehicles as follows:

26   _____

[72] *See* **Exhibit 41.**

27   [73] *See* **Exhibit 44.**

28   [74] *See* **Exhibit 45.**

Combustion engines discharge an exhaust that includes toxic gases, such as carbon monoxide. It is well known that elevated levels of carbon monoxide gases contained within a closed space can have harmful and even fatal effects on individuals exposed to higher concentrations thereof.

Numerous occurrences have been noted where residential occupants have succumbed to toxic exhaust gases discharged by a running vehicle engine, where the vehicle was parked within an attached garage. Several advancements in vehicle technology are aggravating the potential issue. For example, keyless engine control systems allow an operator to leave the vehicle while the engine remains running. Until recently, all vehicle engines would initiate operation by inserting a key into an ignition switch, whereby removing the key causes the engine to cease operating. The vehicle key would commonly be stored on a key ring used to hold a series of keys. The operator commonly uses other keys to access buildings, offices, desks, residence, etc. An operator who forgets to remove the keys from the vehicle would be reminded the next time a key stored on the same key ring would be needed. Furthermore, vehicle engines are now much quieter, making people less aware that the engine is running. In addition, vehicles now commonly include remote starters, where an individual can start a vehicle's engine remotely. This can occur by accidentally depressing the remote start button, thereby starting the vehicle engine unbeknownst to the individual.[75]

Patent application 2012/0130604 thus proposes to patent a system whereby sensors "automatically disables or turns off the ignition of the vehicle engine to cease the generation of the toxic exhaust gases."[76]

       (c)    Patent number 8,825,224, applied for on March 26, 2012 by Directed, LLC and issued on September 2, 2014, concerns "[a]n automated vehicle

---

[75] *Id.*

[76] *Id.*

shutdown and user notification method and device for shutting down an engine in a vehicle having a passive keyless entry and start ignition system where the engine has unintentionally been left running by the user is disclosed."[77] In the relevant part, patent number 8,825,224 describes the Defect associated with the Affected Vehicles as follows: to prevent "[l]ong term idling of the engine within a confined space, such as as within a garage attached to a dwelling, can lead to a rise in carbon monoxide levels that might potentially cause asphyxiation, brain damage or death to individuals exposed to high concentrations of carbon monoxide inside the dwelling."[78]

(d)     Patent number 8,977,476, applied for on August 14, 2012 by Safety Shutdown, LLC and issued on March 10, 2015 concerns "[a] system for automatically shutting down an engine of a motor vehicle" taking into account multiple variables, including an Auto-Off timer, carbon monoxide sensing ability, and dependent on driver override request.[79]  In the background section of Safety Shutdown, LLC's patent, it duplicated, in full, Michael W. Kirshon, *et al.*'s patent application number 2012/0130604 regarding why such a safety mechanism is paramount.  Safety Shutdown, LLC's patent simply attempted to address the same problem through different technological means.[80] In short, Safety Shutdown, LLC's patent covers the exact Defect as described herein.

**E.     An "Auto-Off" Mechanism or System is Feasible**

212.   "Auto-Off" is feasible for each of the Automakers to implement—immediately—through a simple recall campaign.

213.   Auto-Off is not only feasible; it has *already* been implemented by several auto manufacturers to prevent the very Defect described herein.

---

[77] *See* **Exhibit 46.**

[78] *Id.*

[79] *See* **Exhibit 47.**

[80] *Id.*

214.   For example, and as noted above,[81] the GM Group has not only instituted an Auto-Off in its 2014-2015 model year Chevrolet Volts, due to safety concerns, it *recalled* all of its prior model year (2011-2013) Chevrolet Volts due to the lack of such a system because "carbon monoxide could build up in [an] enclosed space."[82]

215.   Additionally, the 2014 and 2015 Lincoln MKS vehicles, manufactured and designed by the Ford Group, are equipped with a Keyless Fob but are *not* Affected Vehicles because they have instituted a clear Auto-Off system that: 1) shuts down the vehicle after 30-minutes of running if there is no user intervention, and 2) there is no "defeat" mechanism to override this important Auto-Off safety function. See:

**Automatic Engine Shutdown**

Your vehicle has a feature that automatically shuts down the engine if it has been idling for an extended period. The ignition also turns off in order to save battery power. Before the engine shuts down, a message appears in the information display showing a timer counting down from 30 seconds. If you do not intervene within 30 seconds, the engine shuts down. Another message appears in the information display to inform you that the engine has shut down in order to save fuel. Start your vehicle as you normally do.

**Automatic Engine Shutdown Override**

**Note:** You cannot permanently switch off the automatic engine shutdown feature. When you switch it off temporarily, it turns on at the next ignition cycle.

You can stop the engine shutdown, or reset the timer, at any point before the 30-second countdown has expired by doing any of the following:
- You can reset the timer by interacting with your vehicle (such as pressing the brake pedal or accelerator pedal).
- You can temporarily switch off the shutdown feature any time the ignition is on (for the current ignition cycle only). Use the information display to do so.

**Exhibit 48** (2014 Lincoln MKS Auto Manual), at 152.

---

[81] *See* paragraph 207, *supra*.

[82] NHTSA Safety Recall 14617; *Defect Notice report*; Available at: http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM474874/RCLRPT-15V145-6748.PDF.

216.   Other 2013, 2014, and 2015 Model year Ford Group vehicles have similarly instituted Auto-Off and are therefore not listed as Affected Vehicles. Yet, despite the fact that the Ford Group has instituted Auto-Off in *some* of its most recent cars, it has left *older* model year vehicles with the Defect and without any software update or recall to institute a similar (or identical) Auto-Off system, and it has not issued a warning for its Affected Vehicles.[83]

217.   Given the prevalence of the Defect, the Automakers' failure to immediately implement (and to have previously implemented prior to sale) Auto-Off is a material and unreasonable safety defect.  As a result, the Automakers' nondisclosure of the Defect in Plaintiffs' and Class Members' automotive manuals and sales brochures was (and remains) unreasonable.

## VI.   FRAUDULENT CONCEALMENT ALLEGATIONS

218.   Absent discovery, Plaintiffs are unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals associated with the Automakers responsible for disseminating false and misleading marketing materials (and marketing materials with material omissions) regarding the Affected Vehicles.  The Automakers are necessarily in possession of all of this information. Plaintiffs' claims arise out of the Automakers' fraudulent concealment of the Defect and the safety hazard it poses, and its representations about the safety of the Affected Vehicles. To the extent that Plaintiffs' claims arise from the Automakers' fraudulent concealment, there is no one document or communication, and no one interaction, upon which Plaintiffs base their claims. Plaintiffs allege that at all relevant times, including specifically at the time they purchased their Affected Vehicles, the Automakers knew, or were reckless in not

---

[83] *See ,e.g.,* **Exhibit 1** (for Ford models and model years *not* listed because they have instituted Auto-Off versus Ford models and model years that remain on the list because they did not implement Auto-Off. For example, Ford/Lincoln did not retroactively cure the Defect in the 2009-2014 MKS even though it instituted Auto-Off in the 2014-2015 MKS).

1   knowing, of the Defect when combined with the lack of Auto-Off. The automakers

2   were under a duty to disclose the Defect based upon their exclusive knowledge of

3   the Defect; the Automakers never disclosed the Defect to the Plaintiffs or the

4   public at any time or place or in any manner.

5       219.   Plaintiffs make the following specific fraud allegations with as much

6   specificity as possible absent access to the information necessarily available only

7   to the Automakers:

8       (a)    **Who**:  Automakers actively concealed the Defect from

9   Plaintiffs and the Class while simultaneously touting the safety of the Affected

10  Vehicles.[84]  Plaintiffs are unaware of, and therefore unable to identify, the true

11  names and identities of those specific individuals and the Automakers responsible

12  for such decisions.

13      (b)    **What**:  The Automakers knew, or were reckless or negligent in

14  not knowing, that the Affected Vehicles contain the Defect.  The Automakers

15  concealed the Defect and made express representations about safety of the

16  Affected Vehicles.[85] Moreover, the Automakers knew of or prepared patent

17  applications, defended and confidentially settled personal injury lawsuits, and

18  reviewed NHTSA complaints about the Defect.[86]

19      (c)    **When**:  The Automakers concealed material information

20  regarding the Defect at all times and made representations about the Affected

21  Vehicles, starting no later than 2007, or at the subsequent introduction of certain

22  models of Affected Vehicles to the market, continuing through the time of sale,

23  and on an ongoing basis, and continuing to this day.  The Automakers have,

24  universally, not disclosed the truth about the Defect in the Affected Vehicles to

25

26  [84] *See* paragraphs 38-172 (Plaintiffs' specific allegations with reference to
    attached exhibits touting safety of Plaintiffs' Affected Vehicles), *supra*.

27  [85] *Id.*

28  [86] *See* Factual Allegations, Sections C and D, *supra*.

1    anyone. In fact, in the only two instances in which Automakers have done anything

2    about the Defect, the Automakers have failed to implement Auto-Off on other

3    vehicle models or brands.[87] Moreover, and as a representative example, the 2014-

4    2015 Lincoln MKS, instead of stating that Auto-Off was implemented to prevent

5    the carbon monoxide poisoning, the Ford Group misleadingly stated that such a

6    change was implemented "to save battery power."[88]  Such a claim is disingenuous

7    or a half-truth at best.  Thus, none of the Automakers have ever taken any action to

8    inform consumers about the true nature of the Defect in Affected Vehicles.

9            (d)    *Where*:  The Automakers concealed material information

10   regarding the true nature of the Defect in every communication they had with

11   Plaintiffs and the Class and made representations about the safety of the Affected

12   Vehicles.  Despite counsel's review and analysis of marketing materials, sales

13   brochures, and auto manuals for each of the Affected Vehicles, Plaintiffs are aware

14   of no document, communication, or other place or thing, in which the Automakers

15   disclosed the truth about the Defect in the Affected Vehicles to anyone outside of

16   each individual Automakers' group.  Such information is not adequately disclosed

17   in any sales documents, displays, advertisements, warranties, owner's manual, or

18   on the Automakers' websites.

19           (e)    *How*:  The Automakers concealed the Defect from Plaintiffs

20   and Class Members and made representations about the safety of the Affected

21   Vehicles.[89]  The Automakers actively concealed the truth about the existence and

22   nature of the Defect from Plaintiffs and Class Members at all times, even though

23   they knew about the Defect and knew that information about the Defect would be

24

25   _____

26        [87] *See* paragraphs 213-216, *supra*.

          [88] *See* paragraph 215, *supra*.

27        [89] *See* paragraphs 38-172 (Plaintiffs' specific allegations with reference to

28   attached exhibits touting safety of Plaintiffs' Affected Vehicles), *supra*.

important to a reasonable consumer. The Automakers promised in their marketing materials that Affected Vehicles have qualities that they do not have. [90]

(f)    *Why*:  The Automakers actively concealed material information about the Defect in the Affected Vehicles for the purpose of inducing Plaintiffs and Class Members to purchase the Affected Vehicles rather than purchasing competitors' vehicles, and made representations about the safety of the Affected Vehicles.[91]  Had the Automakers disclosed the truth, Plaintiffs and Class Members (and reasonable consumers) would not have bought the Affected Vehicles or would have paid less for them.

