JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICIA LASSEN, et al., | Case No. CV 15-06491-AB (MRWx) |
| Plaintiffs, | ORDER **GRANTING** MOTION TO DISMISS COMPLAINT  [121] |
| v. | |
| NISSAN NORTH AMERICA, INC., | |
| Defendant. | |
| JASON SHAPIRO, et al., | Case No. CV 15-09200-AB (MRWx) |
| Plaintiffs, | ORDER **GRANTING** MOTION TO DISMISS COMPLAINT  [26] |
| v. | |
| FORD MOTOR COMPANY, | |
| Defendant. | |

1.

| | |
|---|---|
| RICHARD DRAEGER, et al., | Case No. CV 15-09204-AB (MRWx) |
| Plaintiffs, | ORDER **GRANTING** MOTION TO DISMISS COMPLAINT  [29] |
| v. | |
| TOYOTA MOTOR SALES, U.S.A., | |
| Defendant. | |
| BERNICE WIMLEY, et al., | Case No. ED CV 15-02434-AB (MRWx) |
| Plaintiffs, | ORDER **GRANTING** MOTION TO DISMISS COMPLAINT  [28] |
| v. | |
| FCA US LLC, | |
| Defendant. | |
| DANIEL CHESLER, et al., | Case No. SA CV 15-01988-AB (MRWx) |
| Plaintiffs, | ORDER **GRANTING** MOTIONS TO DISMISS COMPLAINT  [31] [33] |
| v. | |
| HYUNDAI MOTORS AMERICA, INC., | |
| Defendant. | |

This Order resolves motions to dismiss in five related consumer fraud class action lawsuits against six Automakers concerning vehicles equipped with keyless fob ignition systems that lack an auto-off feature.  The Plaintiffs assert that their vehicles' lack of an auto-off feature constitutes a design defect that the Automakers had a duty

1   to disclose before sale.  The Plaintiffs claim that by not disclosing before sale that the

2   vehicles lacked auto-off, the Automakers engaged in fraud.  The Automakers move to

3   dismiss on numerous grounds.[1]  The Court heard oral argument on June 27, 2016.  For

4   the following reasons, the motions to dismiss are **GRANTED**.

5   **I.   PROCEDURAL BACKGROUND**

6          All of the Plaintiffs originally filed their claims in August 2015 in a single

7   Complaint against eighteen Automakers and their design entities.  *See Patricia*

8   *Lassen, et al v. Nissan North America, Inc., et al.*, No. 2:15-cv-06491-AB-MRW

9   (C.D. Cal. filed August 26, 2015) (original action).   That Complaint was filed by

10   twenty-seven Plaintiffs, and asserted thirty-one causes of action under the law of nine

11   states.  In November 2015, the Automakers moved to dismiss on the ground of

12   misjoinder and on substantive grounds also raised in the instant motions.

13          In response, the Plaintiffs voluntarily dismissed each defendant Automaker

14   except Nissan, which remained in the original case.  The Plaintiffs then filed eight

15   separate class actions against most of the dismissed Automakers, for a total of nine

16   cases.  Plaintiffs voluntarily dismissed four of the cases, so these five remain.

17          Hereinafter, as necessary, the Court will refer to the cases by their Automaker

18   defendant, e.g., *Nissan*.  Because all of the individual actions are related to the original

19   *Nissan* case, they were all transferred to the same judge.  Each case asserts claims for

20   common law and statutory consumer fraud and unjust enrichment under California

21   law.  In addition, all cases except *Ford*, which involves only California claims*,* also

22   assert some combination of analogous common law and statutory consumer fraud

23   claims, and claims for breach of the implied warranty of merchantability and unjust

24

25   _____

     [1]  The Motions to Dismiss are docketed as follows:

26                   CV 15-06491-AB (MRWx), Dkt. No. 121
                     CV 15-09200-AB (MRWx), Dkt. No. 26

27                   CV 15-09204-AB (MRWx), Dkt. No. 29
                     ED CV 15-02434-AB (MRWx), Dkt. No. 28

28                   SA CV 15-01988-AB (MRWx), Dkt. Nos. 31, 33.

3.

1   enrichment, under Colorado, Florida, Massachusetts, New Jersey, and New York law.[2]
2   The Court also notes that although the docket in each case except *Nissan* reflects that
3   only one Complaint has been filed, those Complaints are actually their Plaintiffs'
4   second efforts to assert their claims because Plaintiffs initially asserted all of their
5   claims against all of the Automakers in the *Nissan* case.

6       The Complaints allege facts and assert theories that are the same in all respects
7   material to the disposition of these motions, and the motions raise similar grounds for
8   dismissal: preemption, primary jurisdiction, lack of standing, and failure to state a
9   claim.  The Court will only reach preemption, primary jurisdiction, and standing, and
10  the analyses apply in the same way to all claims.  Accordingly, for ease of review and
11  to conserve the Court's and the parties' resources, the Court is issuing this single order
12  resolving all six of the motions rather than a separate order for each case.

13  **II. THE COMPLAINTS**

14      As noted, these five cases were initially filed as a single case, and although
15  there are now five different operative Complaints their factual allegations are
16  essentially the same.  The Court will thus refer to all Plaintiffs collectively, and to all
17  of the defendants collectively as the Automakers.   For purposes of summarizing the
18  relevant facts, the Court will refer to the First Amended Complaint ("FAC," Dkt. No.
19  111) in *Nissan*.

20      Plaintiffs own or lease vehicles manufactured by the Automakers that are
21  equipped with an electronic keyless fob system ("keyless fob") to start the ignition.
22  FAC ¶¶ 1, 39.   Keyless fobs allow the driver to start the ignition without using a
23  conventional key.  *Id.* at ¶ 2.  Keyless fobs transmit an electronic signal to a computer
24  system in the vehicle, and when the fob is inside the car, the driver starts the vehicle's
25  engine by pressing a stop/start button on the dashboard.  *Id.* at ¶ 9.  Although the
26  keyless fob must be inside the vehicle for the vehicle to be started, vehicle engines do

27
28  [2]   Two cases, *FCA* and *Hyundai*, also included claims under Connecticut law, but
    those claims were voluntarily dismissed.

1    not automatically turn off when the keyless fob is removed from the vehicle; to turn

2    off the vehicle, the driver must press the start/stop button. *Id.* at ¶¶ 6, 11. Thus, if a

3    driver parks, exits the vehicle, and removes the fob from the vehicle but does not press

4    the start/stop button, the vehicle's engine will continue to run, presumably until its

5    fuel supply is exhausted. *Id.* at ¶¶ 6, 11, 14.

6         Running engines emit carbon monoxide, and the build-up of carbon monoxide

7    in enclosed spaces like garages poses a risk of serious injury from carbon monoxide

8    poisoning. *Id.* at ¶¶ 12, 17. Plaintiffs allege that drivers "fail to appreciate that the

9    Keyless Fob plays no role in turning off a Keyless-Fob-equipped vehicle's engine,"

10   *id.* at ¶ 14, so drivers sometimes inadvertently leave such vehicles running in enclosed

11   spaces. *Id.* at ¶ 27. Plaintiffs thus claim that such vehicles "have a dangerous

12   propensity to cause carbon monoxide poisoning." *Id.* at ¶ 86.

13        At various places, the FAC catalogs a number of incidents of carbon monoxide

14   poisoning – including fourteen deaths – resulting from keyless fob-equipped vehicles

15   left running in enclosed spaces like garages. *See, e.g.*, *id.* at ¶¶ 17-22, 164-166.

16   Plaintiffs contend that vehicles equipped with keyless fobs should be equipped with

17   an auto-off feature ("Auto-Off") by which the vehicles would automatically turn off

18   after a certain amount of time, and that it is a design defect for such vehicles to not

19   have Auto-Off. *See id.* at ¶ 15 ("The lack of an Auto-Off system in the Affected

20   Vehicles (hereinafter, the 'Defect') is dangerous and defective for the reasons

21   described herein.").