## VII.   TOLLING OF THE STATUTE OF LIMITATIONS

### A.    Fraudulent Concealment Tolling

220.   Upon information and belief, the Automakers have known of the Defect in the Affected Vehicles since at least 2007,[92] if not earlier, and have concealed from or failed to notify Plaintiffs, Class Members, and the public of the full and complete nature of the Defect.

221.   Any applicable statute of limitation has therefore been tolled by the Automakers' knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

### B.    Estoppel

222.   The Automakers were and are under a continuous duty to disclose to Plaintiffs and Class Members the true character, quality, and nature of the Affected Vehicles.  The Automakers actively concealed the true character, quality, and nature of the Affected Vehicles and knowingly made representations about the

---

[90] *See* Factual Allegations, Sections C and D, *supra*.

[91] *See* paragraphs 38-172 (Plaintiffs' specific allegations with reference to attached exhibits touting safety of Plaintiffs' Affected Vehicles), *supra*.

[92] This is the date of the first patent application for technology to implement Auto-Off. *See* paragraph 210(a), *supra*.

safety of the Affected Vehicles.  Plaintiffs and Class Members reasonably relied upon the Automakers' knowing and affirmative representations and/or active concealment of these facts.[93]  Based on the foregoing, the Automakers are estopped from relying on any statutes of limitation in defense of this action.

**C.   Discovery Rule**

223.   The causes of action alleged herein did not accrue until Plaintiffs and Class Members discovered that their Affected Vehicles had the Defect.

224.   However, Plaintiffs and Class Members had no realistic ability to discern that the Affected Vehicles were defective until—at the earliest—after the manifestation of the Defect.  Even then, Plaintiffs and Class Members had no reason to know the Defect was caused by the Automakers' active concealment of same.  Not only did the Automakers fail to notify Plaintiffs or Class Members about the Defect, the Automakers in fact, in the above-referenced personal injury cases, have denied any knowledge of or responsibility for the Defect.  Thus, Plaintiffs and Class Members were not reasonably able to discover the Defect until after they had purchased or leased the Affected Vehicles, despite their exercise of due diligence, and their causes of action did not accrue until they personally discovered that the Defect can lead to carbon monoxide poisoning.

**VIII.  CLASS ACTION ALLEGATIONS**

225.   Plaintiffs bring this lawsuit as a class action on behalf of themselves and all other Class Members similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2) and (b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.  If, in any instance, the Court

---

[93] *See* paragraphs 38-172 (Plaintiffs' specific allegations with reference to attached exhibits touting safety of Plaintiffs' Affected Vehicles), *supra*.

finds (b)(3) requirements are not met, Plaintiffs and Class Members alternatively seek certification under Federal Rules of Civil Procedure 23(a) and 23(c)(4).

226.   The Class is defined as:

(a)   All persons in the United States who purchased or leased an Affected Vehicle (the "Nationwide Class");

(b)   All persons in the State of California who purchased or leased an Affected Vehicle (the "California Class");

(c)   All persons in the State of Arizona who purchased or leased an Affected Vehicle (the "Arizona Class");

(d)   All persons in the State of Colorado who purchased or leased an Affected Vehicle (the "Colorado Class");

(e)   All persons in the State of Connecticut who purchased or leased an Affected Vehicle (the "Connecticut Class");

(f)   All persons in the State of Florida who purchased or leased an Affected Vehicle (the "Florida Class");

(g)   All persons in the State of Massachusetts who purchased or leased an Affected Vehicle (the "Massachusetts Class");

(h)   All persons in the State of New Jersey who purchased or leased an Affected Vehicle (the "New Jersey Class");

(i)   All persons in the State of New York who purchased or leased an Affected Vehicle (the "New York Class");

(j)   All persons in the State of Pennsylvania who purchased or leased an Affected Vehicle (the "Pennsylvania Class");

(k)   Excluded from all of the Classes are: (1) the Automakers, any entity or division in which the Automakers have a controlling interest, and their legal representatives, officers, directors, assignees, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) governmental entities; and (4)

1  those persons who have suffered personal injuries as a result of the facts alleged

2  herein.

3      227.   In the alternative, pursuant to Federal Rules of Civil Procedure 23(a)

4  and 23(c)(5), Plaintiffs and Class members reserve the right to propose class

5  groupings of states that do not have materially different bodies of state law.

6      228.   Plaintiffs reserve the right to amend the Class and the in-the-

7  alternative class if discovery and further investigation reveal that the Class should

8  be expanded, otherwise divided into subclasses, or modified in any other way.

9  **A.    Numerosity & Ascertainability**

10     229.   Although the exact number of Class Members is uncertain and can

11 only be ascertained through appropriate discovery, the number is great enough

12 such that joinder is impracticable.  Upon information and belief, the number of

13 Affected Automobiles as outlined in **Exhibit 1** is in excess of 5,000,000 vehicles.

14 The disposition of the claims of these Class Members in a single action will

15 provide substantial benefits to all parties and to the Court.

16     230.   Class Members are readily identifiable from information and records

17 in the Automakers' possession, custody, or control, including the VIN and/or

18 specifications sheets, as well as from records maintained by the various states'

19 Department of Motor Vehicles.

20 **B.    Typicality**

21     231.   The claims of the representative Plaintiffs are typical of the claims of

22 the Class in that the representative Plaintiffs, like all Class Members, purchased or

23 leased an Affected Vehicle designed, manufactured, and distributed by the same

24 Automaker (or Automaker's family of brands).  The representative Plaintiffs, like

25 all Class Members, have been damaged by each respective Automakers'

26 misconduct in that they have, among other reasons, 1) incurred a diminution in the

27 value of his/her Affected Vehicle as a result of the Defect, and 2) incurred

28

substantial risk as a result of the Defect and the Automakers have refused to act to rectify the Defect that apply generally to the Class. Furthermore, the factual bases of the Automakers' misconduct are common to all Class Members and represent a common thread of misconduct resulting in injury to all Class Members.

**C.    Adequate Representation**

232.   Plaintiffs will fairly and adequately represent and protect the interests of the Class.  Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions, including actions involving defective vehicles.

233.   Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class, and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the Class.

**D.    Predominance of Common Issues**

234.   There are numerous questions of law and fact common to Plaintiffs and Class Members that predominate over any question affecting only individual Class Members, the answer to which will advance resolution of the litigation as to all Class Members.  These common legal and factual issues include:

(a)    whether the Affected Vehicles suffer from the Defect;

(b)    whether the Defect constitutes an unreasonable safety risk;

(c)    whether the Automakers knew or should have known about the Defect, and, if yes, how long each of the Automakers has known of the Defect;

(d)    whether the defective nature of the Affected Vehicles constitutes a material fact reasonable consumers would have considered in deciding whether to purchase an Affected Vehicle;

(e)    whether the Automakers have a duty to disclose the defective nature of the Affected Vehicles to Plaintiffs and Class Members;

(f)    whether the Automakers omitted and failed to disclose material facts about the Affected Vehicles;

1    (g) whether the Automakers' concealment of the true defective

2 nature of the Affected Vehicles induced Plaintiffs and Class Members to act to

3 their detriment by purchasing Affected Vehicles;

4    (h) whether the Automakers represented, through their words and

5 conduct, that the Affected Vehicles had characteristics, uses, or benefits that they

6 did not actually have, in violation of California's Consumer Legal Remedies Act

7 ("CLRA") § 1770(a)(5);

8    (i) whether the Automakers represented, through their words and

9 conduct, that the Affected Vehicles were of a particular standard, quality, or grade

10 when they were of another, in violation of the CLRA § 1770(a)(7);

11    (j) whether the Automakers advertised the Affected Vehicles with

12 the intent not to sell them as advertised, in violation of the CLRA § 1770(a)(9);

13    (k) whether the Automakers' affirmative misrepresentations about

14 the true defective nature of the Affected Vehicles were likely to mislead or

15 deceive, and therefore were fraudulent, within the meaning of Cal. Bus. & Prof.

16 Code §§ 17200, *et seq.*;

17    (l) whether the Automakers' affirmative misrepresentations about

18 the true defective nature of the Affected Vehicles were and are unfair within the

19 meaning of Cal. Bus. & Prof. Code §§ 17200, *et seq.*;

20    (m) whether the Automakers intended to sell Affected Vehicles via

21 publications and/or statements that were untrue or misleading, and which were

22 known, or which by the exercise of reasonable care should have been known to the

23 Automakers, to be untrue and misleading to consumers, Plaintiffs, and Class

24 Members within the meaning of Cal. Bus. & Prof Code§ 17500 *et seq.*;

25    (n) whether Plaintiffs are "persons" as defined by Ariz. Rev. Stat. §

26 44-1521(6);

27

28

1          (o)     whether the Automakers are "persons" as defined by Ariz. Rev.

2    Stat. § 44-1521(6);

3          (p)     whether the Affected Vehicles are "merchandise" as defined by

4    Ariz. Rev. Stat. § 44-1521(5);

5          (q)     whether the Automakers failed to disclose and/or actively

6    concealed the Defect in the Affected Vehicles under the Arizona Consumer Fraud

7    Act, Ariz. Rev. Stat. § 44-1522(A) by representing that the Affected Vehicles have

8    characteristics, uses, benefits, and qualities which they do not have;

9          (r)     whether the Automakers failed to disclose and/or actively

10   concealed the Defect in the Affected Vehicles under the Arizona Consumer Fraud

11   Act, Ariz. Rev. Stat. § 44-1522(A) by representing that the Affected Vehicles are

12   of a particular standard, quality, and grade when they are not;

13         (s)     whether the Automakers failed to disclose and/or actively

14   concealed the Defect in the Affected Vehicles under the Arizona Consumer Fraud

15   Act, Ariz. Rev. Stat. § 44-1522(A) by advertising the Affected Vehicles with the

16   intent not to sell them as advertised;

17         (t)     whether the Automakers failed to disclose and/or actively

18   concealed the Defect in the Affected Vehicles under the Arizona Consumer Fraud

19   Act, Ariz. Rev. Stat. § 44-1522(A) by engaging in acts or practices which are

20   otherwise unfair, misleading, false, or deceptive to the consumer;

21         (u)     whether Plaintiffs and the Class are entitled to costs and

22   attorneys' fees as a result of the Automakers' violation of the Arizona Consumer

23   Fraud Act as provided in Ariz. Rev. Stat. § 12-341.01;

24         (v)     whether the Automakers are and were at all relevant times a

25   merchant with respect to motor vehicles under Ariz. Rev. Stat. § 47-2014;

26

27

28

1     (w) whether the warranty that the Affected Vehicles were in

2 merchantable condition was implied by law in the instant transactions, pursuant to

3 Ariz. Rev. Stat. § 47-2314;

4     (x) whether the Automakers are each a "person" within the

5 meaning of Colo. Rev. Stat. § 6-1-102(6);

6     (y) whether the Automakers failed to disclose and/or actively

7 concealed the Defect in the Affected Vehicles under Colo. Rev. Stat. § 6-1-

8 105(1)(b) by "a false representation as to the source, sponsorship, approval, or

9 certification of goods";

10     (z) whether the Automakers failed to disclose and/or actively

11 concealed the Defect in the Affected Vehicles under Colo. Rev. Stat. § 6-1-

12 105(1)(e) by "a false representation as to the characteristics, ingredients, uses,