22        Six Plaintiffs remain in the *Nissan* action, and their allegations are all similar.

23   Plaintiff Lassen's allegations are representative. She purchased her 2007 Nissan

24   Murano in 2013 from a BMW dealer. *Id.* at ¶ 41. She reviewed the marketing

25   materials on Nissan's website, and none of the pre-sale materials she reviewed

26   disclosed that the vehicle lacked Auto-Off, and that the lack of Auto-Off poses a

27   serious safety risk. *Id.* at ¶¶ 46-48. Lassen "inadvertently left the vehicle running on

28   at least two occasions, once at home and once at work." *Id.* at ¶ 49. She claims that

1   "[if] not for the fact that a neighbor told her that her car continued to run while she

2   was [sic], she would not have noticed." *Id.* Plaintiff claims that she is now concerned

3   about the lack of Auto-Off in the vehicle, that she "would not have leased[3] or would

4   have paid less for the lease had she known of the Defect beforehand," and that she

5   therefore overpaid for the vehicle. *Id.* at ¶¶ 50, 54, 55. All of the Plaintiffs in all of

6   the cases make similar allegations: they reviewed pre-sale marketing materials before

7   purchasing their vehicles, none of those materials disclosed the lack of Auto-Off and

8   the resulting danger, they experienced the vehicle not automatically turning off, they

9   are now concerned about the lack of Auto-Off, and they would not have purchased or

10  leased their vehicles or would have paid less had they known about the lack of Auto-

11  Off, and they were harmed by overpaying.

12        No Plaintiff in these cases suffered any physical injury. Indeed, the classes

13  expressly exclude "individuals who have suffered personal injuries as a result of the

14  facts alleged herein." *Id.* at ¶¶ 221. Rather, Plaintiffs claim their harm consists of

15  three elements: first, each "inadvertently left the [] Vehicles' engines running, and

16  therefore have experienced the Defect first-hand"; second, they overpaid because the

17  price of the defective keyless fobs was included in the vehicles' price; and third, the

18  value of their vehicles is diminished. *Id.* at ¶ 39.

19        Notably, although all of the claims are premised on allegations that the lack of

20  Auto-Off is a design defect, these are not products liability actions.  Rather,

21  Plaintiffs' claims sound in consumer fraud: they claim that the automakers unlawfully

22  failed to disclose the alleged defect – that the vehicles lack Auto-Off – in order to

23  induce them to purchase or lease the vehicles.

24        Plaintiffs seek declaratory and injunctive relief, including a determination that

25  the affected vehicles are defective, an order requiring the Automakers to notify all

26

27  [3] In a prior paragraph, the FAC states that Lassen purchased the vehicle.  However,
    whether she purchased or leased the vehicle is not relevant to the disposition of the
28  motion, so the FAC's inconsistentcy on this point is not material.

6.

1  class members that the affected vehicles are defective, an order requiring them to

2  permanently repair the affected vehicles and to include Auto-Off in all newly-

3  produced affected vehicles, an injunction barring them from "selling future vehicles

4  with the Defect," and an injunction "requiring [them] to institute Auto-Off in all

5  Affected Vehicles." *See Nissan* FAC Prayer for Relief, pp. 107-109.  Plaintiffs also

6  seek compensatory and punitive damages, disgorgement or restitution, and attorneys'

7  fees and costs. *Id.*

8  **III. DISCUSSION**

9      Each case asserts five California causes of action, and, as noted above, all of the

10  actions other than *Ford* assert analogous claims under Colorado, Florida,

11  Massachusetts, New Jersey, and/or New York law.  The Court need only reach the

12  Motions' preemption, primary jurisdiction, and standing arguments, all of which are

13  based on federal law and apply in the same way to all of the claims.[4]  Accordingly, for

14  context the Court will describe the California claims, but need not go into depth about

15  the parallel non-California claims.

16      The five California claims are: (1) violation of California's Consumer Legal

17  Remedies Act ("CLRA") (Cal. Civ. Code § 1750, *et seq.*); (2) violation of California's

18  Unfair Competition Law ("UCL") (Cal. Bus. & Prof. Code § 17200, *et seq.*); (3)

19  violation of Cal. Civil Code § 1710 Deceit and Common Law Fraud; (4)  violation of

20  California's False Advertising Law ("FAL") (Bus. & Prof. Code § 17500 *et seq.*); and

21

22  [4]   That these analyses apply in the same way to all claims is implicit in the parties'
briefing: the Automakers' preemption, primary jurisdiction, and standing arguments

23  do not distinguish among the different claims but treat them collectively, and

24  Plaintiffs' oppositions do the same.  To the extent the parties refer to state law aspects
of the claims, they refer to the California claims as a proxy for all of the claims.  The

25  Court on its own can discern no difference among the various claims that would be

26  material to its disposition of the motions.  Finally, at oral argument, the Court asked
counsel to address whether Plaintiffs' standing for all of their claims turns on whether

27  the complaints allege a cognizable defect, and counsel responded in the affirmative
without distinguishing among the claims. *See* Transcript of 06/27/2016 Hearing

28  ("Tr.," *Nissan* Dkt. No. 129), 43:21-44:8.

1  (5) unjust enrichment.

2      The CLRA prohibits "unfair methods of competition and unfair or deceptive

3  acts or practices undertaken by any person in a transaction intended to result or which

4  results in the sale or lease of goods or services to any consumer."  Cal. Civ. Code §

5  1770(a).  Conduct that is "likely to mislead a reasonable consumer" violates the

6  CLRA.  *Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 680 (2006) (so

7  stating).

8      The UCL prohibits "unfair competition," which includes "any unlawful, unfair

9  or fraudulent business act or practice and unfair, deceptive, untrue or misleading

10  advertising."  Cal. Bus. & Prof. Code § 17200.

11      Under Cal. Civil Code § 1709, "[o]ne who willfully deceives another with

12  intent to induce him to alter his position to his injury or risk, is liable for any damage

13  which he thereby suffers."  And under Cal. Civil Code § 1710(3), "deceit" includes

14  the "suppression of a fact, by one who is bound to disclose it, or who gives

15  information of other facts which are likely to mislead for want of communication of

16  that fact."

17      The FAL, as relevant here, makes it unlawful to make "any statement,

18  concerning [one'a products or services] . . . which is untrue or misleading, and which

19  is known, or which by the exercise of reasonable care should be known, to be untrue

20  or misleading."  Cal . Bus. & Prof. Code § 17500.

21      Finally, Plaintiffs claim the Automakers were unjustly enriched by Plaintiffs'

22  purchase or lease of the defective vehicles.

23      All of Plaintiffs' claims rest on the same set of premises: that vehicles equipped

24  with keyless fob systems that lack Auto-Off are defective, that the Automakers had a

25  duty to disclose this defect prior to sale, that the Automakers failed to disclose the

26  defect in order to induce Plaintiffs to purchase or lease the vehicles, and that Plaintiffs

27  would either not have purchased or leased the vehicles at all or would not have paid as

28  much for them.

1    The Automakers move to dismiss all of the claims on various grounds.  They

2    contend that the Complaints fail at the threshold because Plaintiffs claims – all of

3    which arise under state law – are preempted by federal law; that Plaintiffs' claims are

4    barred by the doctrine of primary jurisdiction; and that Plaintiffs lack standing.  The

5    Automakers also argue that the claims are otherwise ill-pled under Fed. R. Civ. Proc.

6    8 and 9(b), and that Plaintiffs claims for equitable relief are unavailable because they

7    have a remedy at law.  The Court will state the applicable legal standards at is

8    addresses each argument, as necessary.  The Court will first address Plaintiffs'

9    threshold arguments.

10   **A. Plaintiffs' Claims Are Not Preempted by Federal Law**.

11   The Automakers pose several preemption-based arguments, so a brief overview

12   of preemption doctrines is in order.  Under the Supremacy Clause, state law that

13   conflicts with federal law is of no effect and is preempted by the federal law.