13 benefits, alterations, or quantities of goods";

14     (aa) whether the Automakers failed to disclose and/or actively

15 concealed the Defect in the Affected Vehicles under Colo. Rev. Stat. § 6-1-

16 105(1)(g) by  "represent[ing] that goods … are of a particular standard, quality, or

17 grade … if he knows or should know that they are of another";

18     (bb) whether the Automakers failed to disclose and/or actively

19 concealed the Defect in the Affected Vehicles under Colo. Rev. Stat. § 6-1-

20 105(1)(i) by "advertis[ing] goods … with intent not to sell them as advertised";

21     (cc) whether Plaintiffs and the Automakers are each "persons" as

22 defined by Conn. Gen. Stat. Ann. § 42-110a(3);

23     (dd) whether the Automakers failed to disclose and/or actively

24 concealed the Defect in the Affected Vehicles under Conn. Gen. Stat. Ann. § 42-

25 110g(a) by (1) representing that Affected Vehicles have characteristics, uses,

26 benefits, and qualities which they do not have, (2) representing that Affected

27 Vehicles are of a particular standard, quality, and grade when they are not, (3)

28

1    advertising Affected Vehicles with the intent not to sell them as advertised, or (4)

2    engaging in acts or practices which are otherwise unfair, misleading, false, or

3    deceptive to the consumer;

4              (ee)   whether Plaintiffs and the Class are entitled to costs and

5    attorneys' fees as a result of the Automakers' violation of the Connecticut Unfair

6    Trade Practices Act as provided in Conn. Gen. Stat. Ann. § 42-110g(d);

7              (ff)   whether the Automakers are and were at all relevant times

8    merchants with respect to motor vehicles under Conn. Gen. Stat. Ann. § 42a-2-

9    104(1);

10             (gg)   whether the Automakers failed to disclose and/or actively

11   concealed the Defect in the Affected Vehicles under Florida's Deceptive and

12   Unfair Trade Practices Act, Fla. Stat. § 501.204(1) by representing that Affected

13   Vehicles have characteristics, uses, benefits, and qualities which they do not have,

14   representing that Affected Vehicles are of a particular standard and quality when

15   they are not, advertising Affected Vehicles with the intent not to sell them as

16   advertised, or otherwise engaging in conduct likely to deceive;

17             (hh)   whether the Automakers failed to disclose and/or actively

18   concealed the Defect in the Affected Vehicles under the Massachusetts Consumer

19   Protection Act, Mass. Gen. Laws Ch. 93A by failing to adequately investigate,

20   disclose, and remedy, and their misrepresentations and omissions regarding the

21   safety, reliability, and functionality of their Affected Vehicles;

22             (ii)   whether the Automakers failed to disclose and/or actively

23   concealed the Defect in the Affected Vehicles under the New Jersey Consumer

24   Fraud Act, N.J. Stat. Ann. §§ 56:8-1, *et seq.* by representing that Affected Vehicles

25   have characteristics, uses, benefits, and qualities which they do not have,

26   representing that Affected Vehicles are of a particular standard and quality when

27

28

they are not, advertising Affected Vehicles with the intent not to sell them as advertised, and otherwise engaging in conduct likely to deceive;

(jj)     whether the Automakers failed to disclose and/or actively concealed the Defect in the Affected Vehicles under New York's General Business Law § 349 by representing that Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have, representing that Affected Vehicles are of a particular standard and quality when they are not, advertising Affected Vehicles with the intent not to sell them as advertised, and otherwise engaging in conduct likely to deceive;

(kk)   whether the Affected Automobiles are a commodity as defined by N.Y. Gen. Bus. Law § 350-a;

(ll)     whether the Automakers failed to disclose and/or actively concealed the Defect in the Affected Vehicles under N.Y. Gen. Bus. Law § 350 by representing in advertising, including labeling, of a commodity and whether those misrepresentations were material;

(mm) whether Plaintiffs and the Class are entitled to recover their actual damages or $500, whichever is greater under N.Y. Gen. Bus. Law § 350

(nn)    whether Plaintiffs and the Class are entitled to recover three times actual damages, up to $10,000, because the Automakers acted willfully or knowingly with respect to the Defect;

(oo)    whether the Automakers failed to disclose and/or actively concealed the Defect in the Affected Vehicles under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, Pa. Stat. Ann. §§ 201-1, *et seq*., by "[r]epresenting that goods or services have … characteristics, …. [b]enefits or qualities that they do not have;" (ii) "[r]epresenting that goods or services are of a particular standard, quality or grade … if they are of another;:" (iii) "[a]dvertising goods or services with intent not to sell them as advertised;" and (iv) "[e]ngaging

1  in any other fraudulent or deceptive conduct which creates a likelihood of

2  confusion or misunderstanding." 73 P.S. § 201-2(4);

3          (pp)   whether the Automakers were unjustly enriched by a benefit

4  conferred on them by Plaintiffs and other Class Members such that it would be

5  inequitable, unconscionable and unjust for the Automakers to retain that benefit;

6          (qq)   whether Plaintiffs and the other Class Members are entitled to a

7  declaratory judgment stating that the Affected Vehicles are defective and/or not

8  merchantable;

9          (rr)   whether Plaintiffs and the other Class Members are entitled to

10  equitable relief, including, but not limited to, a preliminary and/or permanent

11  injunction;

12          (ss)   whether the Automakers have acted or refused to act on

13  grounds generally applicable to the Plaintiffs and Class, thereby making

14  appropriate final and injunctive relief with respect to the Class as a whole; and

15          (tt)   whether the Automakers should be declared financially

16  responsible for notifying all Class Members with the Affected Vehicles of the

17  Defect and for the costs and expenses of permanently remedying the Defect in the

18  Affected Vehicles.

19  **E.     Superiority**

20          235.   Plaintiffs and Class Members have all suffered and will continue to

21  suffer harm and damages as a result of the Automakers' unlawful and wrongful

22  conduct.  A class action is superior to other available methods for the fair and

23  efficient adjudication of this controversy.

24          236.   Absent a class action, most Class Members would likely find the cost

25  of litigating their claims prohibitively high and would therefore have no effective

26  remedy at law.  Because of the relatively small size of the individual Class

27  Members' claims, it is likely that only a few Class Members could afford to seek

28

1   legal redress for the Automakers' misconduct.  Absent a class action, Class
2   Members will continue to incur damages, and the Automakers' misconduct will
3   continue without remedy.

4   237.   Class treatment of common questions of law and fact would also be a
5   superior method to multiple individual actions or piecemeal litigation in that class
6   treatment will conserve the resources of the courts and the litigants, and will
7   promote consistency and efficiency of adjudication.

8   ## IX.   CAUSES OF ACTION

9   **A.   <u>Claims Brought on Behalf of the Nationwide Class</u>**

10   **FIRST CAUSE OF ACTION**

11   **Negligent Failure to Recall**

12   238.   Plaintiffs hereby incorporate by reference the allegations contained in
13   the preceding paragraphs of this Complaint.

14   239.   Plaintiffs bring this cause of action for themselves and on behalf of
15   the Nationwide Class.

16   240.   The Automakers knew or reasonably should have known that the
17   Affected Vehicles were dangerous and/or were likely to be dangerous when used
18   in a reasonably foreseeable manner due to the Defect.

19   241.   The Automakers either knew of the dangers posed by the Defect
20   before the vehicles were sold, or became aware of them and their attendant risks
21   after the vehicles were sold.

22   242.   The Automakers continued to gain information further corroborating
23   the Defect-related dangers, risks and defects from at least 2007 until the present.[94]

24   243.   The Automakers failed to adequately recall the Affected Vehicles in a
25   timely manner, despite doing so in a limited number of other makes and models
26   with the *precise same* Defect.

27   _____

28   [94] *See* Factual Allegations, Sections C and D, *supra*.

---

244.   Purchasers and leases of the Affected Vehicles, including Plaintiffs and Class Members, were harmed by the Automakers' failure to adequately recall all the Affected Vehicles in a timely manner and have suffered damages, including, without limitation, the diminished value of the Affected Vehicles and the costs associated with the loss of use of the Affected Vehicles.

245.   The Automakers' failure to timely and adequately recall the Affected Vehicles was a substantial factor in causing the purchasers harm, including that of Plaintiffs and Class Members.

## SECOND CAUSE OF ACTION

## Unjust Enrichment

246.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

247.   Plaintiffs bring this cause of action for themselves and on behalf of the Nationwide Class.

248.   The Automakers have been unjustly enriched by the purchases of the Affected Vehicles by Plaintiffs and the Class Members

249.   On behalf of all Class Members, Plaintiffs seek to recover for the Automakers' unjust enrichment.

250.   Plaintiffs and the Class Members unknowingly conferred a benefit on the Automakers of which they each had knowledge since they were aware of the defective nature of the Affected Vehicles and the Defect, but failed to disclose this knowledge and misled Plaintiffs and the Class members regarding the nature and quality of the Affected Vehicles while profiting from this omission and deception.

251.   The circumstances are such that it would be inequitable, unconscionable and unjust to permit the Automakers to retain the benefit of these profits that they unfairly have obtained from Plaintiffs and the Class members.

252.   Plaintiffs and the Class members, having been damaged by the Automakers' conduct are entitled to recover or recoup damages as a result of the unjust enrichment of the Automakers to their detriment.

253.   Alternatively, Plaintiffs and the Class members seek to recover for the Automakers' unjust enrichment under the substantially similar laws of the states of purchase.

**B.**      **Claims Brought on Behalf of the California Class**

**THIRD CAUSE OF ACTION**

**Violation of California's Consumer Legal Remedies Act ("CLRA")**
**(Cal. Civ. Code § 1750,** *et seq.* **– INJUNCTIVE RELIEF ONLY)**

254.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

255.   Plaintiffs bring this cause of action for themselves and on behalf of the California Class.

256.   Each of the Automakers is a "person" as defined by the CLRA.  Cal. Civ. Code § 1761(c).

257.   Plaintiffs and Class Members are "consumers" within the meaning of the CLRA. Cal. Civ. Code § 1761(d).

258.   By failing to disclose the defective nature of the Affected Vehicles to Plaintiffs and Class Members, the Automakers violated Cal. Civ. Code § 1770(a), because the Automakers represented that the Affected Vehicles had characteristics and benefits (i.e. reliability, durability, etc.) that they do not have, and represented that the Affected Vehicles were of a particular standard, quality, or grade (i.e. rugged, durable, etc.) when they were of another.  *See* Cal. Civ. Code §§ 1770(a)(5) & (7).

259.   The Automakers' unfair and deceptive acts or practices occurred repeatedly in the Automakers' course of trade or business, were material, were

1  capable of deceiving a substantial portion of the purchasing public, and imposed a

2  safety risk on the public.

3  260.   The Automakers knew that the Affected Vehicles suffered from an

4  inherent defect due to the Defect and thus were defectively designed or

5  manufactured and were not suitable for their intended use.