14   *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992) (citing Article VI of the

15   U.S. Constitution).  A federal law may expressly or impliedly preempt a state law.

16   *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 95 (1983).  Here, the Automakers argue

17   only that Plaintiffs' claims are impliedly preempted by the National Highway

18   Transportation Safety Act ("Safety Act").[5]

19   There are two types of implied preemption: field preemption and conflict

20   preemption.  Field preemption arises if federal law so thoroughly occupies a

---

[5]  The Safety Act includes an express preemption clause: "(b) Preemption. (1) When a
motor vehicle safety standard is in effect under this chapter, a State . . . may prescribe
or continue in effect a standard applicable to the same aspect of performance of a
motor vehicle or motor vehicle equipment only if the standard is identical to the
standard prescribed under this chapter."  49 U.S.C.A. § 30103(b)(1).  It also includes a
savings clause indicating that state tort law and federal motor vehicle safety standards
can coexist.  *See* 49 U.S.C. § 3010(e) ("Compliance with a motor vehicle safety
standard prescribed under this chapter does not exempt a person from liability at
common law.").  However, no Automaker invokes express preemption – perhaps
because there is no motor vehicle safety standard governing the issues raised herein –
so the Court will not address it.

legislative field " 'as to make reasonable the inference that Congress left no room for the States to supplement it.' " *Fidelity Fed. Sav. & Loan Assn. v. De la Cuesta*, 458 U.S. 141, 153 (1982) (citing *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).   Conflict preemption arises either "where it is impossible [] to comply with both state and federal requirements . . . or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990) (citations omitted).   These varieties of conflict preemption are generally referred to as impossibility and frustration-of-purpose, respectively. *See Geier v. American Honda Motor Co.*, 529 U.S. 861, 874 (2000).

The Supreme Court has cautioned that "courts should not lightly infer preemption." *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 491 (1987).  Instead, "and particularly in those [cases] in which Congress has 'legislated . . . in a field which the States have traditionally occupied,' we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (citing *Rice*, 331 U.S. at 230).  Thus, "[t]here is a presumption against implied preemption of State law in areas traditionally regulated by the states," *Cippolone*, 505 U.S. at 958, but this presumption against preemption "is not triggered when the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108 (2000).

## 1. Plaintiffs' Claims are Not Preempted in Their Entirety by the Safety Act.

Some Automakers contend that all of Plaintiffs' claims are preempted in their entirety by the Safety Act, but it is not clear whether they invoke field preemption or conflict preemption.  If field preemption, there is no basis for finding that federal law has occupied the entire field of vehicle safety regulation such that field preemption applies.  To the contrary, it is clear that "Congress in the Safety Act plainly did not

1    intend to occupy the field of motor vehicle safety."  *Harris v. Great Dane Trailers,*
2    *Inc.*, 234 F.3d 398, 400 (8th Cir. 2000).

3         Nor does conflict preemption apply.  For Plaintiffs' claims to be conflict-
4    preempted, "[t]here must be 'clear evidence' of such a conflict." *Chamberlan v. Ford*
5    *Motor Co.*, 314 F. Supp. 2d 953, 957 (N.D. Cal. 2004) (quoting *Geier*, 529 U.S. at
6    885).  "Speculative or hypothetical conflict is not sufficient: only State law that
7    'actually conflicts' with federal law is preempted." *Id.* (quoting *Cipollone*, 505 U.S.
8    at 516).   The Automakers point out that the National Highway Transport Safety
9    Administration ("NHTSA"), pursuant to its authority under the Safety Act, is
10   considering a proposed rule declining to mandate an auto-off feature and instead
11   mandating an audible alarm should a driver remove the keyless fob from a running
12   vehicle.  *See* Not. Prop. Rulemaking, 76 Fed. Reg. 77184, 77184 (Dec. 12 2011).
13   But, the proposed rule has not been adopted, so it presents no "actual conflict" with
14   state law.  The motions to dismiss Plaintiffs' actions in their entirety on preemption
15   grounds are therefore **DENIED**.

16        **2.   The Recall Remedy Plaintiffs Seek Is Not Preempted by the Safety**
17             **Act.**

18        Some Automakers also argue for a more surgical application of conflict
19   preemption: to Plaintiffs' prayer for injunctive relief in the form of a recall.[6]  In their
20   Complaints, Plaintiffs do not use the term "recall," but they seek orders requiring the
21   Automakers to notify all class members that their vehicles lack Auto-Off and to
22   permanently repair the vehicles.  *See Nissan* FAC Prayer for Relief, pp. 107-109.  For
23   purposes of this motion, the Court deems such relief as equivalent to a recall.

24        Insofar as the Automakers premise their conflict preemption argument on the
25   claim that "the NHTSA has exclusive authority to order a recall of motor vehicles

26

27   _____
     [6]   It is not clear whether this is a Rule 12(f) motion to strike or a Rule 12(b)(6)
28   motion.  The Court will treat this as a motion to dismiss Plaintiff's claims insofar as
     they seek injunctive relief that is tantamount to a recall.

1  under the Safety Act.  49 U.S.C. §§ 30118-30120," *see Ford's* Mot. 21:23-34, that

2  premise is unfounded.  None of the code sections cited indicates that the NHTSA's

3  authority is exclusive; rather, these sections prescribe the steps the Secretary of

4  Transportation – who delegated his authority to the NHTSA – must undertake to

5  effectuate a recall, but none of them says that *only* the Secretary may take such

6  actions.

7        The true thrust of the Automakers' preemption argument appears to be that any

8  recall remedy is preempted because a court-ordered recall would frustrate the

9  objectives of the Safety Act by interfering with the regulatory framework the Act

10 establishes for NHTSA investigations of motor vehicle defects and recalls.  In recent

11 years, several courts have addressed at length and rejected this frustration-of-purpose

12 argument.  *See, e.g., In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales*

13 *Practices, & Products Liab. Litig. (In re Unintended Acceleration)*, 754 F. Supp. 2d

14 1145, 1195-96 (C.D. Cal. 2010), and *Kent v. DaimlerChrysler Corp.*, 200 F. Supp. 2d

15 1208, 1212-13 (N.D. Cal. 2002).  This Court is persuaded by the thoughtful analyses

16 in *In re Unintended Acceleration* and *Kent*, and perceives no material difference

17 between the arguments resolved in those cases and the arguments raised here.  The

18 Court also acknowledges that cases from other circuits have found the recall remedy

19 preempted, *see, e.g., In re Bridgestone/Firestone, Inc. Tires Prod. Liab. Litig. (In re*

20 *Bridgestone)*, 153 F. Supp. 2d. 935, 944-948 (S.D. Ind. 2001), but *In re Unintended*

21 *Acceleration* and *Kent* are more persuasive.

22        The starting point of the analysis is whether the presumption against preemption

23 applies.  In *In re Unintended Acceleration*, the court applied the presumption against

24 preemption because motor vehicle safety is a field traditionally regulated by the states.

25 *See In re Unintended Acceleration*, 754 F. Supp. 2d at 1196-1197.  In *In re*

26 *Bridgestone*, by contrast, the court defined the relevant area of law as motor vehicle

27 recalls, and found that the presumption against preemption did not apply because

28 states have "never assumed a significant role in *recalls* related to vehicle safety."  *See*

*In re Bridgestone*, 153 F. Supp. 2d at 942 (emphasis in original).  But as *In re Unintended Acceleration* observed, a recall is a remedy and not a substantive field of regulation, so a recall cannot be a relevant area of substantive law; rather, motor vehicle safety is the relevant area of substantive law.  *In re Unintended Acceleration*, 754 F. Supp. 2d at 1196.  Because "[m]otor vehicle safety is an area of traditional State police power," *City of Columbus v. Ours Garage and Wrecker Serv.*, 536 U.S. 424, 439 (2002), and "[i]n no field has . . . deference to state regulation been greater than that of highway safety regulation," *Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 443 (1978), the presumption against preemption applies.  It follows that "because a presumption against preemption applies [], [the Automakers bear] the burden of showing that it was Congress' 'clear and manifest' intent to preempt State law." *Chamberlan*, 314 F. Supp. 2d at 962 (quoting *California v. ARC Am. Corp.*, 490 U.S. 93, 101 (1989)).