6  261.   The Automakers were under a duty to Plaintiffs and Class Members to

7  disclose the Defect and rectify it through Auto-Off prior to the Affected Vehicles'

8  sale. Additionally:

9  (a)   the Defect is a safety hazard;

10  (b)   the Automakers were in a superior position to know the true

11  state of facts about the Defect in the Affected Vehicles;

12  (c)   Plaintiffs and Class Members could not reasonably have been

13  expected to learn or discover that the Affected Vehicles had the Defect until, at the

14  earliest, the manifestation of the Defect; and

15  (d)   the Automakers knew that Plaintiffs and Class Members could

16  not reasonably have been expected to learn or discover the Affected Vehicles'

17  Defect prior to its manifestation.

18  262.   In failing to disclose the defective nature of the Affected Vehicles, the

19  Automakers knowingly and intentionally concealed material facts and breached

20  their duty not to do so.

21  263.   The facts concealed or not disclosed by the Automakers to Plaintiffs

22  and Class Members are material in that a reasonable consumer would have

23  considered them to be important in deciding whether or not to purchase an

24  Affected Vehicle.  Had Plaintiffs and other Class Members known that the

25  Affected Vehicles had the Defect, they would not have purchased an Affected

26  Vehicle.

27

28

264.   Plaintiffs and Class Members are reasonable consumers who do not expect their Affected Vehicles will experience the Defect.  That is the reasonable and objective consumer expectation relating to the safe and normal operation of a vehicle.

265.   As a result of the Automakers' conduct, Plaintiffs and Class Members have been harmed, creating a safety hazard, and causing Class Members to drive with dangerous Affected Vehicles that cannot be remedied without the Automakers taking action to repair the Defect.

266.   Plaintiffs and the Class are thus entitled to equitable relief.

### FOURTH CAUSE OF ACTION

### Violation of California's Unfair Competition Law
#### (Cal. Bus. & Prof. Code § 17200, *et seq.*)

267.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

268.   Plaintiffs bring this cause of action for themselves and on behalf of the California Class.

269.   California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."  The Automakers engaged in conduct that violated each of this statute's three prongs.

270.   The Automakers committed an unlawful business act or practice in violation of Cal. Bus. & Prof. Code § 17200, *et seq.,* when it violated the CLRA as alleged in the First Cause of Action, above.

271.   The Automakers committed unfair business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq*., when they concealed the existence and nature of the Defect and represented that the Affected Vehicles were "safe" (or words found in the Automakers' advertising to similar effect) when, in

1  fact, they are not.[95] The Defect presents a safety hazard for occupants of the

2  Affected Vehicles.

3      272.   The Automakers committed unfair business acts and practices in

4  violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, when they failed to provide a

5  permanent remedy to fix the Defect once and for all in the Affected Vehicles.

6      273.   The Automakers committed fraudulent business acts and practices in

7  violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, when they concealed the

8  existence and nature of the Defect, while representing in their marketing,

9  advertising, and other broadly disseminated representations that the Affected

10  Vehicles were "safe" (or words found in the Automakers' advertising to similar

11  effect) when, in fact, they are not.[96] The Automakers' representations and active

12  concealment of the Defect is likely to mislead the public with regard to the true

13  defective nature of the Affected Vehicles.

14      274.   The Automakers disseminated unfair, deceptive, untrue and/or

15  misleading advertising in violation of Cal. Bus. & Prof. Code § 17200, *et seq.* and

16  § 17500, *et seq.* when they concealed the existence and nature of the Defect, while

17  stating in their marketing, advertising, and other broadly disseminated

18  representations that the Affected Vehicles are "safe" (or words found in the

19  Automakers' advertising to similar effect) when, in fact, they are not.[97]   These

20  representations and active concealment of the Defect are likely to deceive the

21  public.

22      275.   The Automakers' unfair or deceptive acts or practices occurred

23  repeatedly in the course of their trade or business, and were capable of deceiving a

24  substantial portion of the purchasing public.

25

---

26  [95] *See* paragraphs 38-172 (Plaintiffs' specific allegations with reference to
attached exhibits touting safety of Plaintiffs' Affected Vehicles), *supra*.

27  [96] *Id.*

28  [97] *Id.*

276.   As a direct and proximate result of the Automakers' unfair and deceptive practices, Plaintiffs and Class Members have suffered and will continue to suffer actual damages in the form of, among other things, reduced vehicle valuation.

277.   As a result of their unfair and deceptive conduct, the Automakers have been unjustly enriched and should be required to make restitution to Plaintiffs and Class Members pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204.

**FIFTH CAUSE OF ACTION**

**Violation of Cal. Civil Code § 1710 Deceit and Common Law Fraud**

278.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

279.   Plaintiffs bring this cause of action for themselves and on behalf of the California Class.

280.   Pursuant to California Civil Code § 1710, deceit is either (1) the suggestion, as a fact, of that which is not true, by one who does not believe it to be true; (2) the assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true; (3) the suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or (4) a promise, made without any intention of performing it.

281.   The Automakers' actions constitute deceit under prongs (2), and (3), identified in Paragraph directly above.

282.   Moreover, the Defect presents a safety hazard to Plaintiffs and Class Members.

**Deceit Based on Negligent Misrepresentation**

283.   The Automakers negligently made uniform representations to consumers, including Plaintiffs and Class Members, that the Affected Vehicles

were safe when, in fact, the Affected Vehicles contained the Defect that compromised the Affected Vehicles' safety.[98]

284.   The Automakers knew or were reckless in not knowing that their representations were untrue.  The Automakers either had actual knowledge of the fact that the Affected Vehicles contained the Defect or they were reckless or negligent in not knowing. [99]

285.   The Automakers intended for consumers to rely on their representations regarding the safety of the Affected Vehicles.  The Automakers knew that representations regarding Affected Vehicles' safety would induce consumers to buy their products.

286.   Plaintiffs and the California Class were unaware of the fact that the Affected Vehicles had the Defect.

287.   Plaintiffs and the California Class reasonably relied on the Automakers' misrepresentations regarding the safety of the Affected Vehicles.

288.   Plaintiffs and the California Class have been proximately damaged as a result of their reliance on the Automakers' misrepresentations in that they purchased Affected Vehicles that do not have the safety as promised.

289.   The safety of the Affected Vehicles is a primary selling point to Plaintiffs and the California Class.  Had Plaintiffs and the California Class known that the Affected Vehicles did not have these attributes, they would not have purchased them.

**Deceit Based on Fraudulent Concealment/Nondisclosure**

290.   The Automakers fraudulently concealed from and/or intentionally failed to disclose to Plaintiffs, the California Class, and all others in the chain of distribution (e.g., concealments and omissions in the Automakers' communications

---

[98] *Id.*

[99] *See* Factual Allegations, Sections C and D, *supra.*

1  with wholesalers, retailers, and others in the chain of distribution that were

2  ultimately passed on to Plaintiffs and the California Class) the true nature of the

3  Affected Vehicles, which is that they contain the Defect.

4      291.  Under California law, a duty to disclose arises in four circumstances:

5  (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the

6  defendant has exclusive knowledge of material facts not known to the plaintiff; (3)

7  when the defendant actively conceals a material fact from the plaintiff; and (4)

8  when the defendant makes partial representations but also suppresses some

9  material facts.

10      292.  The Automakers had a duty to disclose material facts regarding the

11  true nature of the Affected Vehicles pursuant to the second, third, and fourth

12  prongs set forth in the above paragraph:

13        (a)  The Automakers had and have a duty to disclose material facts

14  about the Affected Vehicles because the Automakers had exclusive knowledge of

15  the true properties of the Affected Vehicles at the time of sale.  The Defect is latent

16  and not something that Plaintiffs or Class Members could, in the exercise of

17  reasonable diligence, have discovered independently prior to purchase.

18        (b)  The Automakers had and have a duty to disclose material facts

19  about the Affected Vehicles because the Automakers undertook active steps to

20  conceal them.  Plaintiffs are aware of nothing in any of the Automakers'

21  advertising, publicity, or marketing materials that discloses the truth about the

22  Defect in the Affected Vehicles, despite ample evidence that the Automakers were

23  aware of the problem by virtue of, if nothing else, numerous consumer

24  complaints.[100]

25        (c)  The Automakers had and have a duty to disclose material facts

26  about the Affected Vehicles because the Automakers made and make partial

27

28    [100] *See id.*

1   representations about the Affected Vehicles but also suppresses some material
2   facts.  These partial representations give rise to a duty to disclose the full story—
3   that the Affected Vehicles contain the Defect—despite the Automakers' promises
4   to the contrary.

5   293.   The facts concealed and/or not disclosed by the Automakers to
6   Plaintiffs and Class Members are material facts in that a reasonable person would
7   have considered them important in deciding whether to purchase an Affected
8   Vehicle.

9   294.   The Automakers intentionally concealed and/or failed to disclose the
10   fact that the Affected Vehicles contain the Defect for the purpose of inducing
11   Plaintiffs and Class Members to act thereon.

12   295.   Plaintiffs and the Class Members justifiably acted or relied to their
13   detriment upon the concealed and/or non-disclosed facts as evidenced by their
14   purchase of the Affected Vehicles.

15   296.   Had Plaintiffs and Class Members known that the Affected Vehicles
16   contained the Defect, they would not have purchased an Affected Vehicle.

17   297.   As a direct and proximate cause of the Automakers' misconduct,
18   Plaintiffs and Class Members have suffered actual damages in that they bought and
19   own Affected Vehicles that do not perform as promised, and they are now left with
20   vehicles with reduced and diminished value in the marketplace.

21   298.   The Automakers' conduct has been and is wanton and/or reckless
22   and/or shows a reckless indifference to the interests of others.

23   299.   The Automakers have acted with "malice" as that term is defined in
24   Civ. Code § 3294(c)(1) by engaging in conduct that was and is intended by the
25   Automakers to cause injury to the Plaintiffs and Class Members.

26

27

28

300.   The Automakers have committed "fraud" as that term is defined in Civ. Code § 3294(c)(3) through their concealment of material facts known to the Automakers with the intent to cause injury to the Plaintiffs and Class Members.

301.   Plaintiffs, on behalf of themselves and all others similarly situated, demand judgment against the Automakers for actual and punitive damages in accordance with Civ. Code § 3294(a) for themselves and each member of the Class, plus attorneys' fees for the establishment of a common fund, interest, and costs.

## SIXTH CAUSE OF ACTION

### California False Advertising Law (FAL)
### (Bus. & Prof Code§ 17500 *et seq.*)

302.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

303.   Plaintiffs bring this cause of action for themselves and on behalf of the California Class.

304.   California Business and Professions Code § 17500 states:  "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading. . . ."

305.   The Automakers intended to sell property (namely, the Affected Vehicles) to induce the public to enter into any obligation relating to the Affected Vehicles.

1    306.   The Automakers caused to be made or disseminated throughout the

2  United States, through advertising, marketing and other publications, statements

3  that were untrue or misleading, and which were known, or which by the exercise of

4  reasonable care should have been known to the Automakers, to be untrue and

5  misleading to consumers, Plaintiffs, and Class Members.