The Automakers have not demonstrated that Congress had a "clear and manifest" intent to preempt state law recall remedies.  Their arguments turn on the assumption that a recall remedy is so different from other remedies (such as damages) that they should be treated differently.  But it makes little sense to split remedies in an implied preemption analysis because the question is whether the *cause of action* is preempted, not whether a particular remedy is preempted.  "[U]nless there is evidence that Congress meant to 'split' a particular remedy for pre-emption purposes, it is assumed that the full cause of action under state law is available [or pre-empted]." *Int'l Paper*, 479 U.S. at 499 n.19; *see also Kent*, 200 F. Supp. 2d at 1217 ("ordinarily it is assumed that the full cause of action under state law is either available or preempted").  The Safety Act does not reflect any Congressional intent to distinguish among different remedies; to the contrary, if "an injunction requiring a particular repair would 'interfere' with the federal regulatory scheme—so too would a damages award based on the failure to make such a repair."  *Kent*, 200 F. Supp. 2d at 1217.  Thus, the there is no reason to treat a recall remedy different from a damages remedy.

13.

1    Nor have the Automakers shown that a recall would frustrate Congress's
2    purpose in passing the Safety Act.  "The clearest possible expression of legislative
3    purpose is provided in the first section of the Act itself: 'the purpose of this chapter is
4    to reduce traffic accidents and deaths and injuries to persons resulting from traffic
5    accidents.' 15 U.S.C. § 1381."  *Chrysler Corp. v. Tofany*, 419 F.2d 499, 508 (2d Cir.
6    1969).  The Automakers have not shown how a court-ordered recall would frustrate
7    the Safety Act's purpose of reducing traffic accidents and deaths and injuries from
8    traffic accidents, or that the proposed recall would *actually* conflict with federal law,
9    as, indeed, the NHTSA has issued no regulation germane to keyless fobs and Auto-
10   Off.

11   The Automakers also argue that a court-ordered recall would frustrate another
12   Congressional purpose in enacting the NHTSA: uniformity in regulation and
13   administration of recalls.  However, Congress itself indicated " 'that safety shall be
14   the overriding consideration in the issuance of standards under this bill.' [S.Rep. No.
15   1301 at 2714]."  *Tofany*, 419 F.2d at 508.  Unsurprisingly, the weight of authority
16   holds that motor vehicle safety was Congress's paramount concern when it passed the
17   Safety Act, and uniformity was of less importance.  *See, e.g., Chamberlan*, 314 F.
18   Supp. 2d at 963 ("the primary congressional objective behind the MVSA is safety.
19   While legislative history demonstrates a federal interest in uniformity of motor vehicle
20   safety regulation and administration of recalls, uniformity is at best a secondary
21   goal"); *Buzzard v. Roadrunner Trucking*, 966 F.2d 777, 783 (3d Cir. 1992)
22   ("uniformity was merely a secondary concern to Congress when it enacted the Safety
23   Act.  Accordingly, uniformity cannot take precedence over Congress's primary goal
24   of safety, nor can it defeat Congress's intent, as set out in section 1397(k) of the Act to
25   permit state common law to develop more stringent design requirements in the interest
26   of increased safety."); *Tofany*, 419 F.2d at 508 ("Although Chrysler stresses that
27   Congress decreed uniformity, the clear expression of purpose in section 1381 and the
28   other evidence of legislative intent indicate that the reduction of traffic accidents was

14.

1  the overriding concern of Congress." ).  To the extent a court-ordered recall would

2  risk undermining uniformity in regulation, that interest is outweighed by Congress's

3  paramount interest in safety and its corresponding acceptance of continued state

4  involvement in promoting vehicle safety.

5  The Court therefore finds that the Safety Act does not evince a "clear and

6  manifest" Congressional intent to preempt recalls based on state law,[7] so the

7  presumption against preemption applies and the recall remedy is not preempted by the

8  Safety Act.  The motions to dismiss or strike on this ground are therefore **DENIED**.

9  **B.  Plaintiffs' Claims are Not Barred by Primary Jurisdiction.**

10  Some Automakers also contend that all of Plaintiffs' claims, and the recall

11  remedy in particular, are barred by the doctrine of primary jurisdiction.  Under the

12  doctrine of primary jurisdiction, a court may decline to adjudicate "a judicially

13  cognizable claim where 'enforcement of the claim requires the resolution of issues,

14  which, under a regulatory scheme, have been placed within the special competence of

15  an administrative body.' "  *Marsikian v. Mercedes Benz USA, LLC*, 2009 WL

16  8379784, at *9 (C.D. Cal. May 4, 2009) (quoting *United States v. W. Pac. R.R. Co.,*

17  352 U.S. 59, 63-64 (1956)).  But none of Plaintiffs' claims arise under the Safety Act

18  or litigate any regulation or standard that the NHTSA has issued; rather, their claims

19  arise under ordinary state law contract and tort principles.  The Automakers have not

20  shown that any special agency competence is required to adjudicate these claims, so

21  the doctrine of primary jurisdiction does not apply.  These motions are **DENIED**.

22  **C.  Plaintiffs Have Not Alleged Article III Standing or a "Defect".**

23  The Automakers also move to dismiss the actions under Rule 12(b)(1) on the

24  ground that  Plaintiffs lack standing.  A federal court may not adjudicate a case unless

25  the plaintiff has suffered an injury that satisfies the "case or controversy" requirement

26  of Article III of the United States Constitution.  To establish Article III standing, a

27
28  [7]  The Court's ruling that the recall remedy is not preempted does not, of course, mean that it is otherwise an appropriate remedy in this case.

15.

1    plaintiff must have suffered an "injury in fact" that is "distinct and palpable"; the

2    injury must be fairly traceable to the defendant's conduct; and the injury must be

3    redressable by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555,

4    560-61 (1992).  An injury in fact is "an invasion of a legally protected interest which

5    is (a) concrete and particularized, and (b) actual or imminent, not conjectural or

6    hypothetical." *Id.* at 560.

7        The Automakers challenge Plaintiffs' standing on several bases.[8]

8        **1.  Plaintiffs Have Not Alleged an Injury In Fact.**

9        The Automakers argue that the Plaintiffs have not alleged injury in fact because

10   they were not harmed by the alleged defect, and because they received what they paid

11   for.

12       These actions expressly exclude persons who suffered physical injury as a result

13   of inadvertently leaving their vehicles running, so standing must be premised on some

14   other type of harm.  Plaintiffs seem to argue that the following allegations combine to

15   give them standing: they experienced the alleged defect because they experienced

16   their cars not automatically turning off after they inadvertently left them on, *see*

17   *Nissan* FAC at ¶ 39; they are "concerned about the lack of Auto-Off in the vehicle,"

18   *see id.* at ¶ 50; other people have suffered carbon monoxide poisoning, *see id.* at ¶¶

19   17-22; and their injury in fact is that they would not have purchased or leased their

20   vehicles, or would have paid less, had they known they lacked Auto-Off, and their

21   vehicles diminished in value.  *Id.* at ¶¶ 39.

22       **a.  Plaintiffs' Concerns About the Alleged Defect, and Injuries to**

23

24   [8]  Most Automakers asked the Court to take judicial notice of the Owners' Manuals
     for Plaintiffs' vehicles, arguing that they make the very disclosures that Plaintiffs
25   contend they omitted, thereby obviating standing and otherwise undermining
     Plaintiffs' claims.  Plaintiffs respond that the Owners' Manuals are not judicially
26   noticeable and are irrelevant to their claims in any event because the disclosures
     should have been made before the sale and not afterwards through the Owners'
27   Manuals.  The Court need not reach these issues at this juncture because even without
     considering the Owners' Manuals, Plaintiffs lack standing.
28

**Others, Do Not Establish Injury In Fact.**

The first two allegations – that Plaintiffs experienced their cars not automatically turning off and are concerned about the lack of Auto-Off – do not establish standing because they do not constitute any kind of injury.  Merely experiencing a vehicle not automatically turning off, and being concerned about the lack of Auto-Off, are not concrete harms.  Both allegations suggest that Plaintiffs are "concerned" they may be harmed if they inadvertently leave their cars running again, but because Plaintiffs have expressly limited themselves to economic damages, they cannot base standing on their "concern" about future personal injury.  *See Harrison v. Leviton Mfg. Co.*, 2006 WL 2990524, at *7 (N.D. Okla. October 19, 2006) (plaintiffs limiting their claims to economic damages cannot base standing on risk of injury).  In addition, Plaintiffs' concerns about future harm amount to only a speculative risk of injury: the Complaints reveal that out of all the times the Plaintiffs have parked their vehicles, they left them running only a handful of times (usually once or twice), and never suffered physical injury.