6    307.   Defendants violated section 17500 because the misrepresentations and

7  omissions regarding the safety and reliability of their vehicles as set forth in this

8  Complaint were material and likely to deceive a reasonable consumer. In short, the

9  Automakers publically disseminated advertising that was either misleading or

10  untrue, or with an intent to not sell the Affected Automobiles as advertised.[101]

11    308.   Plaintiffs and Class Members have suffered injuries in fact, including

12  the loss of money or property (namely, the diminution in value of their Affected

13  Vehicles), as a result of the Automakers' unfair, unlawful, and/or deceptive

14  practices.  In purchasing or leasing their Affected Vehicles, Plaintiffs and Class

15  Members relied on the misrepresentations and/or omissions of the Automakers

16  with respect to the safety of their vehicles.  Defendants' representations turned out

17  not to be true. Had Plaintiffs and Class Members known this, they would not have

18  purchased or leased the Affected Vehicles and/or paid as much for them.[102]

19    309.   Accordingly, Plaintiffs and Class Members overpaid for the Affected

20  Vehicles and did not receive the benefit of their bargain.  One way to measure this

21  overpayment, or lost benefit of the bargain, at the moment of purchase is by the

22  value consumers place on the vehicles now that the truth has been exposed.  Both

23  trade-in prices and auction prices for the Affected Vehicles have declined as a

24  result of the Automakers' misconduct.  This decline in value measures the

25

26  _____

27  [101] *See* paragraphs 38-172 (Plaintiffs' specific allegations with reference to attached exhibits touting safety of Plaintiffs' Affected Vehicles), *supra*.

28  [102] *Id.*; *see also* Factual Allegations, Sections C and D, *supra*.

1    overpayment, or lost benefit of the bargain, at the time that Plaintiffs and Class

2    Members acquired the Affected Vehicles.

3        310.   All of the wrongful conduct alleged herein occurred, and continues to

4    occur, in the conduct of the Automakers' businesses.  The Automakers' wrongful

5    conduct is part of a pattern or generalized course of conduct that is still perpetuated

6    and repeated nationwide.

7        311.   Plaintiffs and Class Members request that this Court enter such orders

8    or judgments as may be necessary to enjoin Defendants from continuing their

9    unfair, unlawful, and/or deceptive practices, and for such other relief set forth

10   herein.

11   **C.    Claims Brought on Behalf of the Arizona Class**

12                      **SEVENTH CAUSE OF ACTION**

13              **Violations of the Consumer Fraud Act,**
                **(Ariz. Rev. Stat. §§ 44-1521, *et seq.*)**

14

15       312.   Plaintiffs incorporate by reference all preceding allegations as though

     fully set forth herein.

16

17       313.   Plaintiffs bring this Count on behalf of the Arizona Class.

18       314.   Plaintiffs and the Automakers are each "persons" as defined by Ariz.

19   Rev. Stat. § 44-1521(6). The Affected Vehicles are "merchandise" as defined by

     Ariz. Rev. Stat. § 44-1521(5).

20

21       315.   The Arizona Consumer Fraud Act proscribes "[t]he act, use or

22   employment by any person of any deception, deceptive act or practice, fraud, false

23   pretense, false promise, misrepresentation, or concealment, suppression or

24   omission of any material fact with intent that others rely upon such concealment,

     suppression or omission, in connection with the sale or advertisement of any

25   merchandise whether or not any person has in fact been misled, deceived or

26   damaged thereby." Ariz. Rev. Stat. § 44-1522(A).

27

28

---

1    316.   By failing to disclose and actively concealing the Defect in the

2   Affected Vehicles, the Automakers engaged in deceptive business practices

3   prohibited by the Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 44-1522(A),

4   including (1) representing that the Affected Vehicles have characteristics, uses,

5   benefits, and qualities which they do not have, (2) representing that the Affected

6   Vehicles are of a particular standard, quality, and grade when they are not, (3)

7   advertising the Affected Vehicles with the intent not to sell them as advertised, and

8   (4) engaging in acts or practices which are otherwise unfair, misleading, false, or

9   deceptive to the consumer.

10    317.   As alleged above, the Automakers made numerous material

11   statements about the benefits and characteristics of the Affected Vehicles that were

12   either false or misleading. Each of these statements contributed to the deceptive

13   context of the Automakers' unlawful advertising and representations as a whole.

14    318.   The Automakers knew that the Keyless Fobs in the Affected Vehicles

15   were defectively designed or manufactured, would cause the Defect without

16   warning, and were not suitable for their intended use. The Automakers

17   nevertheless failed to warn Plaintiffs about these defects despite having a duty to

18   do so.

19    319.   The Automakers owed Plaintiffs a duty to disclose the defective

20   nature of the Keyless Fobs, because the Automakers:

21       (a)    Possessed exclusive knowledge of the Defect rendering the

22   Affected Vehicles more unreliable than similar vehicles;

23       (b)    Intentionally concealed the defects associated with Keyless

24   Fobs; and/or

25       (c)    Made incomplete representations about the characteristics and

26   performance of Keyless Fobs generally, while purposefully withholding material

27   facts from Plaintiffs that contradicted these representations.

28

---

CLASS ACTION COMPLAINT                                               102

320.    The Automakers' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true performance and characteristics of the Keyless Fobs.

321.    As a result of their violations of the Arizona Consumer Fraud Act detailed above, the Automakers caused actual damage to Plaintiffs and, if not stopped, will continue to harm Plaintiffs. Plaintiffs currently own or lease, or within the class period have owned or leased, an Affected Vehicle that is defective. Defects associated with the Keyless Fobs have caused the value of the Affected Vehicles to decrease.

322.    Plaintiffs and the Class sustained damages as a result of the Automakers' unlawful acts and are, therefore, entitled to damages and other relief as provided under the Arizona Consumer Fraud Act.

323.    Plaintiffs also seek court costs and attorneys' fees as a result of the Automakers' violation of the Arizona Consumer Fraud Act as provided in Ariz. Rev. Stat. § 12-341.01.

## EIGHTH CAUSE OF ACTION

### Breach of the Implied Warranty of Merchantability
### (Ariz. Rev. Stat. § 47-2314)

324.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

325.    Plaintiffs bring this Count on behalf of the Arizona Class.

326.    The Automakers are and were at all relevant times a merchant with respect to motor vehicles under Ariz. Rev. Stat. § 47-2014.

327.    A warranty that the Affected Vehicles were in merchantable condition was implied by law in the instant transactions, pursuant to Ariz. Rev. Stat. § 47-2314. These vehicles and the Keyless Fobs in the Affected Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which they are used. Specifically, the Affected Vehicles

1  are inherently defective in that there are defects in the Keyless Fobs which causes
2  the Defect.

3      328.   The Automakers were provided notice of these issues by numerous
4  complaints filed against them, including the instant Complaint, and by numerous
5  individual letters and communications sent by Plaintiffs and the Class.

6      329.   As a direct and proximate result of the Automakers' breach of the
7  warranties of merchantability, Plaintiffs and the Class have been damaged in an
8  amount to be proven at trial.

9                          **NINTH CAUSE OF ACTION**

10              **Fraudulent Concealment Based on Arizona Law**

11     330.   Plaintiffs incorporate by reference all preceding allegations as though
12  fully set forth herein.

13     331.   Plaintiffs bring this Count on behalf of the Arizona Class.

14     332.   The Automakers intentionally concealed the above-described material
15  safety and functionality information, or acted with reckless disregard for the truth,
16  and denied Plaintiffs and the other Class members information that is highly
17  relevant to their purchasing decision.

18     333.   The Automakers further affirmatively misrepresented to Plaintiffs in
19  advertising and other forms of communication, including standard and uniform
20  material provided with each car, that the Affected Vehicles it was selling were
21  new, had no significant defects, and would perform and operate properly when
22  driven in normal usage.

23     334.   The Automakers knew these representations were false when made.

24     335.   The Affected Vehicles purchased or leased by Plaintiffs and the other
25  Class members were, in fact, defective, unsafe, and unreliable because the Affected
26  Vehicles contained defective Keyless Fobs, as alleged herein.

27

28

---

CLASS ACTION COMPLAINT

336.   The Automakers had a duty to disclose that these Affected Vehicles were defective, unsafe, and unreliable in that the Keyless Fobs result in the Defect, because Plaintiffs and the other Class members relied on the Automakers' material representations that the Affected Vehicles they were purchasing were safe and free from defects.

337.   The aforementioned concealment was material because if it had been disclosed, Plaintiffs and the other Class members would not have bought or leased the Affected Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

338.   The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle. The Automakers knew or recklessly disregarded that their representations were false because they knew that people had experienced the Defect while using the Keyless Fobs. The Automakers intentionally made the false statements in order to sell Affected Vehicles.

339.   Plaintiffs and the other Class members relied on the Automakers' reputation – along with the Automakers' failure to disclose the faulty and defective nature of the Keyless Fobs and the Automakers' affirmative assurance that their Affected Vehicles were safe and reliable, and other similar false statements – in purchasing or leasing the Affected Vehicles.

340.   As a result of their reliance, Plaintiffs and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Affected Vehicles.

341.   The Automakers' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights

of Plaintiffs and the other Class members. Plaintiffs and the other Class members are therefore entitled to an award of punitive damages.

**D.** **Claims Brought on Behalf of the Colorado Class**

### TENTH CAUSE OF ACTION

**Violations of the Colorado Consumer Protection Act**
**(Colo. Rev. Stat. §§ 6-1-101, *et seq*.)**

342.  Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

343.  Plaintiffs bring this Count on behalf of the Colorado Class.

344.  Colorado's Consumer Protection Act (the "CCPA") prohibits a person from engaging in a "deceptive trade practice," which includes knowingly making "a false representation as to the source, sponsorship, approval, or certification of goods," or "a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods." Colo. Rev. Stat. § 6- 1-105(1)(b), (e). The CCPA further prohibits "represent[ing] that goods … are of a particular standard, quality, or grade … if he knows or should know that they are of another," and "advertis[ing] goods … with intent not to sell them as advertised." Colo. Rev. Stat. § 6-1-105(1)(g), (i).

345.  The Automakers are each a "person" within the meaning of Colo. Rev. Stat. § 6-1-102(6).

346.  In the course of the Automakers' business, they willfully misrepresented and failed to disclose, and actively concealed, the dangerous risk of the Keyless Fobs in Affected Vehicles as described above. Accordingly, the Automakers engaged in unlawful trade practices, including representing that Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Affected Vehicles are of a particular standard and quality when they are not; advertising Affected Vehicles with the intent not to sell them as advertised; and otherwise engaging in conduct likely to deceive.

347.   The Automakers' actions as set forth above occurred in the conduct of trade or commerce.

348.   The Automakers' conduct proximately caused injuries to Plaintiffs and the other Class members.

349.   Plaintiffs and the other Class members were injured as a result of the Automakers' conduct in that Plaintiffs and the other Class members overpaid for their Affected Vehicles and did not receive the benefit of their bargain, and their Affected Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of the Automakers' misrepresentations and omissions.

## ELEVENTH CAUSE OF ACTION

### Breach of Implied Warranty of Merchantability
### (Colo. Rev. Stat. § 4-2-314)

350.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

351.   Plaintiffs bring this Count on behalf of the Colorado Class.

352.   The Automakers are and were at all relevant times merchants with respect to motor vehicles.

353.   A warranty that the Affected Vehicles were in merchantable condition is implied by law in the instant transactions.

354.   These Affected Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Affected Vehicles are inherently defective in that there are defects in the Affected Vehicles' Keyless Fobs that cause the Defect.

355.   The Automakers were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and other Class members before or within a reasonable amount of time after the Keyless Fob defects became public.