Nor do Plaintiffs' allegations that others suffered carbon monoxide poisoning establish standing: that other people were injured does not establish any particularized injury as to *these* Plaintiffs.  *See Taragan v. Nissan N. Am., Inc.*, 2013 WL 3157918, at *4 (N.D. Cal. June 20, 2013) ("Plaintiffs fail to cite any authority for the proposition that the Court may appropriately consider the alleged personal experiences of a non-party" to determine adequacy of pleading).  And, other peoples' physical injuries do not establish Plaintiffs' standing to pursue their claimed economic harms.  Injuries suffered by others *can* help establish a non-injured plaintiffs' claim that the defect diminished the value of his vehicle because widespread reports of the defect could decrease market demand for the vehicle.  *See In re Unintended Acceleration*, 754 F. Supp. 2d at 1162 (finding standing where plaintiffs pled widespread knowledge about defect, market value declined, and plaintiffs sold vehicles at a loss ).  But, the Complaints here lack any allegation that Plaintiffs' vehicles declined in value because

17.

1    they lack Auto-Off.   In fact, Plaintiffs admit that the issues they raise with keyless fob
2    design have not received attention from the national mainstream media.  *See Ford* Mot.
3    Dkt. No. 31, p. 18 fn. 15.  It therefore follows that the diminution in resale value that
4    such attention may cause has not occurred here.[9]  And, the Court can discern no nexus
5    between other peoples' physical injuries and Plaintiffs' claimed economic harm of
6    having paid too much for their vehicles.  In short, Plaintiffs' allegations that other
7    people experienced carbon monoxide poisoning do not establish any injury in fact to
8    support Plaintiffs' claims for economic loss.

9           **b.  Plaintiffs' Claimed Economic Injuries Are Not Injuries In Fact**
10              **Under the Facts Pled.**

11           Plaintiffs argue that their economic injuries establish injury in fact for standing
12    purposes.  It is true that both overpayment and diminution in value are theoretically
13    cognizable injuries-in-fact.  *In re Unintended Acceleration*, 754 F. Supp. 2d at 1162
14    ("In principle, the Court agrees . . . that 'overpayment, loss in value, or loss of
15    usefulness' is sufficient to confer standing.").  But, a plaintiff must still plead facts
16    sufficient to establish these injuries-in-fact.  Plaintiffs have not done so.

17           Although all of Plaintiffs' claims depend on the Automakers selling them a
18    defective product, this is not a products liability action.  Indeed, Plaintiffs cannot
19    pursue products liability claims because they did not experience physical injury to
20    person or property.  *See San Francisco Unified School Dist. v. W.R. Grace & Co.*, 37
21    Cal. App. 4th 1318, 1327 (1995) ("Until physical injury occurs—until damage rises
22    above the level of mere economic loss—a plaintiff cannot state a cause of action for
23    strict liability or negligence.").  Because products liability law does not authorize no-
24    injury actions, Plaintiffs have attempted to ground their claims in consumer fraud and
25    seek contract-oriented economic damages: that the Automakers wrongfully induced

26    _____

27    [9]   At oral argument, Plaintiffs' counsel clarified that Plaintiffs' standing is not based
      on the vehicles' diminution in value, but instead is premised on overpayment for the
28    vehicles.  *See* Tr. 86:25-87:9.

Plaintiffs to purchase their vehicles by concealing a material fact (the alleged defect), and that Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all had they known of the defect.

By this hybrid action, Plaintiffs seek to recover damages for an alleged defect that did not injure them and that would not therefore give rise to a products liability claim. *See Kanter v. Warner–Lambert Co.*, 99 Cal. App. 4th 780, 790 (2002) ("[u]nder the product liability law of California, injury to the plaintiff from a defective product is an essential element of a cause of action," and that "if the damage consists solely of economic losses, recovery on a products liability theory is unavailable."); Restatement (Third) of Torts: Prod. Liab. § 21 (1998) ("Some categories of loss, including those often referred to as 'pure economic loss,' are more appropriately assigned to contract law and the remedies set forth in Articles 2 and 2A of the Uniform Commercial Code" than to products liability law).

A number of courts have rejected for lack of standing or injury similar attempts to recast no-injury products-liability claims (which are not cognizable) as consumer fraud claims for contract-like economic damages (which *may* be cognizable). *See, e.g, Birdsong v. Apple, Inc.*, 590 F.3d 955, 961 (9th Cir. 2009) (claimed economic injury arising out of properly-functioning iPod that posed only risk of harm was not injury in fact because theory of defect was not cognizable and plaintiff otherwise received benefit of bargain); *Whitson v. Bumbo*, 2009 WL 1515597, at *6 (N.D. Cal. Apr. 16, 2009) (no standing where "the instant complaint oscillates between tort and contract law language but fails to allege any actual injury"); *Briehl v. General Motors Corp.*, 172 F.3d 623, 627-628 (8th Cir. 1999) (affirming dismissal of consumer fraud and related claims because plaintiff received benefit of bargain where anti-lock brakes performed effectively but in a counter-intuitive way that could lead to injury, and plaintiff pled only overpayment at purchase and lost resale value); *Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 320-21 (5th Cir. 2002) ("the general [contract] principles [plaintiffs] invoke do not help them. [Plaintiff] paid for an effective pain killer, and

she received just that—the benefit of her bargain. . . The confusion arises from the plaintiffs' attempt to recast their product liability claim in the language of contract law.  The wrongs they allege—failure to warn and sale of a defective product—are products liability claims. [] Yet, the damages they assert—benefit of the bargain, out of pocket expenditures—are contract law damages. The plaintiffs apparently believe that if they keep oscillating between tort and contract law claims, they can obscure the fact that they have asserted no concrete injury.  Such artful pleading, however, is not enough to create an injury in fact."); *In re Bridgestone,* 288 F.3d at 1017 (expressing skepticism that no-injury product liability claims can be cognizable as contract/fraud claims, stating "[n]o injury, no tort, is an ingredient of every state's law. [] Plaintiffs describe the injury as financial rather than physical and seek to move the suit out of the tort domain and into that of contract (the vehicle was not the flawless one described and thus is not merchantable, a warranty theory) and consumer fraud (on the theory that selling products with undisclosed attributes, and thus worth less than represented, is fraudulent).  It is not clear that this maneuver actually moves the locus from tort to contract.").  Plaintiffs' attempt to hybridize legal doctrines here similarly fails because ultimately, under the facts pled, Plaintiffs have not suffered any injury in fact.