356.   As a direct and proximate result of the Automakers' breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

## TWELFTH CAUSE OF ACTION

### Fraudulent Concealment
### (Based on Colorado Law)

357.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

358.   Plaintiffs bring this Count on behalf of the Colorado Class.

359.   The Automakers intentionally concealed the above-described material safety information, or acted with reckless disregard for the truth, and denied Plaintiffs and the other Class members information that is highly relevant to their purchasing decision.

360.   The Automakers further affirmatively misrepresented to Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Affected Vehicles they were selling were new, had no significant defects, and would perform and operate properly when driven in normal usage.

361.   The Automakers knew these representations were false when made.

362.   The Affected Vehicles purchased or leased by Plaintiffs and the other Class members were, in fact, defective, unsafe, and unreliable because the Affected Vehicles contained faulty and defective Keyless Fobs, as alleged herein.

363.   The Automakers had a duty to disclose that these Affected Vehicles were defective, unsafe, and unreliable in that the Keyless Fobs resulted in the Defect, because Plaintiffs and the other Class members relied on the Automakers' material representations that the Affected Vehicles they were purchasing were safe and free from defects.

364.   The aforementioned concealment was material because if it had been disclosed Plaintiffs and the other Class members would not have bought or leased the Affected Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

365.   The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle. The Automakers knew or recklessly disregarded that their representations were false because they knew that people had experienced the Defect. The Automakers intentionally made the false statements in order to sell Affected Vehicles.

366.   Plaintiffs and the other Class members relied on the Automakers' reputation – along with the Automakers' failure to disclose the faulty and defective nature of the Keyless Fobs and the Automakers' affirmative assurance that their Affected Vehicles were safe and reliable, and other similar false statements – in purchasing or leasing the Affected Vehicles.

367.   As a result of their reliance, Plaintiffs and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Affected Vehicles.

368.   The Automakers' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs and the other Class members. Plaintiffs and the other Class members are therefore entitled to an award of punitive damages.

**E.    Claims Brought on Behalf of the Connecticut Class**

## THIRTEENTH CAUSE OF ACTION

### Violations of the Unfair Trade Practices Act
### (Conn. Gen. Stat. Ann. §§ 42-110A, *et seq.*)

369.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

370.    Plaintiffs bring this Count on behalf of the Connecticut Class.

371.    Plaintiffs and the Automakers are each "persons" as defined by Conn. Gen. Stat. Ann. § 42-110a(3).

372.    The Connecticut Unfair Trade Practices Act ("CUTPA") provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. Ann. § 42-110b(a). The CUTPA further provides a private right of action under Conn. Gen. Stat. Ann. § 42-110g(a).

373.    By failing to disclose and actively concealing the defects in the Keyless Fobs in the Affected Vehicles, the Automakers engaged in deceptive business practices prohibited by the CUTPA, including (1) representing that Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have, (2) representing that Affected Vehicles are of a particular standard, quality, and grade when they are not, (3) advertising Affected Vehicles with the intent not to sell them as advertised, and (4) engaging in acts or practices which are otherwise unfair, misleading, false, or deceptive to the consumer.

374.    As alleged above, the Automakers made numerous material statements about the benefits and characteristics of the Keyless Fobs that were either false or misleading. Each of these statements contributed to the deceptive context of the Automakers' unlawful advertising and representations as a whole.

375.    The Automakers knew that the Keyless Fobs in the Affected Vehicles were defectively designed or manufactured, would cause the Defect, and were not

1   suitable for their intended use.  The Automakers nevertheless failed to warn

2   Plaintiffs about these defects despite having a duty to do so.

3       376.   The Automakers owed Plaintiffs a duty to disclose the defective

4   nature of the Keyless Fobs in the Affected Vehicles, because the Automakers:

5           (a)    Possessed exclusive knowledge of the defects rendering the

6   Affected Vehicles more unreliable than similar vehicles;

7           (b)    Intentionally concealed the defects associated with Keyless

8   Fobs through their deceptive marketing campaign; and/or

9           (c)    Made incomplete representations about the characteristics and

10  performance of the Keyless Fobs generally, while purposefully withholding

11  material facts from Plaintiffs that contradicted these representations.

12      377.   The Automakers' unfair or deceptive acts or practices were likely to

13  and did in fact deceive reasonable consumers, including Plaintiffs, about the true

14  safety and characteristics of the Keyless Fobs.

15      378.   As a result of their violations of the CUTPA detailed above, the

16  Automakers caused actual damage to Plaintiffs and, if not stopped, will continue to

17  harm Plaintiffs. Plaintiffs currently own or lease, or within the class period have

18  owned or leased, an Affected Vehicle that is defective. Defects associated with the

19  Keyless Fobs have caused the value of Affected Vehicles to decrease.

20      379.   Plaintiffs and the Class sustained damages as a result of the

21  Automakers' unlawful acts and are, therefore, entitled to damages and other relief

22  as provided under the CUTPA.

23      380.   Plaintiffs also seek court costs and attorneys' fees as a result of the

24  Automakers' violation of the CUTPA as provided in Conn. Gen. Stat. Ann. § 42-

25  110g(d). Upon filing, a copy of this Complaint will be mailed to the Attorney

26  General and the Commissioner of Consumer Protection of the State of Connecticut

27  in accordance with Conn. Gen. Stat. Ann. § 42-110g(c).

28

## FOURTEENTH CAUSE OF ACTION

### Breach of the Implied Warranty of Merchantability
(Conn. Gen. Stat. Ann. § 42A-2-314)

381.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

382.   Plaintiffs bring this Count on behalf of the Connecticut Class.

383.   The Automakers are and were at all relevant times merchants with respect to motor vehicles under Conn. Gen. Stat. Ann. § 42a-2-104(1).

384.   A warranty that the Affected Vehicles were in merchantable condition was implied by law in the instant transactions, pursuant to Conn. Gen. Stat. Ann. § 42a-2-314. These vehicles and the Keyless Fobs in the Affected Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which they are used. Specifically, the Affected Vehicles are inherently defective in that there are defects in the Keyless Fobs which cause the Defect.

385.   The Automakers were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class.

386.   As a direct and proximate result of the Automakers' breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

## FIFTEENTH CAUSE OF ACTION

### Fraudulent Concealment
(Based on Connecticut Law)

387.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

388.   Plaintiffs bring this Count on behalf of the Connecticut Class.

389.   The Automakers intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiffs and the other Class members information that is highly relevant to their purchasing decision.

390.   The Automakers further affirmatively misrepresented to Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Affected Vehicles they were selling were new, had no significant defects, and would perform and operate properly when driven in normal usage.

391.   The Automakers knew these representations were false when made.

392.   The Affected Vehicles purchased or leased by Plaintiffs and the other Class members were, in fact, defective, unsafe, and unreliable because the Affected Vehicles contained faulty and defective Keyless Fobs, as alleged herein.

393.   The Automakers had a duty to disclose that these Affected Vehicles were defective, unsafe, and unreliable in that the Keyless Fobs caused the Defect, because Plaintiff and the other Class members relied on the Automakers' material representations that the Affected Vehicles they were purchasing were safe and free from defects.

394.   The aforementioned concealment was material because if it had been disclosed, Plaintiffs and the other Class members would not have bought or leased the Affected Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

395.   The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle. The Automakers knew or recklessly disregarded that their representations were false because they knew that people had experienced the

1  Defect. The Automakers intentionally made the false statements in order to sell

2  Affected Vehicles.

3      396.   Plaintiffs and the other Class members relied on the Automakers'

4  reputation – along with the Automakers' failure to disclose the faulty and defective

5  nature of the Keyless Fobs and the Automakers' affirmative assurance that their

6  Affected Vehicles were safe and reliable, and other similar false statements – in

7  purchasing or leasing the Affected Vehicles.

8      397.   As a result of their reliance, Plaintiffs and the other Class members

9  have been injured in an amount to be proven at trial, including, but not limited to,

10  their lost benefit of the bargain and overpayment at the time of purchase or lease

11  and/or the diminished value of their Affected Vehicles.

12      398.   The Automakers' conduct was knowing, intentional, with malice,

13  demonstrated a complete lack of care, and was in reckless disregard for the rights

14  of Plaintiffs and the other Class members. Plaintiffs and the other Class members

15  are therefore entitled to an award of punitive damages.

16  **F.**     **Claims Brought on Behalf of the Florida Class**

17                    **SIXTEENTH CAUSE OF ACTION**

18      **Violations of the Florida Deceptive & Unfair Trade Practices Act**
                    **(Fla. Stat. §§ 501.201, _et seq._)**

19      399.   Plaintiffs incorporate by reference all preceding allegations as though

20  fully set forth herein.

21      400.   Plaintiffs bring this Count on behalf of the Florida Class.

22      401.   Florida's Deceptive and Unfair Trade Practices Act prohibits "[u]nfair

23  methods of competition, unconscionable acts or practices, and unfair or deceptive

24  acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

25      402.   In the course of the Automakers' business, they willfully failed to

26  disclose and actively concealed the dangerous risk of the Keyless Fobs in Affected

27  Vehicles as described above. Accordingly, the Automakers engaged in unfair

28

---

methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices as defined in Fla. Stat. § 501.204(1), including representing that Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Affected Vehicles are of a particular standard and quality when they are not; advertising Affected Vehicles with the intent not to sell them as advertised; and otherwise engaging in conduct likely to deceive.

403. The Automakers' actions as set forth above occurred in the conduct of trade or commerce.

404. The Automakers' conduct proximately caused injuries to Plaintiffs and the other Class members.

405. Plaintiffs and the other Class members were injured as a result of the Automakers' conduct in that Plaintiffs and the other Class members overpaid for their Affected Vehicles and did not receive the benefit of their bargain, and their Affected Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of the Automakers' misrepresentations and omissions.

**SEVENTEENTH CAUSE OF ACTION**

**Breach of Implied Warranty of Merchantability**
**(Fla. Stat. § 672.314)**

406. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

407. Plaintiffs bring this Count on behalf of the Florida Class.

408. The Automakers are and were at all relevant times merchants with respect to motor vehicles.

409. A warranty that the Affected Vehicles were in merchantable condition is implied by law in the instant transactions.

410. These Affected Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which

cars are used. Specifically, the Affected Vehicles are inherently defective in that there are defects in the Affected Vehicles' Keyless Fobs that cause the Defect.

411.   The Automakers were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and other Class members before or within a reasonable amount of time after the Keyless Fob defects became public.

412.   As a direct and proximate result of the Automakers' breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

## EIGHTEENTH CAUSE OF ACTION

### Fraudulent Concealment
### (Based on Florida Law)

413.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

414.   Plaintiffs bring this Count on behalf of the Florida Class.

415.   The Automakers intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiffs and the other Class members information that is highly relevant to their purchasing decision.

416.   The Automakers further affirmatively misrepresented to Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Affected Vehicles they were selling were new, had no significant defects, and would perform and operate properly when driven in normal usage.

417.   The Automakers knew these representations were false when made.

418.   The Affected Vehicles purchased or leased by Plaintiffs and the other Class members were, in fact, defective, unsafe, and unreliable because the Affected Vehicles contained faulty and defective Keyless Fobs, as alleged herein.

419.   The Automakers had a duty to disclose that these Affected Vehicles were defective, unsafe, and unreliable in that the Keyless Fobs caused the Defect, because Plaintiff and the other Class members relied on the Automakers' material representations that the Affected Vehicles they were purchasing were safe and free from defects.