Plaintiffs argue that they suffered an injury in fact because they overpaid for their vehicles.  *Birdsong* is instructive as to why overpayment does not establish in this case.  There, the plaintiffs alleged that their iPods were defective because they could be played at volumes that could cause hearing loss, yet "lacked 'noise isolating or cancelling properties,' and [] lack[] any volume meter that will inform users they are listening at dangerous levels." *Birdsong*, 590 F.3d at 958.  The plaintiffs did not claim any actual physical injury to themselves but alleged that the claimed defect made their iPods worth less than what they paid for them.  *Id.* at 951.  As here, the *Birdsong* plaintiffs couched their claims for economic loss in terms of fraud, breach of warranty, the UCL, and similar theories.  Despite plaintiffs' invoking such theories,

the Ninth Circuit recognized that the plaintiffs' claimed economic injuries derived from a fear of future physical harm.  The court therefore analyzed standing by considering whether the feared physical harm was concrete and particularized, and actual and imminent, and relatedly, whether the purported defect underlying the alleged economic loss was actually cognizable as a defect.  The court found that "the alleged loss in value does not constitute a distinct and palpable injury that is actual or imminent because it rests on a hypothetical risk of hearing loss to other consumers who may or may not choose to use their iPods in a risky manner." *Id.* at 961.  The court also found that the plaintiffs pled only "conjectural and hypothetical [] injury as the plaintiffs merely assert that some iPods have the 'capability' of producing unsafe levels of sound and that consumers 'may' listen to their iPods at unsafe levels combined with an 'ability' to listen for long periods of time." *Id.*  Furthermore, as to the claimed defect, the plaintiffs failed to plead that the iPods malfunctioned or "failed to do anything they were designed to do," and instead they "merely suggest[ed] possible changes to the iPod which they believe[d] would make the product safer." *Id.* at 959.  Thus, although plaintiffs' alleged economic harm "centers on their claim that the iPod has a defect (an inherent risk of hearing loss)," they "failed to allege any cognizable defect." *Id.* at 961-962.  Absent a cognizable defect, plaintiffs failed to plead any injury in fact.  The court concluded that the plaintiffs showed none of the three components of standing.[10]

*Taragan v. Nissan* is also instructive.  Like this case, *Taragan* involved vehicles equipped with a keyless fob system.  The plaintiffs claimed the system was defective because it allowed the vehicle to be stopped and the engine turned off without requiring the driver to first put the transmission in park.  As a result, such vehicles

---

[10]   More precisely, the court discussed standing under the UCL standard, but also noted that standing under the UCL is consistent with standing under Article III, such that the plaintiffs would lack Article III standing for the same reasons.  *See Id.* at 960, and fn. 4.

1    posed a greater risk of rollaway incidents than vehicles with conventional keys do.

2    *Taragan*, 2013 WL 3157918 at *3.  Although the complaint did not allege that any of

3    the plaintiffs experienced a rollaway incident, the plaintiff asserted they could amend

4    the complaint to allege that one plaintiff and at least one non-party did.  *Id.* at *4.  The

5    court dismissed all of plaintiffs' consumer fraud and related claims on several

6    grounds.  As relevant here, the " 'risk' that vehicles equipped with the [keyless fob]

7    system will roll away if the operator fails to place the transmission in park after

8    shutting off the engine" did not support a claim because this "claim of defect [was]

9    theoretical" and the plaintiffs did not actually experience a rollaway incident.  *Id.* at

10   *5.  The court also noted that "the alleged rollaway risk is particularly attenuated

11   given that it only manifests, if at all, if the vehicle operator fails to exercise common

12   sense and prudence by placing the transmission in park and applying the parking

13   brake when leaving the vehicle."  *Id.* at fn. 5.

14        Plaintiffs here assert similar claims as those in *Birdsong* and *Taragan*: that their

15   vehicles' keyless fob systems are defective because Plaintiffs can use them in a

16   dangerous way, and they lack a safety feature – Auto-Off – that could mitigate that

17   danger.  However, as in *Birdsong* and *Taragan*, Plaintiffs have pled only a conjectural

18   and hypothetical injury: their vehicles have the *capability* of causing carbon monoxide

19   poisoning, but this risk depends entirely on Plaintiffs' parking their vehicles in an

20   enclosed space and walking away from their vehicles without turning them off.  Any

21   actual injury – carbon monoxide poisoning – that could result is purely theoretical

22   because no Plaintiff actually experienced that injury.  Any injury is also attenuated

23   because that risk of harm manifests not because the vehicles malfunction or fail, but

24   rather because of human error: drivers neglect to press the start/stop button to stop the

25   vehicle's engine.

26        Most problematic, as discussed more fully below, Plaintiffs have not pled a

27   design defect that is actionable in the consumer fraud context, and as counsel

28   admitted, absent a defect, Plaintiffs lack standing.  *See* Tr. 43:21-44:8 (Plaintiffs'

counsel acknowledging that standing for all of their claims turns on whether the
Complaints allege a cognizable defect).  Plaintiffs do not allege that the keyless fob
systems malfunctioned or "failed to do anything they were designed to do," and
instead they "merely suggest[ed] possible changes. . . which they believe[d] would
make the product safer."  *Birdsong,* 590 F.3d at 959.  Insofar as Plaintiffs' claimed
economic damages arising out of the alleged "defect" can be characterized as "benefit
of the bargain" damages, they fail to establish standing because that "alleged injury in
fact is premised on the loss of a 'safety' benefit that was not part of the bargain to
begin with."  *Id.* at 961-62.  Plaintiffs cite no cases in which a product that worked as
intended could support consumer fraud claims for failure to disclose a defect.  Rather,
each consumer fraud case that Plaintiffs rely on involved a product malfunction or
failure.  *See, e.g., In re Unintended Acceleration*, 754 F. Supp. 2d at 1159 (electronic
and/or mechanical issues cause vehicles to have sudden unintended acceleration);
*Kearney v. Hyundai Motor Am.*, 2010 WL 8251077, at *2 (C.D. Cal. Dec. 17, 2010)
(airbags fail to deploy when persons of small-stature adult size are seated in vehicle
despite manufacturer's claim that its system automatically adjusts the power at which
its front seat airbags will deploy based upon occupant weight and height); *Grodzitsky
v. Am. Honda Motor Co.*, 2013 WL 2631326, at *1 (C.D. Cal. June 12, 2013)
(window regulator fails, causing window to fall into open position and rendering it
inoperative, and window may shatter); *Philips v. Ford Motor Co.*, No. 14-CV-02989-
LHK, 2015 WL 4111448, at *1 (N.D. Cal. July 7, 2015) (power steering system fails
and defaults to manual steering, leading to increased risk that driver will lose control
of vehicle); *Asghari v. Volkswagen Grp. of Am., Inc.*, 42 F. Supp. 3d 1306, 1312 (C.D.
Cal. 2013) (engines do not "utilize engine oil properly, and [] improperly burn[] off
and consume[] 'abnormally high amounts of oil'" which can cause engine failure
while the vehicle is in operation);  *In re MyFord Touch Consumer Litig.*, 46 F. Supp.
3d 936, 949 (N.D. Cal. 2014) (vehicle "infotainment system" manifests numerous
malfunctions, including "the entire system freezing up or crashing", blackouts,

nonresponsiveness, the rearview camera locks up, inaccurate directions on the navigation system); *Apodaca v. Whirlpool Corp.*, 2013 WL 6477821, at *3 (C.D. Cal. Nov. 8, 2013) (design defect allows moisture to enter dishwasher control panels, causing it to fail and to short-circuit, resulting in a fire hazard); *Marsikian*, 2009 WL 8379784, at *1 (vehicle's air intake system susceptible to clogging and accumulation of water, resulting in damage to computer and electrical systems, and possible catastrophic engine failure); *Elias v. Hewlett-Packard Co.*, 2014 WL 493034, at *1 (N.D. Cal. Feb. 5, 2014) (computer lacks power sufficient to handle the graphics card that defendant sold with it, causing computer to freeze, restart, or shut down, and ultimately "short out" and melt); *Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1092 (N.D. Cal. 2007) (speedometers malfunction by "sticking, moving in jerky increments and reading incorrect speeds"); *Corson v. Toyota Motor Sales, U.S.A., Inc.*, 2013 WL 10068136, at *1 (C.D. Cal. July 18, 2013) ("design defect in the Electric Power Steering [] causing the vehicles to drift from the center at highway speeds or suddenly veer to one direction").

In summary, Plaintiffs did not purchase their vehicles based on any expectation that they included additional safety features. From a consumer fraud perspective, Plaintiffs were entitled to expect that the suite of features included with their vehicles would function as designed; the Complaints reveal that that is what Plaintiffs received, and that Plaintiffs know how to use the keyless fob systems but inadvertently used them incorrectly on occasion. Plaintiffs make no allegation that the keyless fob systems malfunction or fail. Thus, Plaintiffs' allegations that they overpaid are untenable and cannot establish standing to pursue their consumer fraud claims.