420.   The aforementioned concealment was material because if it had been disclosed, Plaintiffs and the other Class members would not have bought or leased the Affected Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

421.   The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle. The Automakers knew or recklessly disregarded that their representations were false because they knew that people had experienced the Defect. The Automakers intentionally made the false statements in order to sell Affected Vehicles.

422.   Plaintiffs and the other Class members relied on the Automakers' reputation – along with the Automakers' failure to disclose the faulty and defective nature of the Keyless Fobs and the Automakers' affirmative assurance that their Affected Vehicles were safe and reliable, and other similar false statements – in purchasing or leasing the Affected Vehicles.

423.   As a result of their reliance, Plaintiffs and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Affected Vehicles.

424.   The Automakers' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs and the other Class members. Plaintiffs and the other Class members are therefore entitled to an award of punitive damages.

## G.   Claims Brought on Behalf of the Massachusetts Class

### NINETEENTH CAUSE OF ACTION

### Violations of the Massachusetts Consumer Protection Act
### (Mass. Gen. Laws Ch. 93A)

425.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

426.   Plaintiffs bring this Count on behalf of the Massachusetts Class.

427.   The conduct of the Automakers as set forth herein constitutes unfair and deceptive acts or practices in violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws Ch. 93A, including but not limited to the Automakers' design, manufacture, and sale of Affected Vehicles with the defective Keyless Fobs, which the Automakers failed to adequately investigate, disclose, and remedy, and their misrepresentations and omissions regarding the safety, reliability, and functionality of their Affected Vehicles, which misrepresentations and omissions possessed the tendency to deceive.

428.   The Automakers engage in the conduct of trade or commerce and the misconduct alleged herein occurred in trade or commerce.

429.   Plaintiffs, individually and on behalf of the other Class members, have made a demand on the Automakers pursuant to Mass. Gen. Laws Ch. 93A, § 9(3). The letter asserted that rights of consumers as claimants had been violated, described the unfair and deceptive acts committed by the Automakers, and specified the injuries the Plaintiffs and the other Class members have suffered and the relief they seek.

430.   Therefore, Plaintiffs seek monetary and equitable relief under the Massachusetts Consumer Protection Act as a result of the Automakers' unfair and deceptive acts and practices.

## TWENTIETH CAUSE OF ACTION

### Breach of Implied Warranty of Merchantability
### (Mass. Gen. Laws Ch. 106, § 2-314)

431.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

432.   Plaintiffs bring this Count on behalf of the Massachusetts Class.

433.   The Automakers are and were at all relevant times merchants with respect to motor vehicles.

434.   A warranty that the Affected Vehicles were in merchantable condition is implied by law in the instant transactions.

435.   These Affected Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Affected Vehicles are inherently defective in that there are defects in the Affected Vehicles' Keyless Fobs that cause the Defect.

436.   The Automakers were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class.

437.   As a direct and proximate result of the Automakers' breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

## TWENTY-FIRST CAUSE OF ACTION

### Fraudulent Concealment
### (Based on Massachusetts Law)

438.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

---

439.   Plaintiffs bring this Count on behalf of the Massachusetts Class.

440.   The Automakers intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiffs and the other Class members information that is highly relevant to their purchasing decision.

441.   The Automakers further affirmatively misrepresented to Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Affected Vehicles they were selling were new, had no significant defects, and would perform and operate properly when driven in normal usage.

442.   The Automakers knew these representations were false when made.

443.   The Affected Vehicles purchased or leased by Plaintiffs and the other Class members were, in fact, defective, unsafe, and unreliable because the Affected Vehicles contained faulty and defective Keyless Fobs, as alleged herein.

444.   The Automakers had a duty to disclose that these Affected Vehicles were defective, unsafe, and unreliable in that the Keyless Fobs caused the Defect, because Plaintiff and the other Class members relied on the Automakers' material representations that the Affected Vehicles they were purchasing were safe and free from defects.

445.   The aforementioned concealment was material because if it had been disclosed, Plaintiffs and the other Class members would not have bought or leased the Affected Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

446.   The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle. The Automakers knew or recklessly disregarded that their representations were false because they knew that people had experienced the

Defect. The Automakers intentionally made the false statements in order to sell Affected Vehicles.

447.   Plaintiffs and the other Class members relied on the Automakers' reputation – along with the Automakers' failure to disclose the faulty and defective nature of the Keyless Fobs and the Automakers' affirmative assurance that their Affected Vehicles were safe and reliable, and other similar false statements – in purchasing or leasing the Affected Vehicles.

448.   As a result of their reliance, Plaintiffs and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Affected Vehicles.

449.   The Automakers' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs and the other Class members. Plaintiffs and the other Class members are therefore entitled to an award of punitive damages.

## H.   Claims Brought on Behalf of the New Jersey Class

### TWENTY-SECOND CAUSE OF ACTION

**Violations of the New Jersey Consumer Fraud Act**
**(N.J. Stat. Ann. §§ 56:8-1, *et seq.*)**

450.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

451.   Plaintiffs bring this Count on behalf of the New Jersey Class.

452.   The New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1, *et seq.* ("NJ CFA"), prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce.

453.   In the course of the Automakers' business, they willfully failed to disclose and actively concealed the dangerous risk of the Keyless Fobs in Affected Vehicles as described above. Accordingly, the Automakers engaged in unfair and

deceptive trade practices, including representing that Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Affected Vehicles are of a particular standard and quality when they are not; advertising Affected Vehicles with the intent not to sell them as advertised; and otherwise engaging in conduct likely to deceive. Further, the Automakers' acts and practices described herein offend established public policy because the harm they cause to consumers, motorists, and pedestrians outweighs any benefit associated with such practices, and because the Automakers' fraudulently concealed the defective nature of the Affected Vehicles from consumers.

454.   The Automakers' actions as set forth above occurred in the conduct of trade or commerce.

455.   The Automakers' conduct proximately caused injuries to Plaintiffs and the other Class members.

456.   Plaintiffs and the other Class members were injured as a result of the Automakers' conduct in that Plaintiffs and the other Class members overpaid for their Affected Vehicles and did not receive the benefit of their bargain, and their Affected Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of the Automakers' misrepresentations and omissions.

457.   Pursuant to N.J. Stat. Ann. § 56:8-20, Plaintiffs will serve the New Jersey Attorney General with a copy of this Complaint upon filing the same.

## TWENTY-THIRD CAUSE OF ACTION

### Breach of Implied Warranty of Merchantability
### (N.J. Stat. Ann. § 12A:2-314)

458.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

459.   Plaintiffs bring this Count on behalf of the New Jersey Class.

460.   The Automakers are and were at all relevant times merchants with respect to motor vehicles.

461.   A warranty that the Affected Vehicles were in merchantable condition is implied by law in the instant transactions.

462.   These vehicles and the Keyless Fobs in the Affected Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which they are used. Specifically, the Affected Vehicles are inherently defective in that there are defects in the Keyless Fobs which cause the Defect.

463.   The Automakers were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class.

464.   As a direct and proximate result of the Automakers' breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

### TWENTY-FOURTH CAUSE OF ACTION

**Fraudulent Concealment**
**(Based on New Jersey Law)**

465.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

466.   Plaintiffs bring this Count on behalf of the New Jersey Class.

467.   The Automakers intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiffs and the other Class members information that is highly relevant to their purchasing decision.

468.   The Automakers further affirmatively misrepresented to Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Affected Vehicles they were selling were new, had no significant defects, and would perform and operate properly when driven in normal usage.

469.   The Automakers knew these representations were false when made.

470.   The Affected Vehicles purchased or leased by Plaintiffs and the other Class members were, in fact, defective, unsafe, and unreliable because the Affected Vehicles contained faulty and defective Keyless Fobs, as alleged herein.

471.   The Automakers had a duty to disclose that these Affected Vehicles were defective, unsafe, and unreliable in that the Keyless Fobs caused the Defect, because Plaintiff and the other Class members relied on the Automakers' material representations that the Affected Vehicles they were purchasing were safe and free from defects.

472.   The aforementioned concealment was material because if it had been disclosed, Plaintiffs and the other Class members would not have bought or leased the Affected Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

473.   The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle. The Automakers knew or recklessly disregarded that their representations were false because they knew that people had experienced the Defect. The Automakers intentionally made the false statements in order to sell Affected Vehicles.

474.   Plaintiffs and the other Class members relied on the Automakers' reputation – along with the Automakers' failure to disclose the faulty and defective nature of the Keyless Fobs and the Automakers' affirmative assurance that their Affected Vehicles were safe and reliable, and other similar false statements – in purchasing or leasing the Affected Vehicles.

475.   As a result of their reliance, Plaintiffs and the other Class members have been injured in an amount to be proven at trial, including, but not limited to,

their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Affected Vehicles.

476.   The Automakers' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs and the other Class members. Plaintiffs and the other Class members are therefore entitled to an award of punitive damages.

## I.   Claims Brought on Behalf of the New York Class

### TWENTY-FIFTH CAUSE OF ACTION

#### Violations of New York General Business Law § 349
#### (N.Y. Gen. Bus. Law § 349)

477.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

478.   Plaintiffs bring this Count on behalf of the New York Class.

479.   New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."

480.   In the course of the Automakers' business, they willfully failed to disclose and actively concealed the dangerous risk of the Keyless Fobs in Affected Vehicles as described above. Accordingly, the Automakers engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices as defined in N.Y. Gen. Bus. Law § 349, including representing that Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Affected Vehicles are of a particular standard and quality when they are not; advertising Affected Vehicles with the intent not to sell them as advertised; and otherwise engaging in conduct likely to deceive.

481.   The Automakers' actions as set forth above occurred in the conduct of trade or commerce.

482.   Because the Automakers' deception takes place in the context of automobile safety, the deception affects the public interest. Further, the

1  Automakers' unlawful conduct constitutes unfair acts or practices that have the

2  capacity to deceive consumers, and that have a broad impact on consumers at

3  large.

4      483.   The Automakers' conduct proximately caused injuries to Plaintiffs

5  and the other Class members.

6      484.   Plaintiffs and the other Class members were injured as a result of the

7  Automakers' conduct in that Plaintiffs and the other Class members overpaid for

8  their Affected Vehicles and did not receive the benefit of their bargain, and their

9  Affected Vehicles have suffered a diminution in value. These injuries are the direct

10  and natural consequence of the Automakers' misrepresentations and omissions.

## TWENTY-SIXTH CAUSE OF ACTION

### Violations of New York General Business Law § 350
### (N.Y. Gen. Bus. Law § 350)

13      485.   Plaintiffs incorporate by reference all preceding allegations as though

14  fully set forth herein.

15      486.   Plaintiffs bring this Count on behalf of the New York Class.

16      487.   New York's General Business Law § 350 makes unlawful "[f]alse

17  advertising in the conduct of any business, trade or commerce[.]" False advertising

18  includes "advertising, including labeling, of a commodity … if such advertising is

19  misleading in a material respect," taking into account "the extent to which the

20  advertising fails to reveal facts material in the light of … representations [made]

21  with respect to the commodity…." N.Y. Gen. Bus. Law § 350-a.