The Court therefore concludes that Plaintiffs' concerns about the alleged defect, other peoples' physical injuries, and Plaintiffs' alleged overpayment do not establish standing, either singly or together, to pursue their consumer fraud claims.

1

**D.  Plaintiffs Have Not Alleged a Design Defect that Could Support Their**

2

   **Consumer Fraud Claims.**

3        As noted above, Plaintiffs' standing and all of their claims rest on the premise

4   that vehicles equipped with keyless fob systems that lack Auto-Off are defective.  The

5   Automakers' duty to disclose the lack of Auto-Off prior to sale, and Plaintiffs'

6   claimed economic harms, all flow from that premise.  None of the states whose law is

7   implicated in these actions appear to impose a general duty to disclose, but rather limit

8   that duty to certain circumstances.  In California, for example, courts have "generally

9   rejected a broad obligation to disclose."  *Wilson v. Hewlett–Packard Co.*, 668 F.3d

10  1136, 1141 (9th Cir. 2012).  However, a party has a duty to disclose "in four

11  circumstances: '(1) when the defendant is in a fiduciary relationship with the plaintiff;

12  (2) when the defendant had exclusive knowledge of material facts not known to the

13  plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff;

14  and (4) when the defendant makes partial representations but also suppresses some

15  material fact.' "  *Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1094 (N.D. Cal.

16  2007) (identifying the "*Judkins* factors," citing *LiMandri v. Judkins*, 52 Cal. App. 4th

17  326, 337 (1997).  Plaintiffs here invoke the latter three circumstances, all of which

18  involve the duty to disclose a *material fact*.[11]  Where a plaintiff's claim is that the

19  material fact that the seller had a duty disclose is a defect, materiality requires that the

20  defect pose a safety concern.  *See Wilson*, 668 F.3d at 1141-1142 (discussing

21  California and federal case law so holding).

22        As suggested in the discussion above about standing, however, it is not clear

23  that the lack of Auto-Off constitutes a design defect in the consumer fraud context.

24  The Plaintiffs' memoranda failed to articulate a plausible legal theory of defect:

25

26  ───────────────
   [11]  Plaintiffs treat the California approach to the duty to disclose as representative of
27  the duty other states impose and do not argue that any other states demand more than
   California does.  The Court therefore assumes that if there is no duty under California
28  law, there is no duty under other state laws implicated in these cases.

Plaintiffs' vehicles did not malfunction or fail, if the vehicles remain running it is due to Plaintiffs' own inadvertence, and Plaintiffs did not discuss any theories, such as those from the products liability context, whereby a properly-functioning product could nevertheless be deemed defectively designed.  At oral argument, the Court asked Plaintiffs' counsel to address this point.  In particular, the Court asked counsel to explain how the keyless fob system – which worked as intended – was defective because it lacked Auto-Off.  The Court also expressed skepticism that the design defect jurisprudence developed in the products liability context is transferable to the doctrinally distinct consumer fraud claims in this case, and asked counsel to respond.

Plaintiffs' counsel argued that the legal standard for determining a design defect in the products liability realm applied.  This standard in California, for example, allows a plaintiff to prove that a product's design is defective under either the "consumer expectations test" or the "risk-benefit test."  *See Lucas v. City of Visalia*, 726 F. Supp. 2d 1149, 1154 (E.D. Cal. 2010) (identifying tests).  Under the consumer expectations test, a "product's design is defective if it has failed to perform as safely as its ordinary consumers would expect when used in an intended or reasonably foreseeable manner," and under the risk benefit test "a product's design is defective if the design embodies 'excessive preventable danger,' that is, the risk of danger inherent in the design outweighs the benefits of such design."  *See id.* (citing *Barker v. Lull Engineering Co.*, 20 Cal. 3d  413, 430 (1978)).   Also, a design must account for misuse: a "manufacturer [must] foresee some degree of misuse and abuse of his product, either by the user or by third parties, and [] take reasonable precautions to minimize the harm that may result from misuse and abuse."  *Wright v. Stang Manufacturing Co.,* 54 Cal. App. 4th 1218, 1235 (1997).

The Restatement is similarly open-ended, defining a product as "defective in design" when "the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor . . . and the omission of the alternative design renders the product not

1   reasonably safe."  Restatement (Third) Torts: Prod. Liab. § 2.

2         Plaintiffs argued that keyless fob systems that lack Auto-Off pose an excessive

3   increased risk of carbon monoxide poisoning because such systems increase the risk

4   that drivers will inadvertently fail to shut off their vehicles, and that therefore such

5   keyless fob system are defectively designed under products liability standards.

6   Indeed, it became apparent at oral argument that Plaintiffs so extensively pled other

7   peoples' injuries in order to establish that the keyless fob systems are defectively

8   designed.  Such allegations may help plead a design defect for purposes of products

9   liability law – indeed, the Court assumes that they do – but these are not products

10  liability cases.  Plaintiffs failed to acknowledge the novelty of their theory – that it is

11  appropriate to rely on products liability standards for a design defect to prove that a

12  properly-functioning product is defective for purposes of establishing a duty to

13  disclose under consumer fraud law – and accordingly failed to justify it.  They argued

14  *for* their theory at length during oral argument, but did not explain *why* their theory

15  was legally sound.  There are several reasons why products liability design defect

16  standards are not readily transferable to consumer fraud claims, especially where the

17  product in issue did not fail or malfunction, but instead functioned as intended.

18      **1.  Products Liability Law and Consumer Fraud Law Serve Different**

19          **Purposes.**

20         Why products liability design defect standards do not readily transfer to the

21  consumer fraud context can be understood by considering the purpose of each body of

22  law.

23         The purpose of products liability law is to encourage manufacturers to optimize

24  the safety of their products.  *See* Restatement (Third) of Torts: Prod. Liab. § 2 cmt. (a)

25  (for design and failure to warn defects, "[t]he emphasis is on creating incentives for

26  manufacturers to achieve optimal levels of safety in designing and marketing

27  products.  Society does not benefit from products that are excessively safe . . . any

28  more than it benefits from products that are too risky.").  This is achieved by

providing consumers a remedy for harm to persons or property caused by unreasonably dangerous products, thereby shifting the risks caused by such dangerous products from consumers to manufacturers. *Greenman v. Yuba Power Prod., Inc.*, 59 Cal.2d 57, 63 (1963) (the purpose of "imposing strict [products] liability on the manufacturer . . . is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves"). Thus, as noted below, products liability law will impose liability even where the defendant did not know the product was defective. However, such liability is limited to personal injury and property damage, *see* Restatement (Third) of Torts: Prod. Liab. § 1 cmt. d, § 21, and excludes mere economic loss, otherwise sellers could be exposed to open-ended tort liability for defects that have nothing to do with safety, a result that would be inconsistent with the safety-optimizing purpose of products liability law.  In light of the purpose of products liability law – incentivizing manufacturers to optimize safety – it makes sense to impose liability when a properly-functioning product is nevertheless defectively designed under open-ended test like the "consumer expectations" or the "risk-benefit" tests, but only for actual harm to persons or property, not for mere economic loss.

By contrast, the purpose of consumer fraud law is to prevent sellers from deceiving consumers about their products and services. *See* Cal. Civ. Code § 1760 (purpose of CLRA is "to protect consumers against unfair and deceptive business practices").  Insofar as consumer fraud law requires sellers to disclose defects that raise safety concerns, that is because safety-related defects are considered sufficiently *material* to trigger a duty to disclose in order to avoid deceiving a consumer, not because consumer fraud law is directly concerned with consumer safety. *See Wilson*, 668 F.3d at 1141-1142 (where plaintiff claims that a seller failed to disclose a material fact that it had the duty to disclose, a defect is not material unless it poses a safety concern).  Consumer safety is therefore incidental to consumer fraud law's paramount

28.

concern of preventing deception.  Thus, where the basis of an alleged consumer fraud claim is that the seller failed to disclose a safety defect, and where gravamen of the defect is that the product does not malfunction but lacks certain additional safety features, the claim starts to become less about deception and more about consumer safety, which is not the immediate concern of consumer fraud law.