22      488.   The Automakers caused to be made or disseminated through New

23  York, through advertising, marketing, and other publications, statements that were

24  untrue or misleading, and which were known, or which by the exercise of

25  reasonable care should have been known to the Automakers, to be untrue and

26  misleading to consumers, including Plaintiffs and the other Class members.

27

28

---

489.   The Automakers have violated N.Y. Gen. Bus. Law § 350 because the misrepresentations and omissions regarding the dangerous risk of the Keyless Fobs in Affected Vehicles as described above were material and likely to deceive a reasonable consumer.

490.   Plaintiffs and the other Class members have suffered injury, including the loss of money or property, as a result of the Automakers' false advertising. In purchasing or leasing their Affected Vehicles, Plaintiffs and the other Class members relied on the misrepresentations and/or omissions of the Automakers with respect to the safety, quality, functionality, and reliability of the Affected Vehicles. The Automakers' representations turned out to be untrue because the Keyless Fobs caused the Defect. Had Plaintiffs and the other Class members known this, they would not have purchased or leased their Affected Vehicles and/or paid as much for them.

491.   Accordingly, Plaintiffs and the other Class members overpaid for their Affected Vehicles and did not receive the benefit of the bargain for their Affected Vehicles, which have also suffered diminution in value.

492.   Plaintiffs, individually and on behalf of the other Class members, request that this Court enter such orders or judgments as may be necessary to enjoin the Automakers from continuing their unfair, unlawful and/or deceptive practices. Plaintiffs and the other Class members are also entitled to recover their actual damages or $500, whichever is greater. Because the Automakers acted willfully or knowingly, Plaintiffs and the other Class members are entitled to recover three times actual damages, up to $10,000.

## TWENTY-SEVENTH CAUSE OF ACTION

### Breach of Implied Warranty of Merchantability
### (N.Y. U.C.C. § 2-314)

493.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

494.   Plaintiffs bring this Count on behalf of the New York Class.

495.   The Automakers are and were at all relevant times merchants with respect to motor vehicles.

496.   A warranty that the Affected Vehicles were in merchantable condition is implied by law in the instant transactions.

497.   These vehicles and the Keyless Fobs in the Affected Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which they are used. Specifically, the Affected Vehicles are inherently defective in that there are defects in the Keyless Fobs which cause the Defect.

498.   The Automakers were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class.

499.   As a direct and proximate result of the Automakers' breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

## TWENTY-EIGHTH CAUSE OF ACTION

### Fraudulent Concealment
### (Based on New York Law)

500.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

501.   Plaintiffs bring this Count on behalf of the New York Class.

502.   The Automakers intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiffs and the other Class members information that is highly relevant to their purchasing decision.

503.   The Automakers further affirmatively misrepresented to Plaintiffs in advertising and other forms of communication, including standard and uniform

material provided with each car, that the Affected Vehicles they were selling were new, had no significant defects, and would perform and operate properly when driven in normal usage.

504.   The Automakers knew these representations were false when made.

505.   The Affected Vehicles purchased or leased by Plaintiffs and the other Class members were, in fact, defective, unsafe, and unreliable because the Affected Vehicles contained faulty and defective Keyless Fobs, as alleged herein.

506.   The Automakers had a duty to disclose that these Affected Vehicles were defective, unsafe, and unreliable in that the Keyless Fobs caused the Defect, because Plaintiff and the other Class members relied on the Automakers' material representations that the Affected Vehicles they were purchasing were safe and free from defects.

507.   The aforementioned concealment was material because if it had been disclosed, Plaintiffs and the other Class members would not have bought or leased the Affected Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

508.   The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle. The Automakers knew or recklessly disregarded that their representations were false because they knew that people had experienced the Defect. The Automakers intentionally made the false statements in order to sell Affected Vehicles.

509.   Plaintiffs and the other Class members relied on the Automakers' reputation – along with the Automakers' failure to disclose the faulty and defective nature of the Keyless Fobs and the Automakers' affirmative assurance that their Affected Vehicles were safe and reliable, and other similar false statements – in purchasing or leasing the Affected Vehicles.

510.   As a result of their reliance, Plaintiffs and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Affected Vehicles.

511.   The Automakers' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs and the other Class members. Plaintiffs and the other Class members are therefore entitled to an award of punitive damages.

**J.    Claims Brought on Behalf of the Pennsylvania Class**

### TWENTY-NINTH CAUSE OF ACTION

**Violations of the Unfair Trade Practices and Consumer Protection Law**
**(Pa. Stat. Ann. §§ 201-1, *et seq.*)**

512.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

513.   Plaintiffs bring this Count on behalf of the Pennsylvania Class.

514.   The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: (i) "[r]epresenting that goods or services have … characteristics, …. [b]enefits or qualities that they do not have;" (ii) "[r]epresenting that goods or services are of a particular standard, quality or grade … if they are of another;" (iii) "[a]dvertising goods or services with intent not to sell them as advertised;" and (iv) "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4).

515.   In the course of the Automakers' business, they willfully failed to disclose and actively concealed the dangerous risk of the Keyless Fobs in Affected Vehicles as described above. Accordingly, the Automakers engaged in unfair and deceptive trade practices, including representing that Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing

that Affected Vehicles are of a particular standard and quality when they are not; advertising Affected Vehicles with the intent not to sell them as advertised; and otherwise engaging in conduct likely to deceive. Further, the Automakers' acts and practices described herein offend established public policy because the harm they cause to consumers, motorists, and pedestrians outweighs any benefit associated with such practices, and because the Automakers' fraudulently concealed the defective nature of the Affected Vehicles from consumers.

516.   The Automakers' actions as set forth above occurred in the conduct of trade or commerce.

517.   The Automakers' conduct proximately caused injuries to Plaintiffs and the other Class members.

518.   Plaintiffs and the other Class members were injured as a result of the Automakers' conduct in that Plaintiffs and the other Class members overpaid for their Affected Vehicles and did not receive the benefit of their bargain, and their Affected Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of the Automakers' misrepresentations and omissions.

## THIRTIETH CAUSE OF ACTION

### Breach of Implied Warranty of Merchantability
#### (13 Pa. Stat. Ann. §2314)

519.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

520.   Plaintiffs bring this Count on behalf of the Pennsylvania Class.

521.   The Automakers are and were at all relevant times merchants with respect to motor vehicles.

522.   A warranty that the Affected Vehicles were in merchantable condition is implied by law in the instant transactions.

523.   These vehicles and the Keyless Fobs in the Affected Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit

---

for the ordinary purpose for which they are used. Specifically, the Affected Vehicles are inherently defective in that there are defects in the Keyless Fobs which cause the Defect.

524.   The Automakers were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class.

525.   As a direct and proximate result of the Automakers' breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

## THIRTY-FIRST CAUSE OF ACTION

### Fraudulent Concealment
### (Based on Pennsylvania Law)

526.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

527.   Plaintiffs bring this Count on behalf of the Pennsylvania Class.

528.   The Automakers intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiffs and the other Class members information that is highly relevant to their purchasing decision.

529.   The Automakers further affirmatively misrepresented to Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Affected Vehicles they were selling were new, had no significant defects, and would perform and operate properly when driven in normal usage.

530.   The Automakers knew these representations were false when made.

531.   The Affected Vehicles purchased or leased by Plaintiffs and the other Class members were, in fact, defective, unsafe, and unreliable because the Affected Vehicles contained faulty and defective Keyless Fobs, as alleged herein.

532.   The Automakers had a duty to disclose that these Affected Vehicles were defective, unsafe, and unreliable in that the Keyless Fobs caused the Defect, because Plaintiff and the other Class members relied on the Automakers' material representations that the Affected Vehicles they were purchasing were safe and free from defects.

533.   The aforementioned concealment was material because if it had been disclosed, Plaintiffs and the other Class members would not have bought or leased the Affected Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

534.   The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle. The Automakers knew or recklessly disregarded that their representations were false because they knew that people had experienced the Defect. The Automakers intentionally made the false statements in order to sell Affected Vehicles.

535.   Plaintiffs and the other Class members relied on the Automakers' reputation – along with the Automakers' failure to disclose the faulty and defective nature of the Keyless Fobs and the Automakers' affirmative assurance that their Affected Vehicles were safe and reliable, and other similar false statements – in purchasing or leasing the Affected Vehicles.

536.   As a result of their reliance, Plaintiffs and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Affected Vehicles.

537.   The Automakers' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights

of Plaintiffs and the other Class members. Plaintiffs and the other Class members are therefore entitled to an award of punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class Members, pray that the Court enter judgment against each of the Automakers, as follows:

a.    An order certifying the proposed Nationwide Class and State Sub-classes, designating Plaintiffs as named representatives of the relevant Class and/or Sub-classes, and designating the undersigned as Class Counsel;

b.    A declaration that the Defect in Affected Vehicles is defective;

c.    A declaration that the Automakers are financially responsible for notifying all Class Members about the defective nature of the Affected Vehicles due to the Defect;

d.    An order enjoining the Automakers from further deceptive distribution, sales, and lease practices with respect to the Affected Vehicles, and to permanently repair the Affected Vehicles so that they no longer possess the Defect;

e.    An award to Plaintiffs and Class Members of compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial (except under their CLRA claim);

f.    A declaration that the Automakers must disgorge, for the benefit of Plaintiffs and Class Members, all or part of the ill-gotten profits they received from the sale or lease of the Affected Vehicles, or make full restitution to Plaintiffs and Class Members;

g.    An award of attorneys' fees and costs, as allowed by law;

h.    An award of attorneys' fees and costs pursuant to Cal. Code Civ. P. § 1021.5;

i.    An award of pre-judgment and post-judgment interest, as provided by law;

1        j.      An injunction under Rule 23(b)(2) barring the Automakers from

2    selling future vehicles with the Defect;

3        k.      An injunction under Rule 23(b)(2) requiring the Automakers to

4    institute Auto-Off in all Affected Vehicles;

5        l.      Leave to amend this Complaint to conform to the evidence produced

6    at trial; and

7        m.      Such other relief as may be appropriate under the circumstances.

8    **DEMAND FOR JURY TRIAL**

9        Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial

10   by jury of any and all issues in this action so triable of right.

11

Dated: August 26, 2015

12                           Respectfully submitted,

13

14                           HAGENS BERMAN SOBOL SHAPIRO LLP

15                           By  */s/ Elaine T. Byszewski*

16                             Elaine T. Byszewski (SBN 222304)
     301 N. Lake Avenue, Suite 203

17   Pasadena, CA  91101
     Telephone:  (213) 330-7150

18   elaine@hbsslaw.com

19   Martis Alex (SBN 77903)
     Daniel R. Leathers (*pro hac vice anticipated*)

20   Brian B. Morrison (*pro hac vice anticipated*)
     LABATON SUCHAROW LLP

21   140 Broadway
     New York, New York 10005

22   Telephone: (212) 907-0700
     Facsimile: (212) 818-0477

23   malex@labaton.com
     dleathers@labaton.com

24   bmorrison@labaton.com

25   Steve W. Berman (*pro hac vice anticipated*)
     HAGENS BERMAN SOBOL SHAPIRO LLP

26   1918 Eighth Avenue, Suite 3300
     Seattle, WA 98101

27   Telephone: 206-623-7292
     Facsimile: 206-623-0594

28   steve@hbsslaw.com

---

<small>CLASS ACTION COMPLAINT</small>                                              135