### 2.  Products Liability Law Imposes Liability Regardless of a Defendants' Knowledge; Consumer Fraud Requires Knowledge.

Consistent with their different purposes, products liability law and consumer fraud law have different requirements for the seller's knowledge of the alleged defect. This gives the Court great pause about relying on products liability design defect standards to establish a design defect for purposes of consumer fraud claims.

Products liability law will hold all participants in the distribution chain liable for a defect regardless of whether they knew of the defect.  *See* Restatement (Third) of Torts: Prod. Liab. § 1 cmt. (a) ("is no defense that they acted reasonably and did not discover a defect in the product").  Accordingly, whether a product that functions as intended is nevertheless defective under products liability law need not be self-evident but instead is decided retrospectively by a factfinder applying the open-ended, indeterminate, and unpredictable tests mentioned above.  The risk/benefit test, for example, "directs the jury to weigh or balance a number of factors and sets out a list of competing considerations for the jury to evaluate in determining the existence of a design defect." *Anderson v. Owens-Corning Fiberglas Corp.*, 53 Cal.3d 987, 1001 (1991); *see also* Restatement (Third) of Torts: Prod. Liab. § 2 cmt.(b)(c) ("Consumer expectations as to proper product design or warning are typically more difficult to discern than in the case of a manufacturing defect.").  Because products liability law imposes liability regardless of a seller's knowledge of a defect, it is not problematic that its design defect tests establish the "defectiveness" of a properly-working product only in retrospect and only after applying open-ended legal standards.

By contrast, products liability law's retrospective, open-ended tests for "design

29.

defect" do not map to consumer fraud claims, where a defendant's prior knowledge of the defect is an element.  To establish their consumer fraud claims, Plaintiffs must show that the manufacturers *knew* their vehicles were defective before selling them, and concealed or violated a duty to disclose the defect in order to induce Plaintiffs to purchase those vehicles.  *Morgan v. Harmonix Music Sys., Inc.*, 2009 WL 2031765, at *4 (N.D. Cal. July 7, 2009), as amended (July 30, 2009) (citing California cases for proposition that "[a]ccording to all relevant case law, defendants are only under a duty to disclose a *known defect* in a consumer product when there are safety concerns associated with the product's use") (emphasis added).  Thus, knowledge of the defect and its concealment or nondisclosure are elements of Plaintiffs' causes of action and are the foundation of their theories.  Where a product's design causes the product to malfunction or fail, the alleged defectiveness of the design is evident, so a seller who knows a product malfunctions or fails can plausibly be charged with prior knowledge of a design defect.  However, where, as here, the product functions as designed so its alleged "defectiveness" can only be established by the retrospective standards of products liability law, that "defectiveness" cannot also establish a defect for purposes of consumer fraud law, which requires that the seller had prior knowledge of that defect.

In summary, the retrospective design defect standards developed in the products liability context, in which a seller's knowledge of the defect is not relevant to establishing liability, cannot also establish a "known defect" for consumer fraud claims.

### 3. Importing Products Liability Design Defect Standards into Consumer Fraud Law Would Create Undesirable Incentives for Sellers, and Would Undermine Limitations on Products Liability Law.

Finally, allowing sellers to be held liable for consumer fraud based on allegations that a properly-functioning product was defective because there is a safer design would have at least several unfortunate consequences.  First, in order to shield

1    themselves from potential liability, sellers would have to disclose that the product

2    lacked all other safer alternative design features.  This goes far beyond the primary

3    purpose of consumer fraud law, which is to prevent businesses from deceiving

4    consumers, not to protect consumers from dangerous products.  Also, to countenance

5    such claims would obliterate the distinction between consumer fraud claims and

6    failure-to-warn products liability claims, because, in effect, a seller could be held

7    liable for mere economic loss for failure to disclose hazards of a product, even where

8    the failure to disclose resulted in neither physical injury nor property damage – either

9    of which is required to sustain a true products liability action.  *See Kanter*, 99 Cal.

10   App. 4th at 790 ("[u]nder the product liability law of California, injury to the plaintiff

11   from a defective product is an essential element of a cause of action," and "if the

12   damage consists solely of economic losses, recovery on a products liability theory is

13   unavailable.").

14          In summary, the design defect standards developed in the products liability

15   context do not readily map to the consumer fraud context.  Whether a product is

16   defectively designed and therefore triggers a duty to disclose for purposes of

17   consumer fraud actions cannot be coextensive with the retrospective, open-ended

18   design defect tests of products liability law.  This is apparent when the product in

19   issue functions as designed.  While the policy objectives underlying products liability

20   law allow for a properly-functioning product to be deemed defectively designed in

21   retrospect and regardless of the seller's knowledge, the policies animating consumer

22   fraud law do not.  This is borne out, at least implicitly, by the cases: Plaintiffs have

23   not cited a single case allowing a plaintiff to pursue claims that a defendant engaged

24   in fraud by not disclosing that a properly-functioning product lacked a certain safety

25   feature that was not bargained for, the omission of which allegedly rendered the

26   product defectively designed under products liability standards.  Each and every case

27   that Plaintiff relies on involved products that failed or malfunctioned in some way.

28   *See supra,* pp. 23-24.  By contrast, when the product functioned as designed and did

1  not fail, consumer fraud claims were dismissed for lack of standing, for failure to
2  plead a defect, or both. *See Birdsong*, 590 F.3d at 959, 96-962 (plaintiffs failed to
3  plead that the iPods malfunctioned or "failed to do anything they were designed to
4  do," and instead they "merely suggest[ed] possible changes to the iPod which they
5  believe[d] would make the product safer" and they "failed to allege any cognizable
6  defect."); *Taragan*, 2013 WL 3157918 at *5 ("claim of defect [was] theoretical"
7  where allegations were that properly-functioning keyless fob system posed increased
8  rollaway risk, dismissing warranty and fraud claims). Although none of the cases
9  explained why this is so, they do establish a pattern that the reasoning set forth above
10  explains.

11      Ultimately, Plaintiffs have not articulated a precise legal theory of defect that
12  accounts for the fact that the keyless fob systems work as designed, that they do not
13  allege that they expected their vehicles to shut themselves off, that user error is a but-
14  for cause of the risk, that it is common knowledge that vehicles left running in
15  enclosed spaces can cause carbon monoxide poisoning, and that these are consumer
16  fraud cases and not a products liability actions.

17      For the reasons discussed above, the Court concludes that the design defect
18  jurisprudence developed in the products liability context is not transferable to the
19  doctrinally distinct consumer fraud claims in this case. Because all of Plaintiffs'
20  claims – which sound in consumer fraud law – rest on the premise that their vehicles'
21  lack of Auto-Off constitutes a design defect under products liability standards, they
22  have failed to articulate a plausible legal theory of defect applicable to *their* claims.
23  Plaintiffs therefore lack of standing to pursue them.

24      The motions to dismiss for lack of standing are therefore **GRANTED**. Because
25  the foregoing is dispositive of all of Plaintiffs' claims, the Court will not address the
26  Automakers' other arguments.

27
28

32.

**IV. CONCLUSION**

For the foregoing reasons, the Court finds that Plaintiffs lack standing to bring their consumer fraud claims and therefore **GRANTS** all of the Automakers' Motions to Dismiss on that basis.  This is Plaintiffs' second attempt to plead these claims against the Automakers.  At oral argument, Plaintiffs' counsel asked for leave to amend if the Court granted the motions, stating Plaintiffs could plead more facts to establish that the keyless fob systems are defectively designed under products liability standards.  However, the Complaints recite abundant facts in this regard.  The problem is that Plaintiffs' facts showing a design defect in the products liability realm do not also establish a design defect under the consumer fraud theories of liability that they invoke.  Pleading more such facts would not cure the mismatch between Plaintiffs' design defect theories that sound in products liability law and their liability theories that sound in consumer fraud law.  Accordingly, the Court **GRANTS** the Motions to Dismiss **without leave to amend.**  These actions are hereby **DISMISSED.**

Dated:  September 30, 2016

_____

HONORABLE ANDRÉ BIROTTE JR.
UNITED STATES DISTRICT COURT JUDGE